**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

Towaki Komatsu,

                          Plaintiff,

              -vs-

The City of New York, Bill de Blasio, James O'Neill, Howard
Redmond, NYPD Detective Christopher Fowler (badge #:
3185), NYPD Inspector Ritchie Taylor, Marco Carrion, Austin
Finan, Gabrielle Dann-Allel, Jim Doe 7/25/17, NYPD Officer
Harish Mansharamani (badge #: 4425), NYPD Gilot Lemorin,
NYPD 7/25/17 John Doe3 (transit cop on subway platform),
NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Jesse
Sendroff, NYPD Officer Paul Briscoe, Judith Lê, Jonathan
Darche,

                          Defendants.

The defendants listed above who are people are being sued in
their individual and official capacities.

-------------------------------------------------------------------- X

**Complaint:**

**(About 7/25/17 City Hall
subway station claims)**

**JURY DEMAND**

## Table of Contents

I.    Nature of the Action ............................................................................. 5

II.   Continuing Violations that Have Caused the
Statute of Limitations for My Claims to be Equitably Tolled ............... 11

III.  Preliminary Remarks ........................................................................ 16

IV.  Parties ............................................................................................. 18

V.   Jurisdiction and Venue .................................................................... 23

VI.  Legal Standards ............................................................................... 25

VII. Background Facts About Precursors for the 7/25/17 Illegal Acts and Omissions
Against Me and Deliberate Indifference that Enabled that .................. 92

    A.    My claims since 5/19/17 in my HRA lawsuit against members of the NYPD
for Bill de Blasio and other members of the NYPD ....................... 92

    B.    5/19/17 perjury by Defendant Howard Redmond during a deposition about
why he directed members of the NYPD to arrest Kalan Sherrard on 9/17/12 in
front of the Manhattan Family Court ........................................... 93

    C.    5/24/17 Unusual Occurrence Report by New York State court officers
confirming members of the Mayor's staff and NYPD security detail prevented
me from attending the 5/23/17 resource fair ............................... 96

    D.    My 6/14/17 testimony to the New York City Council in New York City Hall
against the NYPD ..................................................................... 98

    E.    6/15/17 whistleblowing by me to news censors partly against members of the
NYPD in response to illegal acts and omissions by them against me in public
places in relation to public meetings ......................................... 98

    F.    Illegal acts on 6/21/17 by members of the NYPD to block members of the
public from communicating information during a town hall meeting ....... 99

    G.    My 6/26/17 conversation with former NYPD Commissioner James O'Neill
that was partly about illegal acts against me by members of Mr. de Blasio's
NYPD security detail ............................................................... 100

    H.    6/28/17 e-mails about me between members of the Mayor's Office, Defendant
Redmond, and Erin Durkin that were precipitated by an inquiry that Ms.

Durkin made about illegal acts that had been committed against me by members of the NYPD since 4/27/17 in public places in relation to public meetings .................................................................................................................... 104

I.  Members of the NYPD illegally prevented me from attending the public town hall meeting in the room in which it was held that members of the public held on 7/12/17 in the Bronx with Bill de Blasio and others after I RSVP-ed for it advance .................................................................................................................... 111

J.  My 7/16/17 conversation with Mr. de Blasio near news censors that was partly about illegal acts against me by members of his NYPD security detail ............... 113

K.  My 7/18/17 conversation with Mr. de Blasio near news censors that was partly about illegal acts against me by members of his NYPD security detail ............... 117

L.  Mr. Redmond's 7/19/17 acts to block labor rights activists from lawfully communicating information during a town hall meeting I attended ..................... 128

M.  7/21/17 equal protection and due process precedent set by Vickie Paladino to be near Mr. de Blasio and news censors in public places in New York City while loudly berating him and not be interfered with by members of the NYPD for doing so ................................................................................................. 130

VIII.  Statement of Facts ................................................................................................... 131

A.  Illegal acts and omissions against me on 7/25/17 inside of the City Hall subway station .......................................................................................................... 131

    1.  Discussion of the relevance of information about the Twitter postings that are shown in the table that spans between pages 157 and 166 ........... 156

    2.  Mr. de Blasio's NYPD security detail having illegally caused the delay of a downtown subway train following Mr. de Blasio's illegal publicity stunt in the City Hall subway station ....................................... 171

B.  Negligence and a probable cover-up by the CCRB and NYPD after 7/25/17 about the illegal acts and omissions that were committed against me on 7/25/17 inside of the City Hall subway station ................................................... 177

    1.  Discussion of remarks by Defendants Redmond and Lê on 8/18/17 during Ms. Lê's interview of Mr. Redmond in response to my complaint to the CCRB about the illegal acts that Mr. Redmond and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station ....................................................................... 180

2.      Discussion of remarks by Defendants Taylor and Lê on 8/29/17 during Ms. Lê's interview of Mr. Taylor in response to my complaint to the CCRB about the illegal acts that Mr. Taylor and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station ........................................................................................189

C.      Additional Facts ..............................................................................................197

IX.     Causes of Action .............................................................................................................205

X.      Jury Demand ...................................................................................................................231

XI.     Prayer for Relief .............................................................................................................231

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege:

## Nature of the Action

1.      Through this complaint, I seek to be granted immediate declaratory, injunctive, equitable, and other relief in response to illegal acts and omissions that have been committed and continue to be committed under the color of law in violation of my constitutional rights and other applicable laws that include New York State's Open Meetings Law. Such acts and omissions have been and continue to be an abuse of process comprised of standardless discretion, viewpoint discrimination, First Amendment retaliation, and selective-enforcement among other things that include a conspiracy to violate my constitutional rights at public forums and whistleblower retaliation.

2.      Unless this Court finally intervenes and does so immediately to grant me declaratory, injunctive, and equitable relief that I seek through this complaint, the following irreparable and manifestly unjust harm will persist and worsen significantly very soon at the expense of the public's interest in ending the NYPD criminal mob's ability to continue to commit crimes with impunity, other government accountability, transparency, and fighting voter suppression, and voter fraud:

        a.      The City of New York will continue to illegally conceal the critically significant video recording that is a public record and was recorded on 7/18/17 during the public resource fair meeting that I conducted with other members of the public, Defendant Bill de Blasio, trashy news censors in journalism, and others in Kew Gardens in Queens as a result of arrangements that the New York City Mayor's office made to have that recorded. I engaged in protected whistleblowing against Defendant Redmond about my 4/27/17 claims in this case and his status

at that time as the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) as I talked with Mr. de Blasio during that public forum that was subject to New York State's Open Meetings Law because of the government officials who attended it, how they interacted with the members of the public who attended it, and the sum and substance of what they discussed with the members of the public with whom they interacted during that meeting. I engaged in further whistleblowing about additional matters while talking with Mr. de Blasio then that was partly about whether he could arrange to have Steven Banks while he was then the New York City Human Resources Administration ("HRA") Commissioner to resolve the litigation that I then had against HRA. I previously had sought to lawfully talk with Mr. de Blasio and Mr. Banks about that specific matter and others during the public town hall and resource fair meetings that they conducted on 4/27/17, 5/23/17, and 6/8/17 while attending them from within the rooms in which they were conducted as they were conducted and talking with them within earshot of journalists, members of the public, and other government officials. However, members of the NYPD and others illegally prevented me from entering those rooms.

b.      I will continue to have my constitutional rights and those pursuant to the MTA's Rules of Conduct flagrantly violated by members of the NYPD's criminal mob in public areas in subway stations and subways in New York City while Mr. de Blasio is also in them.

c.      The NYPD's criminal mob will otherwise continue its longstanding *modus operandi* of operating outside the bounds of applicable law both **a)** while a pandemic, looting, and/or protests are occurring in New York City and not occurring and **b)** while Mr. de Blasio is present and otherwise in public forums in New York City that include, but aren't limited to certain public areas inside of MTA subway stations about which Mr. de Blasio previously stated he doesn't control the MTA, press conferences and publicity stunts that Mr. de Blasio conducts

in public areas, public town hall meetings that Mr. de Blasio conducts, public resource fair meetings that Mr. de Blasio conducts, public hearings that Mr. de Blasio conducts, sidewalks, streets, parks, hallways in courthouses, other areas in courthouses, and hallways in airports.

      d.      Mr. de Blasio will continue his longstanding practice of being a liar and hypocrite while maintaining his tiresome and totally fraudulent claim that he supports civil rights that include the First Amendment on one hand while he illegally and flagrantly engages in and otherwise supports and condones illegal viewpoint discrimination, selective-enforcement, and prior restraints on fundamental First, Fifth Amendment, and Fourteenth Amendment rights of New Yorkers with absolutely no valid justification nor proper due process accorded to New Yorkers prior to the imposition of practices that violate First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment freedoms that include the right to relentlessly and mercilessly criticize Mr. de Blasio at all times that he is in subway stations in New York City in areas where public speaking is permissible according to the MTA's Rules of Conduct and the U.S. Constitution. This refers to the following:

            i.      The fact that Mr. de Blasio illegally condoned the fact that I was illegally prevented by members of the NYPD on 7/25/17 from being able to lawfully exercise my constitutional rights pertaining to lawful assembly, freedom of expression, freedom to receive information, expressive association, liberty, equal protection, and prohibitions against illegal seizures while attempting to stand adjacent to and within an area inside of a subway station located near New York City Hall and Warren Street below Broadway in which Mr. de Blasio illegally conducted a publicity stunt next to a staircase and with a microphone in flagrant violation of the MTA's official rules that are available on the Internet from the MTA's web site at http://web.mta.info/nyct/rules/rules.htm.

e.      It's objectively reasonable to believe that members of the NYPD's criminal mob will continue to criminally assault me in the presence of Mr. de Blasio and other members of the NYPD's mob at public forums that are partly conducted by Mr. de Blasio as neither Mr. de Blasio nor other members of that mob perform their Fourteenth Amendment affirmative legal duty to intervene on my behalf to protect my constitutional rights and such circumstances will prompt me to immediately take matters into my own hands by engaging in legal self-defense to disable everyone who assault me that may prevent them from having the ability to commit further physical abuse.

3.      The violations of my rights to which I just referred violated and otherwise illegally infringed on my legal rights to have lawfully accessed, attended, participated in, and/or remained in the following public forum on 7/25/17:

a.      A public forum that existed to a limited degree on 7/25/17 inside of a subway station that is located below Broadway near City Hall by Warren Street while the Mayor, Defendant Redmond, other government personnel, members of the Mayor's staff, many loathsome whistleblower news censors, and members of the public in journalism were present.

4.      The violations of my rights to which I just referred illegally violated my First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment rights. They violated those rights due to the following facts:

a.      I was illegally prevented by members of the NYPD from lawfully accessing public areas in that subway station on 7/25/17 in the specific area in which Mr. de Blasio was illegally conducting a publicity stunt in flagrant violation of the MTA's Rules of Conduct that apply to him as well.

b.      Members of the Mayor's staff and/or other personnel whose services they retained

illegally setup obstructions in a public area of that subway station on 7/25/17 in violation of the

MTA's Rules of Conduct and New York City Administrative Code §16-122(b). Such

obstructions that existed then in that public area include the following:

      i.    A podium that Mr. de Blasio used.

      ii.    Barricades to illegally segregate members of the public away from Mr. de

Blasio and whistleblower news censors in journalism that gathered in front of him like rats by

garbage cans that have been knocked over.

      iii.    Signs that stood on what appeared to be easels.

      iv.    Tripods for video cameras.

5.    My claims that this complaint concerns relate back to and amplify my existing claims in

this action for reasons that include the following:

    a.    The illegal acts and omissions that were committed against me on 7/25/17

occurred while **a)** Mr. de Blasio was nearby in a subway station on 7/25/17.

    b.    Defendant Redmond was personally involved in committing some of those illegal

acts against me on 7/25/17 in the Mayor's immediate presence while other members of the

NYPD illegally witnessed that and illegally didn't intervene on my behalf against Mr. Redmond

to uphold my constitutional rights.

    c.    The illegal acts and omissions that were committed against me on 7/25/17 were

part of a series of related transactions and continuing violation in terms of behavior by Mr.

Redmond and other members of the NYPD and other government personnel against me that

occurred in public areas such as sidewalks where Mr. de Blasio was and otherwise would soon

be present.

    d.    Defendant Briscoe was recorded on video on 4/27/17 while he was present in the

immediate area outside of the entrance to the school that hosted the Mayor's town hall on that date while I was nearby and being illegally prevented from attending that public forum. Although he had a realistic opportunity and legal duty to have intervened on my behalf on both 4/27/17 at the site of the Mayor's town hall on that date and 7/25/17 inside of the subway station located near City Hall that is below Broadway by Warren Street to end illegal acts that were being committed against me in violation of my First Amendment rights and more by Defendant Redmond and others in his immediate presence, he illegally didn't make an effort to try to intervene on my behalf for that purpose.

      e.     The illegal acts and omissions that were committed against me on 7/25/17 were similar to illegal acts that NYPD Officer Rafael Beato committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall as he illegally coerced me to move from where I lawfully stood on a nearly empty public sidewalk as I lawfully waited to try to talk with Mr. de Blasio as he left the school that hosted his 4/27/17 town hall and crossed that sidewalk.

      f.     Those 7/25/17 illegal acts and omissions against me in a subway station were related to Mr. Beato having criminally assaulted me on 4/27/17 for the purpose I just discussed because of the following reasons:

         i.     Mr. Redmond criminally assaulted me on 7/25/17 in a subway station by illegally seizing me and dragging me from where I had just been lawfully standing and engaging in lawful First Amendment expression to the Mayor's detriment as I stood on a subway platform for the uptown "R" train line and was physically then separated from where Mr. de Blasio stood by a vertical metal partition that stretched from the ground to the ceiling and Defendant Fowler as he stood in front of me and faced me. In short, there was absolutely no valid legal justification for Defendant Redmond's illegal acts against me on 7/25/17 inside of that subway station.

**Continuing Violations that Have Caused the Statute**
**of Limitations for My Claims to be Equitably Tolled**

1.      On 3/21/19, NYPD Officer Ryan Dwyer was a member of the NYPD security detail for

Mr. de Blasio when he illegally tried to prevent me from lawfully boarding an uptown subway

train that Mr. de Blasio and news censors boarded inside of the Brooklyn Bridge subway station

as I recorded a video recording of that at 12:05 pm. That video recording is available at

https://drive.google.com/open?id=1DYMxwLDk57tbtcoI2XRaNp3xzoII8HwS. While doing so,

he illegally initiated physical contact with me that hindsight confirms I should have responded to

by smashing his face with legal self-defense and throwing him on to the subway tracks for proper

social-distancing. He illegally didn't identify himself to me then after I ordered him to do so. In

addition, another male member of the Mr. de Blasio's NYPD security detail who didn't identify

himself to me illegally and deliberately initiated physical contact with me from behind me while

I was walking to a subway platform in that subway station. The video recording that I just

discussed recorded that too. Those clearly were continuing violations against me in a subway

station by members of the NYPD security detail for Mr. de Blasio against me that cause

equitable tolling to apply and toll the statutes of limitations for my claims in this case. Mr.

Dwyer also illegally again initiated physical contact with me on 1/3/20 at City Hall near its

entrance by Broadway while I was there to attend a public hearing inside of City Hall. I recorded

a video recording of that too on 1/3/20 at 11:25 am that is available at

https://drive.google.com/open?id=1iGA7O_tq_SchW1TcI_OnTgcOOOrLc4FL. I responded to

that assault by him by shoving that trash away from me. That prompted him to express

displeasure about that in spite of the fact that I demonstrated restraint instead of having proper

broken the hands of his that he illegally used to commit that assault prior to feeding them to him.

I recorded a video of our interactions then too. What is shown next is are screenshots of that trash **a)** on the left on 3/21/19 right after he assaulted me by pushing me as I lawfully entered the subway train that he illegally tried to prevent me from boarding and **b)** on the right on 1/3/20 after I shoved that trash away right after he illegally assaulted me.

 

2.      What is shown next is a relevant excerpt from an e-mail message that I sent on 5/25/21 at 2:49 pm partly to Andrew Spears of the Law Department in which I briefed him about the fact that members of the NYPD security detail for Mr. de Blasio yet again violated my rights pursuant to the First and Fourteenth Amendment as well as other laws on 5/25/21 in Harlem on a public sidewalk that is a traditional public forum.

**From:** Towaki_Komatsu [mailto:towaki_komatsu@yahoo.com]
**Sent:** Tuesday, May 25, 2021 2:49 PM
**To:** Spears, Andrew (Law)
**Cc:** Faddis, Hannah (Law)
**Subject:** Re: Consenting to further additional relief in an upcoming order to show cause in Komatsu v. City of New York, et al., 18 Civ. 3698 (LGS) (GWG)

Mr. Spears,

NYPD Sergeant Jemaal Gungor and other members of the Mayor's NYPD security detail illegally blocked my ability to freely move about on a public sidewalk near the Mayor as other members of the public nearby weren't interfered at all by him. That occurred near Al Sharpton's offices on 145th Street in Harlem as I made remarks that were critical of the Mayor to express views.

3.      The members of that NYPD security detail who violated my rights in Harlem on 5/25/21 partly consisted of an unknown Black female, NYPD Detective Gilbert Pierre-Louis, and NYPD Sergeant Jemaal Gungor as I recorded a video recording of that. The Black female to whom I just referred was also present on 4/27/17 in Long Island City in Queens near the entrance to a public school as I was being illegally prevented from entering that school partly by Defendant Redmond to lawfully attend a public town hall meeting that members of the public held with Mr. de Blasio and others inside of that school for which I had registered in advance to attend and was issued an admission ticket to attend on 4/27/17 near that entrance. That Black woman was required to have intervened on my behalf on 4/27/17 to attend that town hall and illegally didn't do so. I have video recordings that show her there on 4/27/17 and in Harlem on 5/25/21 at the location to which I referred above. Roberto Perez was also present both **a)** on 4/27/17 near that entrance while I was being illegally barred from that meeting and **b)** on the sidewalk in Harlem on 5/25/21 while members of Mr. de Blasio's NYPD security detail were illegally preventing me from being able to freely move about on it in contrast to other members of the public in that immediate vicinity. Mr. Perez was the Commissioner of the Mayor's CAU's on 5/25/21 after having succeeded Defendant Carrion in that job. Defendant Redmond also was present on

5/25/21 near where I was being illegally prevented from freely moving about on that sidewalk. These facts further establish a continuing violation against me on 5/25/21 in Harlem by members of Mr. de Blasio's NYPD security detail in flagrant violation of my First Amendment assembly and expressive association rights as well as my Fourteenth Amendment equal protection, liberty, and due process rights. Those 5/25/21 continuing violations also warrant equitable tolling of the statutes of limitations that apply to my 7/25/17 claims that this complaint concerns.

4.      One of my additional claims in this case that I will present in a separate and yet related complaint will be about illegal acts and omissions that were committed against me on 8/19/17 by members of the NYPD inside of the Union Square subway station as they illegally stopped me, seized me, and arrested me while I conducted myself in a lawful manner in contrast to those criminals as that occurred after I swiped my Metrocard through a reader at a turnstile that didn't function properly. That malfunction caused me to enter that subway station through an emergency gate before the NYPD criminals who illegally stopped, seized, and arrested me lied by fraudulently claiming that I didn't swipe my Metrocard. A woman who works for the MTA and worked inside of the subway booth confirmed that I swiped my Metrocard through the card reader and that I had a sufficient balance on my Metrocard when I did so to enter that subway station. That illegal stop, seizure, and arrest also is a continuing violation in relation to my claims in this complaint that warrant equitable tolling of the statutory deadlines of my claims in this complaint. When I was illegally stopped, seized, and arrested on 8/19/21, I was on my way to reach a public hearing in Brooklyn to testify against Mr. de Blasio and other members of his administration as well as his administration's business partners. This was something that I also intended to do while attending the 4/27/17 town hall. This fact reinforces my point about a continuing violation that warrants equitable tolling.

5.     Moreover, I previously attempted to pursue my claims in this case to the extent that they concern illegal acts and omissions that were committed against me on 7/25/17 inside of a subway station as I attempted to pursue those claims by preparing and filing a complaint about them in *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.). However, U.S. District Judge Lorna Schofield and U.S. Magistrate Judge Gabriel Gorenstein engaged in criminal obstruction of justice in that case by illegally and pretextually blocking my ability and rights pursuant to the First and Fourteenth Amendment to pursue those claims in that case. They did so as they illegally exalted form over substance by subjecting me to First Amendment retaliation as they rejected my complaint in that case that was about my 7/25/17 claims in this case. They did so in response to the fact that I submitted a complaint in that case that that was solely about my 7/28/17 claims instead of having complied with an illegal, irrational, and discriminatory prior restraint upon my First and Fourteenth Amendment rights that they imposed on me. That restraint required me to have lumped my 7/25/17 claims in this case in a single pleading together with other claims that I was pursuing in that case about other illegal acts and omissions that were committed against me on other dates and locations. If I had lumped all of that information together in a single pleading, then that would have caused that pleading to be extraordinarily voluminous by exceeding 1,000 pages in length. This confirms that that pleading would have been utterly inefficient, unwieldy, unmanageable, and bloated due to the sheer volume of relevant facts and matters of law that I would have needed to include in support of my claims in that pleading. Through his 7/28/20 order (Dkt. 405) in *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.), Judge Gorenstein illegally and pretextually subjected me to First Amendment retaliation by rejecting the complaint that I filed in that case on 7/20/20 that contained my 7/25/17 claims in this case. Through the order that she issued on 8/10/20 (Dkt.

418) in that case, Judge Schofield fraudulently upheld his illegal rejection of that complaint in response to Federal Rule of Civil Procedure ("FRCP") Rule 72 objections that I submitted in response to that. On 1/3/22, U.S. District Judge Edgardo Ramos issued a memo endorsement (Dkt. 289) in _Komatsu v. City of New York_, No. 20-cv-7046(ER)(GWG)(S.D.N.Y.) in which he authorized me to commence a new civil action to pursue claims that would be about illegal acts and omissions that were committed against me inside of subway stations in New York City since 7/25/17 to the extent that my claims in such a new case wouldn't be about City of New York personnel restricting my speech at public meetings that were conducted partly by Mr. de Blasio.

### Preliminary Remarks

1.     Unless otherwise specified in this complaint, all references that exist in it that refer to "the Mayor" and "the Mayor's" refer to Bill de Blasio throughout the period that New York City was plagued by having him as its Mayor. This partly includes the period between 2018 and 2021 during which he certainly was the bastard and illegitimate Mayor of New York City by having stolen the 2017 New York City government elections through violations of the Voting Rights Act. I'm the plaintiff in other ongoing and entirely valid litigation about that.

2.     The following applies throughout this complaint in the interests of brevity:

       a.     Acronyms in the second column of the following table will be used throughout this affidavit instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | 374-page PDF file | The 374-page PDF file that I received from the Mayor's office on 2/15/19 at 4:45 pm in an e-mail message in response to the FOIL demand that I submitted to it on 7/21/17 before it assigned the FOIL identification code of FOIL-2017-002-00687 to that FOIL demand. |
| 2 | CCRB | New York City Civilian Complaint Review Board |
| 3 | City Council | New York City Council |
| 4 | City Hall | New York City Hall |

| 5 | City Hall subway station | The subway station that is located below Broadway near City Hall and Warren Street in Manhattan |
|---|---|---|
| 6 | DOI | New York City Department of Investigations |
| 7 | DSS | The New York City Department of Social Services |
| 8 | FOIL | Freedom of Information Law |
| 9 | HRA | The New York City Human Resources Administration |
| 10 | IAB | The NYPD's Internal Affairs Bureau |
| 11 | Law Department | New York City Law Department |
| 12 | MTA | New York City Metropolitan Transit Authority |
| 13 | The Mayor | Former New York City Mayor Bill de Blasio |
| 14 | Mayor's 4/27/17 town hall | The public town hall that members of the public conducted on 4/27/17 in a collaborative manner with Mr. de Blasio and other government officials in Long Island City in Queens |
| 15 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted on 5/23/17 in a collaborative manner with Mr. de Blasio and other government officials inside of the Bronx Supreme Court |
| 16 | Mayor's 6/8/17 town hall | The public town hall meeting that members of the public conducted on 6/8/17 in a collaborative manner with Mr. de Blasio and other government officials in Rego Park in Queens just 1 day after I presented oral arguments in my HRA lawsuit to a corrupt New York State Supreme Court judge named Nancy Bannon. |
| 17 | Mayor's 6/21/17 town hall | The public town hall meeting that members of the public conducted on 6/21/17 in a collaborative manner with Mr. de Blasio and other government personnel in Chinatown in Manhattan. |
| 18 | Mayor's 7/12/17 town hall | The public town hall meeting that members of the public conducted on 7/12/17 in a collaborative manner with Mr. de Blasio and other government officials at 2160 Morris Avenue in the Bronx. |
| 19 | Mayor's 7/18/17 resource fair | The public resource fair meeting that members of the public conducted on 7/18/17 in a collaborative manner with Mr. de Blasio and other government officials in Kew Gardens in Queens. |
| 20 | Mayor's 7/18/17 resource fair video | The video recording that was recorded of the Mayor's 7/18/17 resource fair as a result of arrangements that the Mayor's office made. |
| 21 | Mayor's 7/19/17 town hall | The public town hall meeting that members of the public conducted on 7/19/17 in a collaborative manner with Mr. de Blasio and other government officials in Astoria in Queens that I attended in the room in which it was conducted. |
| 22 | Mayor's 7/25/17 subway publicity stunt | The press conference that Mr. de Blasio conducted illegally on 7/25/17 inside of the subway station located below Broadway by Warren Street near City Hall. |

| 23 | Mayor's CAU | The New York City Mayor's Community Affairs Unit under Bill de Blasio |
| 24 | Mayor's Office | The New York City Mayor's Office under Bill de Blasio |
| 25 | Mr. Banks | Former DSS Commissioner Steven Banks |
| 26 | My HRA lawsuit | The parallel lawsuit I commenced against HRA in January of 2017 and filed with the New York State Supreme Court in Manhattan that **a)** was assigned the index number of 100054/2017 and **b)** is pending appeal with the New York State Court of Appeals. |
| 27 | NTT | NTT Data, Inc. |
| 28 | OCA | New York State Office of Court Administration |
| 29 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 30 | Second Circuit | U.S. Court of Appeals for the Second Circuit |
| 31 | UCS | New York State Unified Court System |
| 32 | Urban | Urban Pathways, Inc. |

## Parties

1.      I am the Plaintiff in this action, a U.S. Navy veteran, and I reside in the Bronx in new York City.

2.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter.

3.      Bill de Blasio is now and belatedly a former New York City Mayor and at all relevant times herein was New York City's Mayor. He is being sued in his official capacity as such as well as in his individual capacity.

4.      The following were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York:

> James O'Neill, Howard Redmond, NYPD Detective Christopher Fowler (badge #: 3185), NYPD Inspector Ritchie Taylor, NYPD Officer Harish Mansharamani (badge #: 4425), Gilot Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, NYPD Officer Paul Briscoe

5.      At all times relevant herein, Defendant O'Neill was the NYPD's Commissioner.

6.      Defendants O'Neill and Briscoe have retired from the NYPD.

7.     At all times relevant herein, Defendant Redmond helped to direct how the NYPD security detail for Bill de Blasio while Mr. de Blasio was New York City's Mayor operated and held the rank of Deputy Inspector or Inspector in the NYPD.

8.     The following defendants upon information and belief were at all times relevant herein members of the NYPD security detail for New York City Mayor Bill de Blasio while Defendant Redmond helped to direct it:

> Howard Redmond, NYPD Detective Christopher Fowler (badge #: 3185, Gilot Lemorin, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, NYPD Officer Paul Briscoe

9.     Marco Carrion, Austin Finan, Gabrielle Dann-Allel, and Jesse Sendroff were at all times relevant herein officers, employees, and agents of the City of New York:

10.    At all times relevant herein, Marco Carrion worked for the Mayor's CAU as its Commissioner and Austin Finan, Jim Doe 7/25/17, and Gabrielle Dann-Allel worked for the Mayor's office. Mr. Finan then worked for the Mayor's office as a First Deputy Press Secretary for the Mayor.

11.    Jesse Sendroff worked for the New York City Mayor's office at all times relevant herein. He is also a nephew of former U.S. Senator Joseph Liebermann and is or was an attorney. According to information that is shown on his LinkedIn profile that reflects his career and is available on the Internet at https://www.linkedin.com/in/jesse-sendroff-0b01a811, he worked as the "Director of Advance" for the Mayor's office at all times relevant herein.

12.    The following were at all times relevant herein officers, employees, and agents of the CCRB and the City of New York:

> Judith Lê, Jonathan Darche

13.    At all times relevant herein, Judith Lê was an investigator who worked for the CCRB and

Mr. Darche was the Executive Director of the CCRB. Upon information and belief, Mr. Darche was among people who worked for the CCRB who were responsible for making sure that its personnel were properly trained, supervised, and suspended and/or terminated from the CCRB when appropriate. I have talked with him a few times face-to-face. Ms. Lê no longer works for the CCRB. She instead disturbingly transitioned from working for the CCRB as an investigator in 2017 to working for Mr. de Blasio as an attorney that clearly appears to be a huge conflict of interest. This is because complaints that I reported to the CCRB that she was assigned to investigate were partly against Defendant Redmond and other members of Mr. de Blasio's NYPD security detail. This is analogous to decisions by **a)** a bank to hire a bank robber as a security guard for its vault and **b)** a pharmacy to hire a drug addict to inventory its supplies.

14.     The table shown next shows how the faces of defendants Gilot Lemorin, NYPD 7/25/17 Kelly Bryant, and NYPD 7/25/17 John Doe2, and Gabrielle Dann-Allel appear for identification purposes with respect to pseudonyms that I have used to identify them in this complaint, Although NYPD 7/25/17 Kelly Bryant once told me that her name is Kelly Bryant, I have reason to believe that she lied to me about that. Also, though I don't have a photograph nor video recording of what NYPD 7/25/17 John Doe3 looks like, the City of New York does and both it and the New York City Transit Authority have been legally required to preserve video recording evidence that was recorded on 7/25/17 by video security cameras located inside of the subway station located below Broadway by Warren Street as he illegally coerced me to leave that subway station at the direction of an illegal order that Defendant Howard Redmond gave him to coerce me to leave that subway station in violation of my constitutional rights and the MTA's Rules of Conduct.

| # | Defendant with comments | Face |
|---|---|---|
| 1 | NYPD 7/25/17 Kelly Bryant<br><br>The images shown to the right are from a video that I recorded on 7/25/17 at 5:35 pm in the subway station located below Broadway by Warren Street. |  |
| 2 | NYPD 7/25/17 John Doe2<br><br>The first image shown to the right is from a video that I recorded on 7/25/17 at 5:35 pm in the subway station located below Broadway by Warren Street.<br><br>The second image shown to the right is from a photograph or video recording that I took or otherwise recorded during a town hall meeting that Mr. de Blasio conducted on 10/24/18 that I attended. |  |



| | | |
|---|---|---|
| 3 | Jim Doe 7/25/17 | |

15.     At all times relevant herein, the individual defendants named above that this complaint concerns were acting under the color of law in the course and scope of their duties and functions as agents, servants, employees, officers, contractors, and/or consultants of the City of New York and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.

16.     At all times relevant herein, the individual defendants named above that this complaint

concerns engaged in illegal acts and omissions that this pleading concerns as they **a)** intentionally and/or with a deliberate, callous, and wanton indifference to or a reckless disregard for the natural and probable consequences of their acts and **b)** without lawful justification oppressively caused me irreparable harm and damage in violation of my constitutional rights and other applicable laws.

17.     The individual defendants are being sued herein in their individual and official capacities.

18.     At all times relevant herein, the individual defendants were acting under color of law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD and Bill de Blasio at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

19.     The individual defendants' acts hereinafter complained of were carried out intentionally, oppressively, recklessly, and with malice and with egregious, callous, and wanton disregard of plaintiff's rights.

20.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## **Jurisdiction and Venue**

1.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331 and 1343 as well as section 11(b) of the Voting Rights Act that is affirmed by findings on page 11 in *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20-cv-8668 (VM) (S.D.N.Y.

Jan. 12, 2021).

2.      The claims that this complaint concerns raise federal questions under the First, Fourth,

Fifth, and Fourteenth Amendments of the United States Constitution and under the following

federal laws:

>       28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments); 42 U.S.C. §§ 1983, 1985,
>       1986, and 1988; 52 U.S.C. §10307 (Voting Rights Act)

3.      The claims that this complaint concerns also raise questions governed by laws of the

State and City of New York State about which it is appropriate for this Court to exercise

supplemental jurisdiction pursuant to 28 U.S.C. §1367 due to a common nucleus of operative

fact and the interests of judicial economy.

4.      Venue is proper pursuant to 28 U.S.C. §1391(b) because I am a resident of Bronx County

in New York City.

5.      This Court has authority to grant the requested injunctive relief under 28 U.S.C.

§1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and my

request to be granted costs that may potentially include reasonable attorneys' fees pursuant to 42

U.S.C. § 1988 and 28 U.S.C. §1920.

6.      Upon information and belief and consistent with the requirements of New York General

Municipal Law § 50-e, I filed timely Notices of Claim with the New York City Comptroller

within 90 days of the accrual of my claims under New York law for most if not all of my claims

that this complaint concerns. In the event that I may be incorrect about all or some of this, the

City of New York has had sufficient knowledge about my claims in this complaint largely

because I have testified about them in detail in public hearings that have been conducted by the

City Council and Mayor. For this reason, in the event that I may have overlooked my need to file

a notice of claim for claims that I am pursuing in this complaint, equity demands that this Court

grant me leave to do so in a manner that does not delay my ability to pursue those claims in this action.

7.     My claims have not been adjusted by the New York City Comptroller's Office.

## Legal Standards

1.     This pleading is to be treated as part of my consolidated complaint in this action. Prior to commencing this action, I commenced *Komatsu v. City of New York*, No. 20-cv-7046 (ER)(GWG)(S.D.N.Y.). That is a consolidated case that is comprised of multiple individual complaints that I filed in it. Each of those complaints were related to one another and were about illegal acts and omissions that were committed against me by City of New York personnel in relation to public meetings that were public forums that I attempted to lawfully attend. In order to present relevant facts and matters of law in regards to my claims in that consolidated case, I chose to efficiently do so by preparing separate and yet related complaints for that case that I filed in it that were about such illegal acts and omissions that were committed against me as each of those complaints addressed such acts and omissions that were committed against me on different dates that involved different meetings and yet a common set of defendants that was among the things that tied the complaints together to cause them to be interrelated while involving a common nucleus of operative facts. These facts confirm that a legal precedent pertaining to me was set in that case that authorizes me pursuant to my First and Fourteenth Amendment rights to apply that same approach for preparing and filing my complaints in this case that are about illegal acts and omissions that were committed against me as continuing violations that causes equitable tolling to be applicable to statutory deadlines to cause them to be tolled with respect to illegal acts and omissions that were committed against me by City of New York personnel inside of subway stations in New York City since 7/25/17.

2.      What I just discussed about the form in which I will prepare and submit my related

complaints in this case to cause them to be treated collectively as a consolidated operative

complaint is supported by findings in **a)** _R.A.V. v. City of St. Paul,_ 505 U.S. 377, 392, 112 S.Ct.

2538, 120 L.Ed.2d 305 (1992), **b)** _Calvary Chapel Dayton Valley v. Sisolak_, 140 S. Ct. 2603

(U.S. 2020), **c)** _Phillips v. Girdich_, 408 F.3d 124 (2d Cir. 2005), **d)** _Triestman v. Federal Bureau_

_of Prisons_, 470 F.3d 471 (2d Cir. 2006), **e)** _Wynder v. McMahon_, 360 F.3d 73 (2d Cir. 2004), **f)**

_Dresner v. Tallahassee_, 375 U.S. 136, 84 S. Ct. 235, 11 L. Ed. 2d 208 (1963), **f)** _Williams v._

_Metro-North Railroad_, No. 17-cv-3092 (KMK) (S.D.N.Y. Mar. 27, 2020), **g)** _Holland v. Florida_,

130 S. Ct. 2549, 560 U.S. 631, 177 L. Ed. 2d 130 (2010), and **h)** _Goldberg v. Kelly_, 397 U.S.

254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970).

3.      The following relevant facts apply to the preceding court decisions:

a.      _R.A.V. v. City of St. Paul_: This confirms that judges are not to discriminate

between different pro se litigants by allowing some pro se plaintiffs to "to fight freestyle, while

requiring" other pro se plaintiffs "to follow Marquis of Queensberry rules" in regards to how

they may litigate matters.

b.      _Calvary Chapel Dayton Valley v. Sisolak_: The fact that this explicitly states that

"respecting some First Amendment rights is not a shield for violating others" reaffirms what I

just stated.

c.      _Phillips v. Girdich_: This confirms that judges are not to exalt form over substance

while dealing with court filings that are submitted by pro se litigants and that technical

irregularities with such pleadings by pro se litigants that do not cause prejudice are to be ignored.

d.      _Triestman v. Federal Bureau of Prisons_: This confirms that judges are to accord

pro se litigants special solicitude and to liberally construe and interpret a pro se plaintiff's court

filings to raise the strongest arguments that they suggest.

      e.     *Wynder v. McMahon*: This confirms that a "district court may not order, under penalty of dismissal, that" a plaintiff "file a complaint that goes above and beyond what Rule 8 requires". FRCP Rule 8 to which it refers doesn't contain any information that requires complaints to be prepared and filed as single pleadings.

      f.     *Williams v. Metro-North Railroad*: This was a case in which a pro se plaintiff from the Bronx was able to prepare and submit a complaint in his case in the form of multiple pleadings that were accepted and construed as a single complaint by the judge who presided over his case.

      g.     *Dresner v. Tallahassee*: This confirms that government personnel are prohibited from interfering with the right that people have pursuant to the First Amendment to petition for redress when that is "exercised in good faith and in good order".

      h.     *Holland v. Florida*: This confirms that judges are to demonstrate flexibility and avoid "mechanical rules" to "relieve hardships" "arise from a hard and fast adherence" "to more absolute legal rules, which, if strictly applied, threaten the "evils of archaic rigidity"". This further confirms that the ""flexibility" inherent in "equitable procedure" enables courts "to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct... particular injustices.""

      i.     *Goldberg v. Kelly*: This confirms that proper due process requires according litigants their right to be heard at a meaningful time in a meaningful way that is tailored to their circumstances and capacity to be heard.

4.     Also, *Perkins v. Perez*, No. 17-cv-1341 (KMK) (S.D.N.Y. Mar. 18, 2019) and *Trahan v. Lazar*, 457 F. Supp. 3d 323 (S.D.N.Y. 2020) confirm that the length of a complaint by itself isn't

valid grounds to dismiss a complaint. *Trahan v. Lazar* makes this point clear by pointing out that a judge refused to dismiss a complaint that was 368 pages and comprised of 1,249 paragraphs "even where it was "an undue imposition on all who [were] obliged to read it"".

5.    The following excerpt from *Jackson v. New York State*, 381 F. Supp. 2d 80 (N.D.N.Y. 2005) addresses the continuing violation doctrine as it concerns causing equitable tolling to be warranted for statutes of limitations:

> "Under the continuing violation doctrine, if a plaintiff has experienced a "`continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Gomes v. Avco Corp.,* 964 F.2d 1330, 1333 (2d Cir.1992) (quoting *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)). "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to a defendant's discriminatory policy or practice, including those that would otherwise be time barred." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993) (Under the continuing violation exception, a charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Although the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination, and although acts so "isolated in time ... from each other ... [or] from the timely allegations[ ] as to break the asserted continuum of discrimination" will not suffice, *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 766, a continuing violation may be found "where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994)."

6.    The following excerpts from *Yang Zhao v. Keuka College*, 264 F. Supp. 3d 482 (W.D.N.Y. 2017) and apply partly to the fact that Judge Gorenstein and Judge Schofield fraudulently engaged in obstruction of justice in *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) as the pretextually blocked my efforts to pursue my claims in this case within the statute of limitations by fraudulently claiming that I couldn't do so by preparing and

submitting my claims in the form of multiple pleadings to be treated as a consolidated and

operative complaint:

  a. "Equitable tolling applies where (1) the plaintiff actively pursued judicial remedies, but filed a defective filing within the statutory time period, (2) an adversary "induced or tricked" the plaintiff into filing after a deadline passed, (3) **a court misled the plaintiff**, (4) affirmative misconduct by the defendant "lulled [the] plaintiff into inaction," (5) notice to the plaintiff was inadequate, or (6) there is a pending motion to appoint counsel."

  b. "A district court must determine whether the plaintiff acted with reasonable diligence during the tolling period, and whether the plaintiff "has proved that the circumstances are so extraordinary that the doctrine should apply.""

  c. "equitable tolling [of the 300-day statutory deadline] is only appropriate `in rare and exceptional circumstances' ... in which a party is `prevented in some extraordinary way from exercising [her] rights.'"

  (boldface formatting added for emphasis)

7. The following are critically significant excerpts from section 1050.6(c) of the MTA's

Rules of Conduct that are available on the MTA's web site at

http://web.mta.info/nyct/rules/rules.htm and identifies some of the activities that are perfectly

legal to engage in within subway stations in New York City and those that are not legal to do

within them:

  a. **The following nontransit uses are permitted by the Authority, provided they do not impede transit activities and they are conducted in accordance with these rules: public speaking;** campaigning; leafletting or distribution of written noncommercial materials; **activities intended to encourage and facilitate voter registration**

  b. **Permitted nontransit uses may be conducted in the transit system except: (A) when on or within: a subway car; an omnibus;** or, any area not generally open to the public; (B) within a distance of 25 feet of a station booth, or a fare media sales device including but not limited to a fare media vending machine; or, (C) within a distance of 50 feet from the marked entrance to an Authority office or tower.

  c. **The following activities are not subject to the minimum distance requirements as set forth in subparagraphs (B) and (C) of this paragraph:**

**public speaking**; leafletting or distribution of written noncommercial materials; campaigning; **and, activities intended to encourage and facilitate voter registration**, provided, that with respect to any of the activities described in this subparagraph, **no sound production device is used** and no physical obstruction, such as a table or other object, is present within a distance of 25 feet of a station booth or fare media sales device, or 50 feet from the marked entrance to an Authority office or tower.

d.   Notwithstanding any other provision of this section, **any activity in a location which interferes with the access onto or off of an** escalator, **stairway** or elevator, **or otherwise interferes with or impedes transit services or the movement of passengers, is prohibited.**

e.   **No activity permitted by the authorization contained in this section shall be conducted** on a subway platform where construction, renovation or maintenance work is underway on or near the platform, or **on or near the staircases**, escalators, or elevators **leading to such platform** and including any such work in or near track areas.

(boldface formatting added for emphasis)

8.      The following findings from *Young v. New York City Transit Authority*, 903 F.2d 146 (2d Cir. 1990) pertains to claims that this complaint concerns about illegal acts and omissions that were committed against me on 7/25/17 in a subway station near City Hall by defendant Howard Redmond and others in flagrant violation of my First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in the immediate presence of the Mayor, other government personnel, and a large number of utterly useless and loathsome people who work in journalism as whistleblower news censors:

"The amendment permits greater utilization of the transit system for certain non-commercial activities such as: "public speaking; distribution of written materials; solicitation for charitable, religious or political causes; and artistic performances, including the acceptance of donations." § 1050.6(c). Pursuant to the amended regulation, these non-transit uses are subject to certain place restrictions. In particular, solicitation for charitable, religious or political causes is prohibited on subway cars, in areas not generally open to the public, within twenty-five feet of a token booth or fifty feet from the entrance to an authority office or tower, § 1050.6(c)(1), in any "location which interferes with access onto or off an escalator, stairway or elevator," § 1050.6(c)(2), and "on a subway platform while construction, renovation or maintenance work is actively underway on or near the platform ...," § 1050.6(c)(3)."

9.      New York City Administrative Code §16-122(b) states the following and relates to the

fact that Mr. de Blasio illegally used a podium during his 7/25/17 publicity stunt inside of the

subway station that my claims in this case concern:

> "**It shall be unlawful for any person, such person's agent or employee to leave, or to suffer or permit to be left, any** box, barrel, bale of merchandise or other **movable property whether or not owned by such person, upon any** marginal or public street or any **public place**, or to erect or cause to be erected thereon any shed, building or other obstruction."

> (boldface formatting added for emphasis)

10.     By using that podium and using barricades to create a segregated area in which that

publicity stunt was conducted, everyone who was responsible for that illegally prevented me

from being able to peacefully assemble within that same segregated area that the City of New

York does not control due to the simple fact that the MTA controls that instead..

11.     The following is a relevant excerpt from *City of Lakewood v. Plain Dealer Pub. Co.*, 486

U.S. 750 (1988):

> "Preserving public forum space for use by the public generally, as opposed to the exclusive use of one individual or corporation, is obviously one such "lawfully dedicated" use."

12.     The following excerpt from *US v. Turner*, 720 F.3d 411 (2d Cir. 2013) clearly supports

my claims in this case:

> "Political speech, ugly or frightening as it may sometimes be, lies at the heart of our democratic process." *Planned Parenthood II,* 290 F.3d at 1089 (Reinhardt, *J.,* dissenting); *see also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.")"

13.     The following are relevant excerpts from *International Soc. for Krishna Consciousness,*

*Inc. v. Lee*, 505 U.S. 672, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) that support my claims in

this case:

  a.  "The First Amendment inevitably requires people to put up with annoyance and uninvited persuasion. Indeed, in such cases we need to scrutinize restrictions on speech with special care."

  b.  "I do not think the Port Authority's solicitation ban leaves open the "ample" channels of communication required of a valid content-neutral time, place, and manner restriction."

14. *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978) states the following:

  "the Constitution provides the press with no greater right of access to information than that possessed by the public at large"

15. The following excerpt from *Schenck v. Pro-Choice Network of Western NY*, 519 U.S. 357, 117 S. Ct. 855, 137 L. Ed. 2d 1 (1997) clearly supports my claims in this case:

  "We strike down the floating buffer zones around people entering and leaving the clinics because they burden more speech than is necessary to serve the relevant governmental interests. The floating buffer zones prevent defendants— except for two sidewalk counselors, while they are tolerated by the targeted individual—from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks. This is a broad prohibition, both because of the type of speech that is restricted and the nature of the location. Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum. See, *e. g., Boos* v. *Barry,* 485 U. S. 312, 322 (1988); *United States* v. *Grace,* 461 U. S. 171, 180 (1983)."

16. The following excerpt from *Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936 (E.D. Mo. 2014) clearly supports my claims in this case:

  "Plaintiffs are entitled to the entry of a preliminary injunction enjoining defendants from telling citizens that they must keep moving, or from threatening them with arrest if they stand still, so long as those citizens are not committing a crime, engaging in violent acts, or participating in a crowd that contains other people doing those things."

17. The following excerpts from *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir. 1980) support my claims in this case:

a.    "The right to a public forum for the discussion and interplay of ideas is one of the foundations of our democracy. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)."

b.    "since the effectiveness of any demonstration depends on its proximity to the target and the relevant audience, it is unlawful to exile demonstrators to an irrelevant milieu. *Wolin v. Port Authority of New York, supra*, 392 F.2d at 90. The purposes of a peaceful and orderly rally or demonstration are to try to impress the target — in this case the Soviet occupants of the Mission — and to publicize the cause to others. Neither objective is served by a demonstration elsewhere, around the corner or at the other end of the block on the other side of the street (where the sidewalk is substantially the same width, 16 feet 4 inches as compared with 15 feet 4 inches). If persons may be permitted to demonstrate in front of a school, *Grayned v. City of Rockford, supra*, in a library, *Brown v. Louisiana, supra*, or at the White House and its executive offices, *A Quaker Action Group v. Morton*, 516 F.2d 717 (D.C. Cir. 1975), surely a right to demonstrate in front of a foreign mission should not be denied out of hand. *See Greenberg v. Murphy*, 329 F.Supp. 37 (S.D.N.Y.1971) (permitting picketing at side entrance of United States Mission to UN and presentation of petitions at front entrance)."

18.    The following excerpt supports my claims in this case *Meyers v. City of New York*, No. 1: 14-cv-09142 (ALC) (S.D.N.Y. Mar. 28, 2019) largely because **a)** Mr. de Blasio's illegal publicity stunt on 7/25/17 inside of the City Hall subway station precipitated my decision to enter that train station and conduct myself in the manner that I did so then to lawfully compete against him with protected First Amendment expression to get my points across to others and **b)** the NYPD was proximately responsible for causing disorder in that subway station then by illegally allowing Mr. de Blasio to conduct his illegal publicity stunt in that train station:

> "Under N.Y. Penal Law § 240.20(6), an officer's dispersal order is unlawful if it "was purely arbitrary and not calculated in any way to promote the public order." *Crenshaw v. City of Mount Vernon,* 372 F. App'x 202, 206 (2d Cir. 2010); *Kass,* 864 F.3d at 212 (accord)."

19.    *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) states the following:

> "The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

20.     _Glus v. Brooklyn Eastern Dist. Terminal_, 359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770

(1959) states the following:

>       "no man may take advantage of his own wrong"

21.     _Alabama Association of Realtors v. Department of Health and Human Services_, 594 S.

Ct. (U.S., August 26, 2021) states the following:

>       "But our system does not permit agencies to act unlawfully even in pursuit of desirable
>       ends. Cf. _Youngstown Sheet & Tube Co._ v. _Sawyer_, 343 U. S. 579, 582, 585–586 (1952)"

22.     _Agudath Israel of America v. Cuomo_, 983 F.3d 620 (2d Cir. 2020) states that no "public

interest is served by maintaining an unconstitutional policy when constitutional alternatives are

available to achieve the same goal."

23.     The following is a relevant excerpt from _Citizens United v. Schneiderman_, 203 F. Supp.

3d 397 (S.D.N.Y. 2016):

>       "A prior restraint on speech violates the First Amendment if it places "unbridled
>       discretion in the hands of a government official or agency." _City of Lakewood v. Plain
>       Dealer Pub. Co._, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)."

24.     The following is a relevant excerpt from _Healy v. James_, 445 F.2d 1122 (2d Cir. 1971):

>       "In order to withstand constitutional attack, prior restraints must be narrowly drawn
>       so as to suppress speech or assembly which presents a "clear and present danger" of a
>       substantial evil."

25.     In _Whitney v. California_, 274 U.S. 357, 47 S. Ct. 641, 71 L. Ed. 1095 (1927), U.S.

Supreme Court Judge Louis Brandeis delivered an impassioned, clear, and lengthy affirmation of

First Amendment rights as he stated the following among other things:

>       "Believing in the power of reason as applied through public discussion, they
>       eschewed silence coerced by law — the argument of force in its worst form.
>       Recognizing the occasional tyrannies of governing majorities, they amended the
>       Constitution so that free speech and assembly should be guaranteed.
>
>       Fear of serious injury cannot alone justify suppression of free speech and assembly.

Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it.[3] Condonation of a breach enhances the probability."

26.     The following excerpts from *Securities & Exch. Com'n v. Management Dyn., Inc.*, 515 F.2d 801 (2d Cir. 1975) pertains to the fact that defendants in this case have been serial criminals like rapists and drug addicts with respect to how such defendants have dealt with me largely in regards to public areas and my constitutional rights:

    a.     "the commission of past illegal conduct is highly suggestive of the likelihood of future violations."

    b.     "the "critical question" in issuing an injunction is whether "there is a reasonable likelihood that the wrong will be repeated.""

    c.     *"*Whether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant."

27.     *Housing Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) contains the following findings that address the legal standards for proving retaliation and violations of Fourteenth Amendment equal protection rights that may include an ongoing campaign of harassment that has been the nature of things by defendants in this case against me through their illegal acts and omissions against me:

    a.     "The plaintiff can demonstrate a causal connection between its protected activities and the defendants' adverse actions either "indirectly by means of circumstantial evidence, . . . or directly by evidence of retaliatory animus." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2003) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)); Kantha v. Blue, 262 F. Supp. 2d 90, 103 (S.D.N.Y. 2003). Summary judgment is inappropriate when "questions concerning the employer's motive predominate the inquiry." Morris, 196 F.3d at 110. "Nonetheless, we have held that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce `some tangible proof to

demonstrate that [his] version of what occurred was not imaginary.'" <u>Cobb</u>, 363 F.3d at 108 (quoting <u>Morris, 196 F.3d at 111</u>))."

b. "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. <u>Morris, 196 F.3d at 110</u>; <u>McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999)</u>. The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. <u>Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001)</u>; <u>Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000)</u> (citing <u>Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994)</u>))."

c.

28.   In <u>USA v. Shroyer</u>, No. 21-cr-542 (ZMF) (D.C. Aug. 24, 2021), U.S. Magistrate Judge Zia M. Faruqui stated the following at the end of it that is equally applicable to the lack of proper oversight of the NYPD, New York City Mayor's Office largely due to rampant news censorship that aids and abets illegal acts and omissions by the NYPD, New York City Mayor's Office, and others:

"The Department of Justice appears to believe that it is the sole enforcer of its regulations. That leaves the court to wonder who watches the watchmen."

29.   <u>Roman Catholic Diocese of Brooklyn v. Cuomo</u>, 592 S. Ct. (U.S. 2020) was a major case about First Amendment rights and the need for judges to diligently and continuously protect and uphold them. The following are relevant excerpts from that court decision that support granting me the relief that I seek in this complaint:

a. "Government is not free to disregard the First Amendment in times of crisis."

b. "we may not shelter in place when the Constitution is under attack. Things never go well when we do."

c. "Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."

d. "judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised."

e.    "In far too many places, for far too long, our first freedom has fallen on deaf ears."

f.    "And while those who are shut out may in some instances be able to watch services on television, such remote viewing is not the same as personal attendance"

30.    On 3/26/19, the Second Circuit conducted an oral arguments hearing in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019). That hearing was recorded on video by C-Span and is available at https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case. Christopher Droney is a former Second Circuit judge who was among the judges who presided over that hearing. The following remark that he made during that hearing was about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks as well as town hall meetings, public resource fair meetings, and public hearings was recorded at the elapsed time of 13 minutes and 2 seconds in that video:

"For the First Amendment, it doesn't really have to be much more burdensome. If it's more burdensome at all, if you have to move down the street, that violates the First Amendment."

31.    The following is a remark that Jennifer Utrecht made during that hearing at the elapsed time of 13 minutes and 49 seconds while she was then an attorney for the U.S. Department of Justice:

"So, if this were considered to be state action…an action taken in his official capacity and not his personal capacity and…and this were to be considered a public forum, then, of course, viewpoint discrimination would not be permissible."

32.    The following excerpt from _US v. Frandsen_, 212 F.3d 1231 (11th Cir. 2000) refers to the decision that was issued in _Freedman v. Maryland_, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) that concerned illegal censorship and is clearly applicable to my claims in this case:

"The Supreme Court in _Freedman_ outlined three procedural safeguards that a prior restraint on protected expression must contain to obviate the dangers of censorship: (1) the burden of going to court to suppress the speech, and the burden of proof once

in court, must rest with the government; (2) any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the status quo; and (3) an avenue for prompt judicial review of the censor's decision must be available."

33.     The following is a relevant excerpt from *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 122 S. Ct. 775, 151 L. Ed. 2d 783 (2002) that also cites *Freedman*:

> "We recognized in *Freedman* that a scheme conditioning expression on a licensing body's prior approval of content "presents peculiar dangers to constitutionally protected speech." *Id.,* at 57. "[T]he censor's business is to censor," *ibid.,* and a licensing body likely will overestimate the dangers of controversial speech when determining, without regard to the film's actual effect on an audience, whether speech is likely "`to incite' " or to "`corrupt [the] morals,' " *id.,* at 52-53, n. 2. Cf. *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 561, and n. 11 (1975). In response to these grave "dangers of a censorship system," *Freedman, supra,* at 58, we held that a film licensing process must contain certain procedural safeguards in order to avoid constituting an invalid prior restraint: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 227 (1990) (principal opinion of O'Connor, J., joined by Stevens and Kennedy, JJ.) (citing *Freedman, supra,* at 58-60)."

34.     Findings in *Liberty and Prosperity 1776, Inc. v. Corzine*, 720 F. Supp. 2d 622 (D.N.Y. 2010) are partly about the need and constitutional right for different views that are expressed by members of the public and government personnel to be able to coexist in public areas that are public forums. The public forum that *Liberty and Prosperity 1776, Inc. v. Corzine* was about was a town hall meeting. Additional findings in *Liberty and Prosperity 1776, Inc. v. Corzine* are about a police officer and government official acting on behalf of a member of the personal security detail for former New Jersey Governor Jon Corzine to prevent members of the public from attending a town hall meeting confirm that I have a First Amendment and Fourteenth Amendment right to attend and otherwise access, assemble, and actively participate in public areas that are public forums partly by communicating and receiving information with others in

such areas while accessing and otherwise assembling in them. *Liberty and Prosperity 1776, Inc. v. Corzine* also confirms that **a)** "supervisory personnel can be held liable under § 1983 if they had knowledge of and acquiesced in subordinates' constitutional violations" and **b)** following orders isn't a defense to 42 U.S.C. §1983 liability when that violates the rights of others.

35.    *State v. Hardin*, 498 N.W.2d 677 (Iowa 1993) states that *In re Kay*, 464 P.2d 142, 1 Cal. 3d 930, 83 Cal. Rptr. 686 (1970) appears to be the leading case that has "attempted to reconcile the competing rights of speaker, audience, and protester" in regards to public forums that are conducted jointly by members of the public and government personnel. The sum and substance of *In re Kay*, 464 P.2d 142 is critically important and thoroughly supports having this Court grant me the relief that I seek in this complaint.

36.    *Feiner v. New York*, 340 U.S. 315, 71 S. Ct. 303, 95 L. Ed. 295 (1951) addressed a heckler's veto and contains the following relevant findings that are applicable to my claims in this case on account of the fact that I was illegally subjected to a heckler's veto on 7/25/17 inside of the City Hall subway station during Mr. de Blasio's illegal publicity stunt in that train station while I never used any fighting words while I was in that subway station and merely projected my speech with my lungs during rush hour in a naturally noisy train station that was made noisier by Mr. de Blasio's illegal use of a microphone during his publicity stunt that I had to compete against in order to have a chance of having my viewpoints, messages, whistleblowing of public and private concern, and ideas received then by other members of the public while they stood on the downtown subway platform and other areas in that train station:

> "Public assemblies and public speech occupy an important role in American life. One high function of the police is to protect these lawful gatherings so that the speakers may exercise their constitutional rights. When unpopular causes are sponsored from the public platform, there will commonly be mutterings and unrest and heckling from the crowd. When a speaker mounts a platform it is not unusual to find him resorting to exaggeration, to vilification of ideas and men, to the making of false charges. But

those extravagances, as we emphasized in _Cantwell_ v. _Connecticut,_ 310 U. S. 296, do not justify penalizing the speaker by depriving him of the platform or by punishing him for his conduct.

A speaker may not, of course, incite a riot any more than he may incite a breach of the peace by the use of "fighting words." See _Chaplinsky_ v. _New Hampshire,_ 315 U. S. 568. But this record shows no such extremes. It shows an unsympathetic audience and the threat of one man to haul the speaker from the stage. It is against that kind of threat that speakers need police protection. If they do not receive it and instead the police throw their weight on the side of those who would break up the meetings, the police become the new censors of speech. Police censorship has all the vices of the censorship from city halls which we have repeately struck down. See _Lovell_ v. _City of Griffin,_ 303 U. S. 444; _Hague_ v. _C. I. O.,_ 307 U. S. 496; _Cantwell_ v. _Connecticut, supra; Murdock_ v. _Pennsylvania,_ 319 U. S. 105; _Saia_ v. _New York,_ 334 U. S. 558."

37.   _Frierson v. Reinisch_, No. 19-1740 (2d Cir. Mar. 26, 2020) cites _Monteiro v. City of Elizabeth_, 436 F.3d 397 (3d Cir. 2006) and includes the following relevant findings:

"_Monteiro v. City of Elizabeth,_ 436 F.3d 397, 404-05 (3d Cir. 2006) (concluding that "specific intent" was an element of plaintiff's First Amendment claim alleging exclusion from a public meeting). That is, whether the ban violated his First Amendment rights turns on whether the Defendants imposed the ban to punish Frierson for expressing dissatisfaction about Coach Bearup or for a viewpoint-neutral reason. _See Locurto,_ 264 F.3d at 170 (noting that "[u]nlawful intent" is "a necessary element of plaintiffs' properly framed First Amendment retaliation claim")"

38.   _Monteiro v. City of Elizabeth_, 436 F.3d 397 (3d Cir. 2006) contains the following relevant findings:

a.   "if Perkins-Auguste acted with an intent to suppress Monteiro's speech on the basis of viewpoint, she violated clearly established law and is not entitled to qualified immunity. In cases in which a constitutional violation depends on evidence of a specific intent, "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." _Locurto v. Safir,_ 264 F.3d 154, 169 (2d Cir.2001). Accordingly, the District Court did not err in holding that whether Perkins-Auguste's conduct violated clearly established law depended upon her motivation for ejecting Monteiro from the meeting. Furthermore, it was not error to submit this question to the jury because there was sufficient evidence from which a reasonable jury could conclude that Perkins-Auguste acted with a motive to suppress Monteiro's viewpoint."

b.   "The speed with which she determined to eject Monteiro from the meeting, her failure to consult her fellow council members or to negotiate any compromise, and her failure to follow any established procedure could be viewed by a

reasonable jury as evidence that Perkins-Auguste's behavior was emotionally charged and motivated by anger and personal animosity, rather than a desire to maintain smooth operation of the meeting. "

39.     Although my claims in this case have striking parallels to the facts and circumstances that pertain to *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), my claims in this case aren't about attending a public meeting that was held by government personnel because my body wasn't within the area in which Mr. de Blasio conducted his illegal publicity stunt inside of the City Hall subway station on 7/25/17. *Lozman* was about First Amendment retaliation and viewpoint discrimination that pretextually caused a critic of government personnel to be ejected from a public meeting while he was then suing the government body that such government personnel worked for. My HRA lawsuit similarly was ongoing litigation that I was pursuing against HRA on 7/25/17 that I apprised Mr. de Blasio about on 7/18/17 during the Mayor's 7/18/17 resource fair and that Mr. Redmond was aware of 6/28/17.

40.     The following is a relevant excerpt from *Robar v. Village of Potsdam Board of Trustees, No. 8: 20-cv-0972 (LEK/DJS) (N.D.N.Y. Sept. 21, 2020)* that addressed a legal standard that pertained to an application for a preliminary injunction to uphold First Amendment rights that was granted through that decision:

> ""Violations of the First Amendment are presumed irreparable." Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Bery, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (noting that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," and collecting cases)."

41.     *Tunick v. Safir* that is cited in the preceding excerpt includes a lengthy listing of court decisions in which preliminary injunctions have been issued against the City of New York in

response to violations of First Amendment rights by its agencies and personnel. The following

excerpt from that case shows that listing that supports my claims and the relief that I seek in this

case:

> "We would be ostriches if we failed to take judicial notice of the heavy stream of
> First Amendment litigation generated by New York City in recent years. Notable
> cases in which this court or a district court has preliminarily enjoined or found
> unconstitutional on First Amendment grounds some action or policy of the City
> include *Latino Officers Ass'n v. City of New York,* 196 F.3d 458 (2d Cir.1999)
> (affirming a preliminary injunction that enjoined the City from prohibiting plaintiffs
> from participating, in their uniforms and behind their organizational banner, in
> various parades held in 1999); *Million Youth March, Inc. v. Safir,* 155 F.3d 124 (2d
> Cir.1998) (affirming and modifying a preliminary injunction requiring the City to
> issue a parade permit to an organization seeking to hold a public event in 1998);
> *Harman v. City of New York,* 140 F.3d 111 (2d Cir. 1998) (finding unconstitutional
> the City's policy of requiring City employees to obtain permission before speaking to
> the media); *New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123 (2d
> Cir.) (finding unconstitutional the municipality's refusal to display advertisements
> arguably critical of the mayor), *cert. denied,* 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d
> 53 (1998); *Bery v. City of New York,* 97 F.3d 689 (2d Cir.1996) (finding
> unconstitutional the City's limitation on licenses for sidewalk artists), *cert. denied,*
> 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *Housing Works, Inc. v. City
> of New York,* 72F.Supp.2d 402 (S.D.N.Y.1999) (issuing a preliminary injunction
> requiring the City to re-rank plaintiff, a non-profit agency, on a priority list for federal
> funding based on a clear and substantial likelihood that the City had downgraded
> plaintiff on the list in retaliation for its protected speech, including, *inter alia,*
> criticism of the mayor's administration and various successful First Amendment
> lawsuits against the City), *appeal dismissed as moot,* 203 F.3d 176 (2d Cir.2000);
> *East Timor Action Network v. City of New York,* 71 F.Supp.2d 334 (S.D.N.Y.1999)
> (issuing a declaratory judgment that the City's denial of plaintiff's application to erect
> temporary street signs violated the First Amendment); *Brooklyn Inst. of Arts &
> Sciences v. City of New York,* 64 F.Supp.2d 184 (E.D.N.Y.1999) (preliminarily
> enjoining the City from withholding funding from and filing suit for ejectment against
> the Brooklyn Museum based on the content of a temporary exhibit at the museum);
> *Million Youth March, Inc. v. Safir,* 63 F.Supp.2d 381 (S.D.N.Y.1999) (issuing a
> preliminary injunction requiring the City to grant a parade permit to an organization
> seeking to hold a public event in 1999); *Gasparo v. City of New York,* 16 F.Supp.2d
> 198 (E.D.N.Y.1998) (preliminarily enjoining the City's concession scheme for
> newsstands in light of the likelihood that the City's unlimited authority to terminate
> concessions would chill protected speech); *Latino Officers Ass'n v. City of New York,*
> 966 F.Supp. 238(S.D.N.Y.1997) (preliminarily enjoining the City from prohibiting
> plaintiffs from participating, in their uniforms and behind their organizational banner,
> in parades held in June 1997); *Time Warner Cable v. City of New York,* 943 F.Supp.
> 1357 (S.D.N.Y.1996) (preliminarily enjoining as unconstitutional the City's decision

to place commercial television programs on cable channels reserved for educational or governmental purposes), *aff'd on other grounds sub nom., Time Warner Cable v. Bloomberg L.P.,* 118 F.3d 917 (2d Cir. 1997); *Housing Works, Inc. v. Safir,* 1998 WL 823614 (S.D.N.Y. Nov.25, 1998) (preliminarily enjoining the City from prohibiting non-profit AIDS organization from conducting a press conference in front of City Hall in view of the likelihood that the City policy was content-based), *stay granted in part,* 1998 WL 824534 (2d Cir.Nov.30, 1998) (order issuing partial stay later withdrawn); *Housing Works, Inc. v. Safir,* 1998 WL 409701 (S.D.N.Y. July 21,1998) (preliminarily enjoining City from enforcing its policy of limiting press conferences in front of City Hall to groups of 25 or fewer); *United Yellow Cab Drivers Ass'n v. Safir,* 1998 WL 274295 (S.D.N.Y. May 27, 1998) (finding unconstitutional the City's refusal to permit more than 20 taxi drivers to participate in a protest against proposed rules for pick-up and drop-off), *aff'd as modified,* No. 98-7737 (2d Cir. May 27, 1998) (unpublished disposition); *Latino Officers Ass'n v. City of New York,* 1997 WL 473972 (S.D.N.Y. Aug.19, 1997) (enjoining the City from prohibiting plaintiffs from participating, in their uniforms and behind their organizational banner, in parades held in the late summer and fall of 1997), *appeal dismissed as moot,* 152F.3d 919 (2d Cir.1998) (unpublished disposition); *cf. MacDonald v. Safir,* 206 F.3d 183 (2d Cir.2000) (vacating and remanding the district court's grant of summary judgment for the City on plaintiff's claim that the City ordinance governing the issuance of parade permits violates the First Amendment).[16] Some of the parties' names reappear on this list. This is apparently the result of the City engaging in acts similar to those previously enjoined by the federal courts."

42.     In *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011), the U.S.

Supreme Court issued the following findings about the First Amendment that are very relevant to

my claims in this action and the relief that I seek to be granted:

> "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."

43.     *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017) states the following

about what are arguably offensive views to some that may be appreciated by others:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572"

44.     The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670

(ARR)(JO) (E.D.N.Y. Jan. 9, 2020):

> ""[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the police without reprisal" is "clearly" an "interest protected by the First Amendment," *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)). Thus, on summary judgment, the Second Circuit has held that a plaintiff established a First Amendment retaliation claim when he proffered facts showing that police officers retaliated against him for making derogatory comments to the officers and for threatening to sue them. *Kerman,* 261 F.3d at 241-42.[3]"

45.    *Barboza v. D'Agata,* 151 F. Supp. 3d 363 (S.D.N.Y. 2015) states the following that confirms that crude and offensive expression may lawfully be expressed against government personnel in the context of complaining about government activity:

> "The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

46.    The following are relevant excerpts from *Connick v. Myers,* 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983):

> a.    "the First Amendment expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.""

> b.    "The constitutionally protected right to speak out on governmental affairs would be meaningless if it did not extend to statements expressing criticism of governmental officials."

> c.    "Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government."

> d.    "a major purpose of that Amendment was to protect the free discussion of

governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

e.   "one of the central purposes of the First Amendment's guarantee of freedom of expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government."

f.   "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."

g.   "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system."

h.   "No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny."

47.   The following excerpts from _People v. Howard_, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980) include a citation to a U.S. Supreme Court decision and confirm that people have a right to be left alone by law-enforcement personnel when they are conducting themselves in a lawful manner that include times when they exercise their First Amendment rights to verbally lambast trashy government personnel in a vitriolic and galvanizing manner in public places irrespective of how well liked that may be and aren't a security risk:

a.   "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away."

b.   "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. As Mr. Justice BRANDEIS put it long ago in _Olmstead v United States_ (277 US 438, 478), defendant had "the right to be let

alone."'"

48.     The following findings from *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App.

Div. 1981) that address what it means to be arrested and confirms that people may be arrested

even when they are not officially under arrest:

> "The majority finds that, although defendant was told that he was "under arrest", no
> arrest, in fact, took place. We disagree. "Whenever an individual is physically or
> constructively detained by virtue of a significant interruption of his liberty of
> movement as a result of police action, that individual has been seized within the
> meaning of the Fourth Amendment"'"

49.     The following excerpts from *Dotson v. Farrugia*, No. Civ. 1126 (PAE) (S.D.N.Y. Mar.

26, 2012) that reinforce the preceding findings from *People v. Alba*:

> a.      ""A person is seized by the police and thus entitled to challenge the government's
> action under the Fourth Amendment when the officer, by means of physical force
> or show of authority terminates or restrains his freedom of movement through
> means intentionally applied."

> b.      "when the officer, by means of physical force or show of authority, has in some
> way restrained the liberty of a citizen may we conclude that a `seizure' has
> occurred."

50.     *Portillo v. Webb*, No. 16-cv-4731 (VEC)(GWG) (S.D.N.Y. Oct. 11, 2017) contains the

following findings that confirm that "all law enforcement officials have an affirmative duty to

intervene to protect the constitutional rights of citizens from infringement by other law

enforcement officers" **a)** in their presence and **b)** that occurs outside of their presence in

instances in which they're provided information that causes them to be apprised of such

violations:

> "It is widely recognized that all law enforcement officials have an affirmative duty to
> intervene to protect the constitutional rights of citizens from infringement by other law
> enforcement officers in their presence." Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir.
> 2014) (internal quotation marks omitted) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d
> Cir. 1994)). As such, an officer who fails to intervene where he or she observes or has reason
> to know that excessive force is being used or a constitutional violation has been committed
> by a fellow officer is liable for the preventable harm caused by that officer. Anderson, 17

F.3d at 557; accord Porter v. Goord, 467 F. App'x 21, 23 (2d Cir. 2012) (summary order); Baines v. City of New York, 2017 WL 3425746, at *2 (S.D.N.Y. Aug. 9, 2017). Although liability may attach only where there was "a realistic opportunity to intervene to prevent the harm from occurring," Anderson, 17 F.3d at 557, "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise," id.; accord Terebesi, 764 F.3d at 243-44; Stephens v. Venettozzi, 2016 WL 929268, at *11 (S.D.N.Y. Feb. 24, 2016); Bowen v. Patrick, 2012 WL 3743409, at *7 (S.D.N.Y. Aug. 29, 2012)."

51.    *Marom v. NYPD Sergeant Fior Blanco*, No. 15-cv-2017 (PKC) (S.D.N.Y. July 25, 2019)

states the following:

    a.    "To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)."

    b.    "A defendant becomes liable for damages under section 1983 only if he or she is "personal[ly] involve[d] . . . in [the] alleged constitutional deprivations." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). A defendant is "personally involved" if, for example, he or she directly participates in the constitutional deprivation. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). A defendant is also considered "personally involved" if he or she fails to intervene despite having a realistic opportunity to prevent the constitutional violation from occurring. Harris v. City of New York, No. 15-cv-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017); see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)."

    c.

52.    The following is a pertinent excerpt from *Marom v. City of New York*, No. 15-cv-2017

(PKC) (S.D.N.Y. Mar. 7, 2016) that further addresses the legal duty that all law-enforcement

personnel have to intervene to protect constitutional rights against infringement:

    "All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.""

53.     While Alan C. Marin was a judge who was assigned to the New York State Court of Claims, he issued a decision on 12/9/10 on behalf of that court in _Re v. the State of New York_, Ct Cl, Dec. 9, 2010, Marin, A., claim No. 11517, UID No. 2010-016-069. He stated in that decision that "the detaining of an individual may be pretextual to remove him or her from a public meeting, speech or demonstration."

54.     The following is a relevant excerpt from _Nicholas v. Bratton_, No. 15-cv-9592 (JPO) (S.D.N.Y. Mar. 26, 2019) addresses mendacity by government personnel and was from a lawsuit that a photojournalist filed against the City of New York in response to its personnel having used a fraudulent pretext to block him from accessing public areas:

> "[C]ourts must [always] be cognizant of disguised attempts to refuse the fullest scope of free speech allegedly based on governmental concerns such as safety." _Tunick v. Safir_, No. 99 Civ. 5053, 1999 WL 511852, at *7 (S.D.N.Y. July 19, 1999), aff'd, 228 F.3d 135 (2d Cir. 2000) (per curiam). Here, "there are disputed issues of fact regarding whether the City's purported justifications for denying Plaintiff[]" access to the street adjacent to the ambulance are being used as "pretext for content based discrimination." Nat'l Council of Arab Ams., 478 F. Supp. 2d at 494 (citing Olivieri, 801 F.2d at 606, for proposition "that issues of fact regarding whether purported justifications are pretextual may warrant a trial on the merits"). Because a reasonable jury could conclude that Davis and DeBonis unjustifiably treated Nicholas differently from the fire buffs or from the City's own press officials for content-based reasons, summary judgment cannot be granted to them on the question of their having provided equal access to the scene of the emergency rescue to all newsgatherers without reference to content."

55.     In his 3/26/19 decision in _Nicholas v. Bratton_, U.S. District Judge J. Paul Oetken also ordered the unsealing of e-mail messages that had previously been filed under seal in that case as he explained that his decision to unseal that was due to "the importance of th[is] sealed material to [the] disposition of this matter".

56.     This case is largely about a lack of credibility that the defendants have in regards to my claims against them. _Reeves v. Sanderson Plumbing Products, Inc._, 530 U.S. 133, 120 S. Ct.

2097, 147 L. Ed. 2d 105 (2000) addresses such a lack of credibility and mendacity by stating the following:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.,* at 511.
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."

57. The following findings from *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) confirm that discriminatory intent and animus may be inferred from the totality of the circumstances and other factors:

> "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decisionmaking body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted)."

58. The following finding from *Williams v. City of New York*, No. 16-cv-8193 (VSB) (S.D.N.Y. Sept. 10, 2018) addresses the use of fraudulent pretexts in furtherance of a scheme to engage in mendacity and violate the legal rights of others:

> "However, assuming these facts to be true, drawing all inferences in Plaintiff's favor, and viewing these facts in the context of the alleged scheme to manufacture pretext to terminate Plaintiff, it is plausible that those personnel decisions were driven by discriminatory animus. At this stage, I decline to dismiss Plaintiff's action, and will permit further development of the facts through discovery."

59. The following findings from *Vega v. Hempstead Union Free School Dist.,* 801 F.3d 72 (2d Cir. 2015) also **a)** confirm that discriminatory intent and animus may be inferred from the totality of the circumstances and other factors and **b)** concern the right to engage in discovery in litigation to establish discriminatory intent and the existence fraudulent pretexts:

> "Second, in making the plausibility determination, the court is to "draw on its judicial

experience and common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. Of course, the court must proceed at all times in a fair and deliberative fashion, alert to any unconscious bias that could affect decisionmaking.[9] In making the plausibility determination, the court must be mindful of the "elusive" nature of intentional discrimination. *See Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. 1089. As we have recognized, "clever men may easily conceal their motivations." *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir.1979) (internal quotation marks omitted). Because discrimination claims implicate an employer's usually unstated intent and state of mind, *see Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), rarely is there "direct, smoking gun, evidence of discrimination," *Richards v. N.Y.C. Bd. of Educ.,* 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir.1988). Instead, plaintiffs usually must rely on "bits and pieces" of information to support an inference of discrimination, *i.e.,* a "mosaic" of intentional discrimination. *Gallagher v. Delaney,* 139 F.3d 338, 342 (2d Cir.1998), *abrogated in part on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Again, as we made clear in *Littlejohn,* at the initial stage of a litigation, the plaintiff's burden is "minimal" — he need only plausibly allege facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." 795 F.3d at 311, 2015 WL 4604250, at *8."

60.    This case is also largely about what is shown in relevant video recordings and photographs as well as what isn't shown in them. *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) was about a video recording that the respondent in that case lied about.

The following are relevant excerpts from *Scott v. Harris*:

a.    "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

b.    "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."

61.    The following is a relevant excerpt from *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

"a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. *See Dean,* 354 F.3d at 551; *Galvin v. Hay,* 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech,**

**speakers may ordinarily— absent a valid time, place and manner restriction— do so in a public forum.");** *Childs v. Dekalb Cnty., Ga.,* **286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech").

(boldface formatting added for emphasis)

62.     The following are relevant excerpts from *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971):

a.     "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."

b.     the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense.

c.     "it is nevertheless often true that one man's vulgarity is another's lyric."

d.     "we are often `captives' outside the sanctuary of the home and subject to objectionable speech.

e.     ""[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation.""

f.     "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views."

g.     "The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests."

63. _Schneider v. State (Town of Irvington)_, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939) states that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

64. The following are relevant excerpts from _Calvary Chapel Dayton Valley v. Sisolak_, 140 S. Ct. 2603 (U.S. 2020):

    a.    "respecting some First Amendment rights is not a shield for violating others"

    b.    "favoring one viewpoint over others is anathema to the First Amendment"

65. _Amidon v. Student Association Of The State University Of New York At Albany_, No. 05-6623-cv (L) (2d Cir. Nov. 20, 2007) states, "Access to a public forum, for instance, does not depend upon majoritarian consent."

66. The following are relevant excerpts from _Minnesota State Bd. for Community Colleges v. Knight_, 465 U.S. 271, 104 S. Ct. 1058, 79 L. Ed. 2d 299 (1984):

    a.    "The First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large."

    b.    "We have consistently adhered to the principle that government must "afford all points of view an equal opportunity to be heard.""

67. The following is a relevant excerpt from _Naturist Soc., Inc. v. Fillyaw_, 858 F. Supp. 1559 (S.D. Fla. 1994) that is about untoward discretion that is also known as standardless discretion and supports my claims in this case:

    "For example, the regulations provide that park managers may deny permits for distribution of literature if "the distribution will present a clear and present danger to the public health or safety," or if it "will unreasonably impair the atmosphere of peace and tranquility," or if it "would unreasonably interfere with any program activities or administrative functions of the division." These provisions for denial of a permit are somewhat vague, and require park managers to make individualized judgments about the nature of a demonstration. Such regulations bestow too much discretion upon park managers, and therefore pose a danger that permits may be denied based upon the content of a demonstrator's message. See _Miami Herald Pub. Co. v. City of_

*Hallandale,* 734 F.2d 666, 675 (11th Cir.1984)."

68.     The following excerpt from *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001)

similarly addresses standardless discretion by government personnel to deny access to public

areas and supports my claims in this case:

> "Courts have also been reluctant to accept policies based on subjective or overly
> general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum
> `must be unambiguous and definite' if the `concept of a designated public forum is to
> retain any vitality whatever.'" *Christ's Bride,* 148 F.3d at 251 (quoting *Gregoire v.
> Centennial Sch. Distr.,* 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective
> standards, government officials may use their discretion to interpret the policy as a
> pretext for censorship. *See Board of Educ. v. Mergens,* 496 U.S. 226, 244-45, 110
> S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content
> poses risk of arbitrary application); *Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d
> 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises]
> possibility of discriminatory application of the policy based on viewpoint");
> *Cinevision Corp. v. City of Burbank,* 745 F.2d at 560 (9th Cir.1984) (vague standard
> has "potential for abuse"); *Gregoire,* 907 F.2d at 1374-75 ("virtually unlimited
> discretion" granted to city officials raises danger of arbitrary application); *see
> also City of Lakewood v. Plain Dealer Publ. Co.,* 486 U.S. 750, 758-59, 108 S.Ct.
> 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context
> raises dual threat of biased administration of policy and self-censorship by licensees).
> Therefore, "the more subjective the standard used, the more likely that the category
> will not meet the requirements of the first amendment." *Cinevision,* 745 F.2d at
> 575; *see also Christ's Bride,* 148 F.3d at 251 (suppression of speech under defective
> standard requires closer scrutiny)."

69.     *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan.

Feb. 17, 2017) addressed viewpoint discrimination and "standardless discretion" by government

officials to deny access to a public forum that does not require a plaintiff to establish that he has

been discriminated against with respect to gaining access to such a public forum because of his

views. The following is a relevant excerpt from that decision:

> "As plaintiff points out, he has alleged that he was denied access to a public forum
> "for unstated reasons, in accordance with no policy, and at the absolute discretion of
> College officials." Dkt. 1, ¶ 50. He alleges that the College "has no policy to specify
> any standards by which College officials approve or deny requests," and that the
> College "vests absolute, standardless discretion in College officials" to allow or deny
> requests to use facilities for expressive activities. *Id.* ¶¶ 41, 42. Additionally, he

alleges that the Board of Trustees and defendants Long and Wynn were acting as policymakers for the College at all relevant times. Finally, plaintiff has spelled out how a municipal policy or custom — in this instance, the *absence* of any standards governing exercise of discretion on requests to use College facilities — caused the deprivation of First Amendment rights alleged in the complaint.

Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. "A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130 (1992) (cite omitted). Government regulation of access to a public forum must have definite standards because "if the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of ... First Amendment freedoms is too great to be permitted." *Id.* at 131 (internal quotation marks and citations omitted); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (awarding space on a first-come, first-served basis "is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.")"

70.  The Second Circuit stated the following about the Vagueness Doctrine in *Berg v. Village of Scarsdale,* No. 20-4130-cv (2d Cir. Dec. 3, 2021):

> "Supreme Court precedent recognizes two independent grounds upon which a statute's language may be so vague as to deny due process of law." *Cunney v. Bd. of Trustees,* 660 F.3d 612, 620 (2d Cir. 2011). "First, a law violates due process `if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Id.* at 620-21 (quoting *Hill v. Colorado,* 530 U.S. 703, 732 (2000)). "Second, a law is unconstitutionally vague `if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* at 621 (quoting *Hill,* 530 U.S. at 732).

71.  The following are relevant excerpts from *Singh v. US Dept. of Justice*, 461 F.3d 290 (2d Cir. 2006) states the following:

   a.   "the Supreme Court has held that an administrative agency must adhere to its own regulations."

   b.   "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."

     c.     "agencies are bound to follow regulations on which individuals justifiably rely"

72.    *Stokes v. City of Madison*, 930 F.2d 1163 (7th Cir. 1991) states the following:

> "First Amendment protects effective speech, not merely uttered words, and effective
> speech sometimes requires that ideas be transformed into" "loud speech" and "other
> forms of expression that a casual reading of the First Amendment might not reveal as
> "speech" as it stated that the decision in *Federal Election Comm'n v. National*
> *Conservative Political Action Comm.*, 470 U.S. 480, 493, 105 S.Ct. 1459, 1466, 84
> L.Ed.2d 455 (1985) seemed to "endorse the idea that amplified speech is sometimes
> essential to effective communication and deserves protection."

73.    The preceding excerpt is relevant with respect to my claims in this case about the fact that

I had a clear First and Fourteenth Amendment right to use my voice to project my views,

messages, and ideas to reach others during rush hour who stood on and near the downtown

subway platform on 7/25/17 in the subway station that my claims in this case concern while I

stood on the subway platform for the uptown train. It also supports the fact that I had a clear

legal right to do so in a loud manner past the noise that was caused partly by Mr. de Blasio

having illegally violated the MTA's rules by **a)** using a microphone, **b)** conducting a publicity

stunt next to a staircase, and **c)** obstructing the movements of people within that subway station

through his publicity stunt that attracted a large mob that was comprised of news censors. Mr. de

Blasio's illegal publicity stunt was conducted in an area that was between the 2 subway

platforms and separated from them by a vertical metal partition that stretched from the ground to

the ceiling in that subway station. This confirms that I was physically standing outside of that

illegal publicity stunt instead of having been attended it. There is a clear difference between

attending a meeting and standing just outside of it. People who then worked for Mr. de Blasio

used barricades that consisted of vertical metal floor mounts with bands to establish a segregated

area in which he conducted his illegal publicity stunt. I was never inside of that area on 7/25/17

and Defendant Taylor confirmed that on 7/25/17 as I recorded a video recording of him in that

subway station.

74.     Although the excerpt from *Grayned v. City of Rockford*, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) that is shown next includes a reference to "boisterous conduct", the simple fact that Mr. de Blasio was illegally using a microphone during his 7/25/17 illegal publicity stunt in the subway station that my claims in this case concern and other members of the public were also boisterous in a lawful manner against Mr. de Blasio while standing near that publicity stunt without being retaliated against blocks the provision of "boisterous conduct" from being applied against in regards to my claims in this case due to the Vagueness Doctrine; estoppel; my Fourteenth Amendment equal protection, liberty, and due process rights; its provisions against selective-enforcement and discrimination; and my First Amendment rights:

> "We held in *Cox* v. *Louisiana,* 379 U. S. 536, 544-545, that a State could not infringe the right of free speech and free assembly by convicting demonstrators under a "disturbing the peace" ordinance where all that the students in that case did was to protest segregation and discrimination against blacks by peaceably assembling and marching to the courthouse where they sang, prayed, and listened to a speech, but where there was no violence, no rioting, no boisterous conduct."

75.     The following are relevant excerpts from *McCutcheon v. Federal Election Com'n*, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014):

a.      "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See *Buckley,* 424 U.S., at 15, 96 S.Ct. 612."

b.      "Those First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine mold," or is, on the other, someone who spends "substantial amounts of money in order to communicate [his] political ideas through sophisticated" means. *National Conservative Political Action Comm.,* 470 U.S., at 493, 105 S.Ct. 1459. Either way, he is participating in an electoral debate that we have

recognized is "integral to the operation of the system of government established by our Constitution." *Buckley, supra,* at 14, 96 S.Ct. 612."

76.    The following are relevant excerpts from *Taglavore v. United States*, 291 F.2d 262 (9th Cir. 1961):

   a.    "The violation of a constitutional right by a subterfuge cannot be justified, and the circumstances of this case leave no other inference than that this is what was done"

   b.    "The courts must be vigilant to detect and prevent such a misuse of legal processes."

77.    *Murphy v. City of Tulsa*, 950 F.3d 641 (10th Cir. 2019) contains the following findings that confirm that municipal liability may arise from a single unconstitutional incident:

   "Cities may incur liability when they adopt unconstitutional "longstanding practice[s] or custom[s]" that become "standard operating procedure[s]." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 485-87, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (White, J., concurring)). A single unconstitutional incident is ordinarily insufficient for municipal liability. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). But a single incident may suffice when caused by an existing policy that "can be attributed to a municipal policymaker." *Id.*"

78.    The excerpts shown next are from *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004) and address municipal liability and deliberate indifference. These findings are largely relevant largely because they sufficiently establish that deliberate indifference by Defendants de Blasio and O'Neill cause them about entirely complaints that I reported to them prior to 7/25/17 against Defendant Redmond and other members of the NYPD cause Defendants de Blasio and O'Neill to be jointly liable for the illegal acts and omissions that were committed against me on 7/25/17 inside of the subway station that this complaint concerns.

   ***Excerpts from Amnesty America v. Town of West Hartford*:**

   "More often than not, however, plaintiffs allege constitutional deprivations at the hands of the lower-level municipal employees to whom some authority has been delegated,

rather than at the hands of those officials with final policymaking authority. While allowing the municipality to be held liable on the basis of the mere delegation of authority by a policymaking official would result in *respondeat superior* liability, allowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983. Therefore, § 1983 plaintiffs may establish that the city is liable for their injuries by proving that "the authorized policymakers approve[d] a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion).

Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions. *See Weber v. Dell,* 804 F.2d 796, 803 (2d Cir.1986) (holding that liability could be premised on sheriff's ordering of unconstitutional strip searches). Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions. *See, e.g., Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870-71 (2d Cir.1992) (stating that municipal liability lies where the subordinate's misconduct is "so manifest, as to imply the constructive acquiescence of senior policymaking officials"). Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city `policy or custom' that is actionable under § 1983." *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197 (citations omitted); *see also Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995), *Jeffes v. Barnes,* 208 F.3d 49, 63 (2d Cir.2000) (holding that sheriff's acquiescence in unconstitutional retaliation could be inferred from his tolerance and encouragement of harassment of plaintiffs). Moreover, because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability."

79.   The excerpt shown next is from *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995) and is about deliberate indifference and municipal liability. The fact that nothing meaningful was done by City of New York personnel to stop Defendant Redmond and other members of the NYPD and other City of New York personnel from continuing to violate my constitutional rights after 4/27/17 when I reported a complaint to the CCRB by telephone against Defendant Redmond and other members of the NYPD's mafia in response to illegal acts and omissions that they and other City of New York personnel were then committing against me in relation to the

4/27/17 town hall sufficiently establishes liability against the City of New York, Mr. de Blasio, and Mr. O'Neill for both deliberate indifference and municipal liability partly in regards to my 7/25/17 claims in this case.

> **Excerpt from *Vann v. City of New York*:**
>
> "A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. *See, e.g., Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *see id.* at 326-27 (**municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating"**).
>
> To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton v. Harris,* 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. *See, e.g., Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d at 123; *Fiacco v. City of Rensselaer,* 783 F.2d at 328"
>
> (boldface formatting added for emphasis)

80.    In *DK BY LK v. Teams*, No. 16-CV-3246 (PAE)(S.D.N.Y. Jul. 5, 2017), U.S. District Judge Paul A. Engelmayer articulated the legal standard that applies to confirming personal involvement of a defendant for 42 U.S.C. §1983 claims in the following way:

> "The personal involvement of a defendant sued in his or her individual capacity is a requirement for liability under § 1983; a defendant's supervisory authority is insufficient in itself to create liability under § 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). "To proximately cause a ... due process violation ... a defendant must be personally involved in the violation. A plaintiff may establish such personal involvement by making any one of five showings (the `Colon factors')." *Warren v. Pataki,* 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). These showings are as follows: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the

wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring." Id. (quoting *Colon*, 58 F.3d at 873); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (" [A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement ... includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.")"

81.    The following excerpt from *An v. City of New York*, 230 F. Supp. 3d 224 (S.D.N.Y. 2017), addressed the legal standard for claims pertaining to failure to train and supervise as well as deliberate indifference:

> As to the failure to train or supervise theory, the Complaint does not adequately allege the equivalent of an official policy because it does not plead deliberate indifference. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350 (internal quotation marks omitted). Deliberate indifference under a failure to train or supervise theory has three requirements:
>
> > First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.
>
> *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks and citations omitted); *see also Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).
>
> "The operative inquiry is whether th[e] facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). Thus a failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by

no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995).

82.     The following excerpts from *Nigro v. City of New York*, No. 19-CV-2369 (JMF)

(S.D.N.Y. Sept. 11, 2020) also address legal standards that apply to claims for municipal liability

deliberate indifference:

a.      "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick,* 563 U.S. at 61."

b.      "although Nigro's citations to unrelated police encounters, letters, and post-hoc reports are not enough to establish a widespread custom or practice of retaliating against the press and public, "they do permit a plausible inference of deliberate indifference." *Case v. City of New York,* 233 F. Supp. 3d 372, 406 (S.D.N.Y. 2017). In particular, the alleged incidents plausibly establish a history of NYPD officers mishandling situations where the press is involved, resulting in the repeated deprivation of constitutional rights."

83.     The following is a pertinent excerpt from *Bleiwas v. City of New York*, No. 15-cv-10046

(ER) (S.D.N.Y. Aug. 14, 2017) that lists the elements for a claim based upon negligence:

"To demonstrate that a defendant acted with negligence under New York law, a plaintiff must show `1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage."

84.     NYC Charter §2604(b)(2) and (b)(3) state the following:

2.   No public servant shall engage in any business, transaction or private employment, or have any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties."

"3.   No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant.

85.     NYC Charter §2606(c) states the following partly about NYC Charter §2604:

"Any person who violates section twenty-six hundred four or twenty-six hundred five of this chapter shall be guilty of a misdemeanor and, on conviction thereof, shall

forfeit his or her public office or employment. Any person who violates paragraph ten of subdivision b of section <u>twenty-six hundred four</u>, on conviction thereof, shall additionally be forever disqualified from being elected, appointed or employed in the service of the city. A public servant must be found to have had actual knowledge of a business dealing with the city in order to be found guilty under this subdivision, of a violation of subdivision a of section <u>twenty-six hundred four</u> of this chapter.

86.    New York City Conflict of Internet Board Rule §1-17 that concerns accomplice liability

and states the following:

> (a) It shall be a violation of Section 2604(b)(2) of the Charter for any public servant to intentionally or knowingly:
>
>> (1) solicit, request, command, importune, aid, induce, or cause another public servant to engage in conduct that violates any provision of Section 2604 of the Charter; or
>>
>> (2) agree with one or more persons to engage in or cause conduct that violates any provision of Section 2604 of the Charter.
>
> (b) For the purposes of this section, "any provision of Section 2604 of the Charter" shall not include a violation of Section 2604(b)(2) of the Charter that does not also violate a rule of the Board.

87.    The following is the text of 5 U.S.C. §1502(a)(1) that corresponds to the federal Hatch

Act:

> "(a) A State or local officer or employee may not—
>     (1) use his official authority or influence for the purpose of interfering with or affecting the result of an election or a nomination for office;"

88.    Section 4 of New York City Mayoral Executive Order 16 that is discussed in a report that

is entitled "Reporting Obligations" that DOI issued and is available at

https://www1.nyc.gov/site/doi/report/reporting-obligation.page confirms that personnel of the

City of New York are required to report information about conflicts of interest, waste, and

corruption to DOI or an inspector general. It also confirms that their failure to report such

information is grounds for termination.

89.    NYC Charter §1116 concerns acts of fraud, neglect of duty, and intentional violations of

law that are committed by personnel who work for the City of New York that is related to the

jobs that they have with the City of New York. NYC Charter §1116(a) states the following:

> "Any council member or other officer or employee of the city who shall wilfully violate
> or evade any provision of law relating to such officer's office or employment, or commit
> any fraud upon the city, or convert any of the public property to such officer's own use, or
> knowingly permit any other person so to convert it or by gross or culpable neglect of duty
> allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in
> addition to the penalties imposed by law and on conviction shall forfeit such office or
> employment, and be excluded forever after from receiving or holding any office or
> employment under the city government."

90.    NYC Charter §1116(b) states the following:

> "Any officer or employee of the city or of any city agency who shall knowingly make a
> false or deceptive report or statement in the course of duty shall be guilty of a
> misdemeanor and, upon conviction, forfeit such office or employment."

91.    New York State Public Officer Law §30 is about the creation of vacancies for

government jobs throughout New York State. It was previously used to strip Chaim Deutsch of

the job that he had as a member of the City Council after he pled guilty to tax evasion that was

after I wasted my time testifying to him during public hearings that the City Council held and

otherwise talked with him outdoors. This Court has the power to invoke New York State Public

Officer Law §30(1)(f) and (1)(g) to effectively fire people who hold government jobs throughout

New York State that are subject to New York State Public Officer Law §30. New York State

Public Officer Law §30(1)(f) confirms that the "entry of a judgment or order of a court of

competent jurisdiction declaring him to be incompetent" is sufficient to create a vacancy for the

government job that someone has that is subject to New York State Public Officer Law §30.

New York State Public Officer Law §30(1)(g) confirms that the "judgment of a court, declaring

void his election or appointment, or that his office is forfeited or vacant" also is sufficient to

create a vacancy for the government job that someone has that is subject to New York State

Public Officer Law §30.

92.     All City of New York personnel are required to complete a constitutional oath of office upon working for the City of New York. That oath requires them to swear or affirm that they will perform their duties as City of New York personnel in compliance with both the New York State and U.S. Constitutions and perform their work as City of New York personnel to the best of their abilities.

93.     NYC Charter §435(a) requires all members of the NYPD to do the following:

        a.      Prevent crimes. This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have prevented crimes that were committed against me by City of New York personnel without regard for whether those crimes were committed by members of the NYPD.

        b.      Preserve the public peace. This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have enforced applicable law by having not allowed Mr. de Blasio to conduct his illegal publicity stunt in that subway station in the illegal manner and location in which he did so that proximately caused the disruption to the public peace.

        c.      Detect and arrest offenders. This required This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have arrested Defendants de Blasio, Redmond, Taylor, and other City of New York personnel in response to illegal acts by them in that subway station on 7/25/17.

        d.      Protect the rights of persons. This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have intervened on my behalf to protect my rights.

e.      Preserve order at all public meetings and assemblages. This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have issued and enforced a dispersal order against Defendants de Blasio, news censors, members of Mr. de Blasio's NYPD security detail, members of the staff for Mr. de Blasio while he was then New York City's Mayor, and others who were unlawfully assembled in that subway station on 7/25/17 in a location and manner that violated the MTA' rules as well as the rights pursuant to the First and Fourteenth Amendment that others had to **a)** freely walk through the precise area in which Mr. de Blasio conducted his illegal publicity stunt on 7/25/17 in that subway station and **b)** assemble and express ourselves in any public area within that subway station while not obstructing the movements of others.

f.      Remove all nuisances in the public streets, parks and places. This required all NYPD personnel who were inside of the subway station on 7/25/17 that my claims in this complaint concern to have caused all of the defendants and all other nuisances to have been removed from that subway station on 7/25/17 that prevented others and I from being able to **a)** freely walk through the precise area in which Mr. de Blasio conducted his illegal publicity stunt on 7/25/17 in that subway station and **b)** assemble and express ourselves in any public area within that subway station while not obstructing the movements of others.

g.      Enforce and prevent the violation of all laws and ordinances in force in the city. This is self-explanatory.

h.      To arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses. This is self-explanatory.

94.    The following is the text of 18 U.S.C. §1513(e):

    (e)Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

95.    The following is the text of subsections "c", "f", and "k" of 18 U.S.C. §1512:

| c | Whoever corruptly—<br>(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or<br><br>(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both. |
| f | For the purposes of this section—<br>(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and<br><br>(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege. |
| k | Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy. |

96.    The following is the text of 18 U.S.C. §1519:

"Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

97.    The following is the text of NYPL §175.25:

"A person is guilty of tampering with public records in the first degree when, knowing that he does not have the authority of anyone entitled to grant it, and with intent to defraud, he knowingly removes, mutilates, destroys, conceals, makes a false entry in or falsely alters any record or other written instrument filed with, deposited in, or otherwise constituting a record of a public office or public servant.

Tampering with public records in the first degree is a class D felony."

98.    The following is the text of NYPL §240.65:

"A person is guilty of unlawful prevention of public access to records when, with intent to prevent the public inspection of a record pursuant to article six of the public officers law, he willfully conceals or destroys any such record.

Unlawful prevention of public access to records is a violation."

99.    The following shows the beginning of NYPL §240.20 and subsections 4 thru 7 within it:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

100.    The following is the plain text of CPL §140.50(1):

"§ 140.50 Temporary questioning of persons in public places; search for weapons. 1. In addition to the authority provided by this article for making an arrest without a warrant, a police officer may stop a person in a public place located within the geographical area of such officer's employment **when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law**, and may demand of him his name, address and an explanation of his conduct."

(boldface formatting added for emphasis)

101.    The following is a relevant excerpt from NYPL §120.45 that addresses stalking:

"A person is guilty of stalking in the fourth degree when he or she intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct:

1. is likely to cause reasonable fear of material harm to the physical health, safety

or property of such person, a member of such person's immediate family or a third party with whom such person is acquainted; or"

102.   The following shows the text of 18 U.S.C. 245(b)(5):

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—shall be fined under this title, or imprisoned not more than one year, or both;

103.   The following is the plain text of 42 U.S.C. 1986:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

104.   The following are relevant excerpts from *Piesco v. City of New York, Dept. of Personnel,*

*933 F.2d 1149 (2d Cir. 1991):*

a.   A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

b.   Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

c.    "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

d.    "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

e.    "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

f.    "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes."

g.    The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

h.    Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

105.   The following excerpts are from *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) that cites *Pen American Center, Inc., v. Trump*, No. 18-cv-9433 (LGS)(S.D.N.Y. Mar. 24, 2020):

a.    "we acknowledged that this Court has referred to a First Amendment right to "receive information and ideas," and that freedom of speech " `necessarily protects the right to receive.'"

b.    "Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here,[14] the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases."

106.   *Trump v. Vance*, 591 S. Ct. (U.S. 2020):

"the public has a right to everyman's evidence"

107.   The following significant findings from *Higginbotham v. City of New York*, 105 F. Supp.

3d 369 (S.D.N.Y. 2015):

> "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 11, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (stating that "[t]here is an undoubted right to gather news `from any source by means within the law'"

108.  *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997):

> Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content on the Internet is as diverse as human thought." 929 F. Supp., at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium.

109.  *Gonzalez v. City of New York*, No. 14 Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016) states the following:

> "Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is very limited."

110.  *Sutera v. Transportation Security Administration*, No. 09-CV-2351 (E.D.N.Y. Apr. 29, 2010) states the following:

> "An individual's substantive due process rights bar "some government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331 (1986). To prevail on a claim alleging a violation of substantive due process, a claimant must establish that the governmental conduct at issue was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir. 1999) (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1716 (1998); *Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C. Cir. 1988)). In some contexts, a "fundamental procedural irregularity" may give rise to a substantive due process violation. *See id.* at 262 (citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832-33 (1st Cir. 1982))."

111.  *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) states the

following:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable America, Inc.,* 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th Cir.1994) (internal quotation omitted)."

112.    *Toy Manufacturers v. Helmsley-Spear*, 960 F. Supp. 673, 42 U.S.P.Q.2d 1203 (S.D.N.Y. 1997) states the following:

> "It is well-established that "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 390 (5th Cir.1977). *See generally* 4 McCarthy § 30:4 at 30-11 (explaining courts have power to enjoin "an act, which if done alone could be legal, but when performed in the context of a totality of acts does constitute unfair competition")."

113.    The following is a relevant excerpt from *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999):

> "[a] public armed with information . . . is better able to detect" wrongdoing. See *id.,* at 67; see also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley v. Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

114.    The following are relevant excerpts from *Elrod v. Burns,* 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976):

    a.    "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

    b.    "timeliness of political speech is particularly important"

115.    The following excerpts from *Capogrosso v. Gelbstein*, No. 18-CV-2710 (MKB)(LB) (E.D.N.Y. Sept. 25, 2019) address First Amendment retaliation claims in relation to temporal proximity between protected speech and adverse treatment that followed 7 weeks later:

a.    "The First Amendment protects "the right of the people . . . to petition the government for the redress of grievances." U.S. Const. amend. I. "The right to petition is . . . implicit in `[t]he very idea of [republican] government," *McDonald v. Smith,* 472 U.S. 479, 482 (1985) (quoting *United States v. Cruikshank,* 92 U.S. 542, 552 (1876)), and "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives," *Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379, 388 (2011). "A petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." *Id.* at 388-89. Because "speech critical of the exercise of the State's power lies at the very center of the First Amendment," *Velez v. Levy,* 401 F.3d 75, 97 (2d Cir. 2005) (quoting *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1034 (1991)), "`a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed' by the First Amendment," *Velez,* 401 F.3d at 97 (quoting *Friedl v. City of New York.,* 210 F.3d 79, 86-87 (2d Cir. 2000)); *see also Safepath Sys. LLC v. N.Y.C. Dep't of Educ.,* 563 F. App'x 851, 857 (2d Cir. 2014) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment." (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir. 2002))).

Plaintiff plausibly alleges that he engaged in protected speech. Plaintiff alleges that he was banned from the TVB courts in response to his March 2015 Complaint to Morgan in her capacity as an Assistant Attorney General in the New York State Office of the Attorney General.[10] "

b.    "The second element of a First Amendment retaliation claim requires a plaintiff to show that "the defendant's actions were motivated or substantially caused" by the plaintiff's First Amendment activity. *Dorsett,* 732 F.3d at 160. "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk,* 776 F.3d 114, 118 (2d Cir. 2015) (citing *Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir. 2004)); *see also Hampshire Recreation, LLC v. Vill. of Mamaroneck,* 664 F. App'x 98, 100 (2d Cir. 2016) (holding, in First Amendment retaliation case, that a "causal connection [is] established where protected activity is closely followed in time by [an] adverse action" (internal quotation marks omitted) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir. 2001))); *Gogol v. City of New York,* No. 15-CV-5703, 2017 WL 3449352, at *9 (finding, in a First Amendment retaliation case, that "temporal proximity is strong evidence of improper intent" (citation omitted)).

"[D]irect evidence of retaliation may consist of `conduct or statements by persons involved in the decision[-]making process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'" *McAvey v. Orange-Ulster BOCES,* 805 F. Supp. 2d 30, 40 (S.D.N.Y. 2011) (alteration in original) (citation omitted) (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir. 1997)). The Second Circuit "has declined to draw a bright line as to how close in time the [protected activity and the adverse action] must be" to establish the causation element of a First Amendment retaliation claim, and has "instead called on courts to exercise `judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.'" *Brandon,* ___ F.3d at ___, 2019 WL 4263361, at *14 (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009))."

For purposes of the motion to dismiss, Plaintiff has established a causal link between his protected First Amendment activity and the State Defendants' actions banning him from the TVB courts. Plaintiff alleges that on May 8, 2015, seven weeks after Plaintiff sent the March 2015 Complaint, Gelbstein and Calvo approached him at the Brooklyn South Office of the TVB. (Compl. ¶ 10.) Gelbstein then stated, "[c]an't you go practice somewhere else[.] I saw what you wrote about me that I am complicit and incapable," (*id.*) — comments that not only indicate that Gelbstein and Calvo were aware of Plaintiff's letter and its contents, but that also "may be viewed as directly reflecting the alleged [retaliatory] attitude," *McAvey,* 805 F. Supp. at 40. Three days later, on May 11, 2015, Plaintiff was approached by Smart, who "attempt[ed] to provoke . . . Plaintiff into a physical confrontation." (*Id.* ¶ 11.) Despite Plaintiff's "refus[al] to engage" in a physical confrontation with Smart, Plaintiff was then approached by Calvo, who asked him to leave the building and informed him that he was no longer allowed at any TVB locations."

116.   The following is a relevant excerpt from the landmark decision that was issued in *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971):

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); see also *Near* v. *Minnesota,* 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971). The District Court for the Southern District of New York in the *New York Times* case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the *Washington Post* case held that the Government had not met that burden. We agree."

117.   *Hoefer v. Board of Education of the Enlarged City School District Of Middletown*, No. 10 Civ. 3244 (ER) (S.D.N.Y. June 6, 2017) states the following about viewpoint discrimination:

""[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Nat'l Council of Arab Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y.*, 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004))."

118.   *Nation Magazine v. US Dept. of Defense*, 762 F. Supp. 1558 (S.D.N.Y. 1991) states the

following:

> Regardless of whether the government is constitutionally required to open the battlefield to the press as representatives of the public, a question that this Court has declined to decide, once the government does so it is bound to do so in a non-discriminatory manner. *See Houchins,* 438 U.S. at 16, 98 S.Ct. at 2597; *American Broadcasting Co., Inc. v. Cuomo,* 570 F.2d 1080 at 1083 (2nd Cir. 1977). Once a limited public forum has been created, the government is under an obligation to insure that "access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C.Cir.1977); *see also Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975). Restrictions on newsgathering must generally be no more "arduous than necessary, and ... individual news[persons] may not be arbitrarily excluded from sources of information." *Sherrill,* 569 F.2d at 130; *see also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491-92, 95 S.Ct. 1029, 1044-45, 43 L.Ed.2d 328 (1975); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943).
>
> The seminal case suggesting the analysis by which to determine whether regulations are discriminatory is *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).[14] Above "all else," the Court wrote, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Id.* The *Mosley* Court invalidated a Chicago ordinance which barred picketing within 150 feet of a school but exempted "peaceful picketing of any school involved in a labor dispute." *Id.* at 93, 92 S.Ct. at 2288. Once a forum is opened to assembly, speaking or observation by some groups, the government may not limit access to others who may express controversial or less favored views. *Id.* at 96, 92 S.Ct. at 2290. Furthermore, the government "may not select which issues are worth discussing or debating." *Id.* There is, the Court wrote, "an equality of status in the field of ideas" and the government must afford all points of view an equal opportunity to be heard. *Id.*
>
> In focusing on the equality of all points of view, the *Mosley* Court was not concerned about whether the restricted speech was harmful or offensive to listeners such that its suppression was justified. Rather, the basis for invalidating the ordinance was its underinclusive character. The Court held that by limiting the voices that could be heard at the stairs of the school door to those involved in a labor dispute, the government was deciding what information was of value to the American people.

> This, the Court concluded, was a content-based determination which is impermissible under the First Amendment. As one commentator has suggested, the key issue in *Mosley* "is whether the government may constitutionally restrict *only* the speech restricted." Stone, *Content Regulation and the First Amendment* 25 Wm. & Mary L.Rev. 189, 203 (1983); *see also Erznoznik v. Jacksonville,* 422 U.S. 205, 208-12, 95 S.Ct. 2268, 2272-74, 45 L.Ed.2d 125 (1975); *Widmar v. Vincent,* 454 U.S. 263, 267-77, 102 S.Ct. 269, 273-78, 70 L.Ed.2d 440 (1981).

119.    The excerpts shown next are from *Ragbir v. Homan*, No. 18-1597 (2d Cir. Apr. 25, 2019) and concern viewpoint discrimination and matters that qualify as being protected speech and of public concern. These excerpts also address retaliation for trying to attract news coverage about a matter. Although not addressed in that case, matters about **a)** members of the NYPD and Bill de Blasio's staff while he was New York City's Mayor committing civil rights crimes comprised of voter fraud, voter suppression, and whistleblower retaliation at public forums that were partly conducted by Mr. de Blasio as he and other incumbents in New York City's government used them as campaign events to boost their re-election prospects in 2017; **b)** wage-theft that substantially harm people during pandemics and otherwise; **c)** governments partnering with companies that commit wage-theft that wage-theft victims and others are forced to fund; **d)** fraud by government agencies and their business partners concerning publicly-subsidized housing; and **e)** judicial misconduct are also matters of public concern. Whistleblowing about such matters unquestionably is protected speech.

**Excerpts from *Ragbir v. Homan*:**

a | ""Ragbir's speech implicates the apex of protection under the First Amendment. His advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents. Thus, Ragbir's speech on a matter of "public concern"[22] is at "the heart of . . . First Amendment[] protection,"[23] and "occupies the highest rung of the hierarchy of First Amendment values,"' *Snyder v. Phelps,* 562 U.S. 443, 451-52 (2011) (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758-59 (1985)). Because Ragbir's speech concerns "political change," it is also "core political speech" and thus "trenches upon an area in which the importance of First Amendment protections *is at its zenith.*" *Meyer v. Grant,* 486 U.S. 414, 421-22, 425 (1988) (emphasis added and internal quotation marks omitted). Indeed, his "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1034 (1991)."

b | ""It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam,* 137 S. Ct. 1744, 1765 (2017). "Such discriminat[ion] based on viewpoint is an `egregious form of content discrimination,' which is `presumptively unconstitutional.'"[24] *Id.* at 1766 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829-30 (1995)). The Supreme Court has further described viewpoint discrimination as a "blatant" "violation of the First Amendment." *Rosenberger,* 515 U.S. at 829.

Ragbir's plausible allegations and evidence, which we must accept as true at this juncture, support that the Government singled him out for deportation based not only on the viewpoint of his political speech, but on the public attention it received."

c | "A plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him."

120.    The following excerpt from *Stauber v. City of New York*, No. 03 Civ. 9162 (RWS) (S.D.N.Y. July 16, 2004) confirms that the defendants bear the burden of establishing that acts and omissions in violation of my legal rights that they committed against me or otherwise condoned had an entirely valid legal justification:

Because a time, place, and manner restriction exists, the defendants "bear the burden of demonstrating that [it] is narrowly tailored to serve a significant governmental interest." Housing Works, Inc. v. Safir, 101 F. Supp. 2d 163, 170 (S.D.N.Y. 2000) (citing Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1052 (2d Cir. 1983)). The defendants attempt to shift this burden by arguing that the

plaintiffs have shown no "First Amendment right to access information." Def.'s Post-Hearing Mem. at 13. However, it is the defendants that must show the law enforcement or public safety purposes that failing to provide access information serves.

Plaintiffs argue that defendants have not shown that the failure to provide access information serves any legitimate governmental interest, and is therefore not narrowly tailored.

> [T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

Ward, 491 U.S. at 799 (internal quotations and citations omitted).

121.   The following are extremely well-reasoned and significant findings about due process insofar as First Amendment, Fifth Amendment, and Fourteenth Amendment rights are concerned that are from *Karem v. Trump*, No. 19-cv-5255 (D.C. Cir. June 5, 2020) and cite findings that were issued by the U.S. Supreme Court:

> Karem raises a host of challenges to the suspension of his hard pass, including that he lacked fair notice of the proscribed conduct; that the professionalism standard permitted discriminatory enforcement; that the White House failed to hand over key evidence; that Grisham predetermined the proceeding's outcome; that the suspension constituted veiled content- and viewpoint-based punishment; and, lastly, that "nothing provided [him] with notice of the severity of the penalty that might be imposed" for his purportedly unprofessional conduct. Appellee's Br. 35 (internal quotation marks omitted). We begin—and end—with Karem's final argument.

> "A fundamental principle in our legal system," the Supreme Court observed in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id*. at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." *Id*. at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis

omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

122.   *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y. 1969) **a)** cites both *Brown v. Louisiana*, 383

U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) and *Edwards v. South Carolina*, 372 U.S. 229, 83

S.Ct. 680, 9 L.Ed.2d 697 (1963) and **b)** includes the following relevant excerpts:

a.     "Fear of disorder, which the City cites to justify its policy, has been ruled out as a

ground for limiting peaceful exercise of First Amendment rights."

b.     "the right of free speech is not confined to verbal expression but includes

"the right in a peaceable and orderly manner to protest by silent and reproachful presence, *in a place where the protestant has every right to be.*" (Emphasis added.)"

123.   The following are significant findings from *Calicchio v. Sachem Central School District,*

No. 14-cv-5958 (DRH)(SIL) (E.D.N.Y. Jan. 17, 2020):

Substantive due process rights safeguard persons "against the government's `exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks omitted). See Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994). To state a Substantive Due Process claim, plaintiffs must allege (1) a valid liberty or property interest, and (2) defendants infringed on that interest in an arbitrary or irrational manner. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 503 (2d Cir. 2001); Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir.1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels `arbitrary' and `outrageous.'").

124.    The following are relevant findings from Pen American Center, Inc., v. Trump, No. 18-cv-9433 (LGS)(S.D.N.Y. Mar. 24, 2020) that addressed First Amendment retaliation and prior restraints imposed First Amendment rights that caused First Amendment injuries by chilling speech as well as the ability of others to receive speech from a speaker:

    a.  "a claim of specific present objective harm or a threat of specific future harm" to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing"

    b.  "Defendant's retaliatory actions and threats have injured Mr. Acosta in two ways: (i) Mr. Acosta's own speech has been chilled, and (ii) Mr. Acosta's right to receive the speech of his press corps colleagues has been impeded, because their speech has been chilled. These are classic First Amendment injuries. See Laird v. Tatum, 408 U.S. 1, 13-14 (1972) (stating that, although claims of a "subjective chill" are insufficient, "a claim of specific present objective harm or a threat of specific future harm" to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing); accord Davis v New York State Bd. of Elections, 689 Fed. App'x 665, 669 (2d Cir. 2017) (summary order); see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-57 (1976) ("[W]here a speaker exists," the First Amendment "necessarily protects the right to receive" the speech) (internal quotation marks omitted); accord Kass v. City of New York, 864 F.3d 200, 207 (2d Cir. 2017).

      The Complaint alleges that Mr. Acosta and the press corps have suffered an "objective harm [and] a threat of a specific future harm," Laird, 408 U.S. at 13-14, and that Mr. Acosta's resulting speech and receipt-of-information injuries are concrete, actual and particularized. Defendant has made an example of Mr.

Acosta, by stripping his press credentials after he asked Defendant critical questions about the Administration, barring Mr. Acosta from the venue necessary to perform his job and directing the Press Secretary to warn other reporters that they would face similar consequences as Mr. Acosta. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) ("A plaintiff must allege something more than an abstract, subjective fear that his rights are chilled . . . but a real and imminent fear of such chilling is enough" based on the objective circumstances); *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (a chilling injury is established through "objective evidence" that "challenged conduct has deterred [a speaker] from engaging in protected activity"). The allegations furthermore suggest that Defendant punished Mr. Acosta publicly in order to chill his speech and the press corps'. In demonstrating that Defendant would in fact punish reporters who spoke critically, Defendant made his threats of future punishment more credible, and consequently, effective. The speech injuries are furthermore particular to Mr. Acosta. As a member of the press corps, and as a reporter specially targeted by Defendant, Mr. Acosta is uniquely vulnerable to Defendant's threats. He also has a unique interest in hearing the questions and discussion of his press corps colleagues with Defendant, which facilitate Mr. Acosta's own reporting.[2]"

125.   *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972)

states the following:

"But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269-270 (1964), and cases cited; *NAACP v. Button,* 371 U. S. 415, 445 (1963); *Wood* v. *Georgia,* 370 U. S. 375, 388-389 (1962); *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); *De Jonge* v. *Oregon*  299 U. S. 353, 365 (1937). To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan, supra,* at 270.

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas,"[4]and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."

126.   The following are relevant excerpts from *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014):

    a.   "It is uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express. See, e.g., *Police Dept. of Chicago v. Mosley*, 408 U. S. 92, 96 (1972)."

    b.   "Instead, the protesters urge, the agents had them moved solely to insulate the President from their message, thereby giving the President's supporters greater visibility and audibility. See Tr. of Oral Arg. 35–36. The Ninth Circuit found sufficient the protesters' allegations that the agents "acted *with the sole intent* to discriminate against [the protesters] because of their viewpoint". 711 F. 3d, at 964. Accordingly, the Court of Appeals "allow[ed] the protestors' claim of viewpoint discrimination to proceed." *Id*., at 962.

    It may be, the agents acknowledged, that clearly established law proscribed the Secret Service from disadvantaging one group of speakers in comparison to another if the agents had "no objectively reasonable security rationale" for their conduct, but acted solely to inhibit the expression of disfavored views. See Tr. of Oral Arg. 28–29; Brief for Petitioners 52 (entitlement to relief might have been established if, for example, "the pro-Bush group had . . . been allowed to move into the nearer location that the anti-Bush had vacated")."

127.   The following is a relevant excerpt from *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) that concerns the fact that the First Amendment includes protection for the right to engage in expressive association with members of the public, government personnel, prospective voters, legal observers, activists, journalists, and others in public areas in subway stations, on sidewalks, in streets, in parks, in public areas that exist inside of courthouses, while attending public meetings, during curfews as illegal selective-enforcement exists, and demonstrations that include protests, and other occasions:

    "Plaintiffs next argue that the searches and detentions violated their First Amendment right of freedom of expressive association. Plaintiffs unquestionably had a protected right to express themselves through association at the RIS Conference. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States*

*Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). As the Supreme Court observed in *Roberts,* the right of expressive association "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.* Participation in the RIS Conference — a social, religious, and cultural gathering — falls squarely within the forms of associational activity protected by the First Amendment."

128.   The following is a pertinent excerpt from *Green v. Westchester County,* No. 18-cv-09167 (NSR) (S.D.N.Y. June 20, 2019) that confirms that both unofficial and official policies by Defendant City of New York may suffice for establishing *Monell* liability for municipal liability claims.

Further, "both official and unofficial policies may suffice for establishing *Monell* liability. For an unofficial policy or custom to invite *Monell* liability, the practice, custom or usage must be so widespread and so persistent that it has the force of law." *DiPippo v. Cty. of Putnam,* No. 17-CV-7948 (NSR), 2019 WL 1004152, at *8 (S.D.N.Y. Feb. 28, 2019).

129.   The following pertinent excerpts from *Doe v. City of New York,* No. 15-CV-0117 (AJN) (S.D.N.Y. Sept. 28, 2018) address municipal liability and deliberate indifference by government officials about violations of constitutional rights:

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). In other words, "municipalities are `responsible only for their own illegal acts,' and cannot be held `vicariously liable under § 1983 for their employees' actions.'" *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson,* 563 U.S. 51, 60 (2011)). To sustain a *Monell* claim, a plaintiff "must prove that `action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick,* 563 U.S. at 60).

A municipal policy may be "pronounced or tacit and reflected in either action or inaction." *Id.* at 334. With respect to the latter category, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution," *Id.* (quoting *Connick,* 563 U.S. at 61-62). Thus, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a `deliberate choice,' that acquiescence may `be properly thought of as a city policy or custom that is actionable under § 1983.'" *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton,* 489

U.S. at 388). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir. 1996). Indeed, failure to "carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced," *City of St. Louis v. Praprotnik,* 485 U.S. 112, 131 (1988). Deliberate indifference may be proven through "proof of repeated complaints of civil rights violations" if "the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995). Such claims put the City on notice even if the complaints are ultimately not meritorious, *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir. 1986). "Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was `contrary to the practice of most . . . departments' and was `particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated" *Vann,* 72 F.3d at 1049."

130.   The following findings from *Duncan v. Sullivan County*, No. 18 CV 9269 (VB)

(S.D.N.Y. Mar. 2, 2020) address personal involvement in deprivations of constitutional rights

and supervisory liability:

> "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994). "The Second Circuit has defined `personal involvement' to mean direct participation, such as `personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as `ordering or helping others to do the unlawful acts.'" Leneau v. Ponte, 2018 WL 566456, at *14 (S.D.N.Y. Jan. 25, 2018) (quoting Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001)).
>
> > Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.
>
> Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).[2]

131.   The following findings from *Adebiyi v. City of New York*, No. 13-CV-380

(WFK)(CLP)(E.D.N.Y. Sep. 30, 2014) address the legal standard that applies to proving

conspiracies to violate civil rights:

""To sustain a claim for conspiracy under § 1983, a plaintiff must demonstrate that **a defendant acted in a `willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiffs rights . . . secured by the constitution or the federal courts**.'" *Morpugo v. Incorporated Vill. of Sag Harbor,* 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) (Seybert, J.) (citing *Maish v. Corr. Officer Austin,* 901 F. Supp. 757, 765 (S.D.N.Y. 1995) (Koeltl, J.))."

(boldface formatting added for emphasis)

132.    The following excerpt from *US v. Basey*, 816 F.2d 980 (5th Cir. 1987) addresses the guilt

of those who participate in conspiracies:

"Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,* 578 F.2d 121, 122-23 (5th Cir.1978)."

133.    The following excerpt from *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) presents a

useful discussion about co-conspirators in conspiracies:

"This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," *United States v. Mangan,* 575 F.2d 32, 44 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. *See United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986), *cert. denied,* ___ U.S. ___, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). *See also United States v. Persico,* 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar,* 714 F.2d 238, 252 (3d Cir.) (citations omitted), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)."

134.    The following excerpts from *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) address

conspiracies and how they may be proven:

a.      "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in

concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

b.   "While "conclusory allegations" of a § 1983 conspiracy are insufficient, _Dwares v. City of New York,_ 985 F.2d 94, 99-100 (2nd Cir.1993) (citing cases), we have recognized that such "conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence. _Rounseville v. Zahl,_ 13 F.3d 625, 632 (2d Cir.1994)."

c.   "while "futility" is a valid reason for denying a motion to amend, _John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp._, 22 F.3d 458, 462 (2d Cir.1994), this is true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims. _Ricciuti v. N.Y.C. Transit Auth._, 941 F.2d 119, 123 (2d Cir.1991)"

135.   The following is a relevant excerpt from _Jutrowski v. TP. of Riverdale_, 904 F.3d 280 (3d Cir. 2018):

"where a plaintiff adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, he may be able to state a claim under § 1983 for the violation of a different constitutional right: the due process right of access to the courts."

136.   The following findings from _Wright v. Musanti_, No. 14-cv-8976 (KBF) (S.D.N.Y. Jan. 20, 2017) address punitive damages, the legal definition of assault in New York State, and the fact that an initial aggressor is liable for all subsequent hostilities that arise between two or more parties:

| a | "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 n.9 (1986); see also Loughry v. Lincoln First Bank, N.A., 494 N.E.2d 70, 74 (N.Y. 1986) (explaining that punitive damages "serve the societal purposes of punishing and deterring the wrongdoer, as well as others, from similar conduct in the future.") (citation omitted). Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases", Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013), such as those "involving `gross, wanton, or willful fraud or other morally culpable conduct'", Action S.A. v. Marc Rich & Co., 951 F.2d 504, 509 (2d Cir. 1991) (quoting Borkowski v. Borkowski, 355 N.E.2d 287, 287 (N.Y. 1976)); see also Marinaccio, 986 N.E.2d at 906 (noting that "the conduct justifying [a punitive damages] award must manifest `spite or malice, or a fraudulent or evil |

motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton'") (quoting Dupree v. Giugliano, 982 N.E.2d 74, 76 (N.Y. 2012)); Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 196 (N.Y. 2007) ("Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but `evince[s] a high degree of moral turpitude and demonstrate[s] such a wanton dishonesty as to imply a criminal indifference to civil obligations") (quoting Walker v. Sheldon, 179 N.E.2d 497, 499 (N.Y. 1961)).

Although the factfinder has discretion to determine whether to award punitive damages and, if so, in what amount, Nardelli v. Stamberg, 377 N.E.2d 975, 977 (N.Y. 1978), punitive damages must "bear some reasonable relation to the harm done and the flagrancy of the conduct causing it". Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 131 (N.Y. 2008) (citation omitted). In arriving at the appropriate amount, the factfinder may consider the defendant's financial circumstances. Brink's Inc v. City of N.Y., 717 F.2d 700, 706-07 (2d Cir. 1983)("Under New York law, evidence of a defendant's wealth is admissible on the issue of the amount of punitive damages.") (citations omitted); see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd., 891 F. Supp. 935, 945 (S.D.N.Y. 1995); Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267-68 (S.D.N.Y. 1999).

Here, the Court finds that defendant's conduct reflects the sort of willful disregard of the interests of others that justifies imposing punitive damages, see, e.g., Marinaccio, 986 N.E.2d at 906, both as a general and specific deterrent, see Memphis Cmty. Sch. Dist., 477 U.S. at 306 n.9. A $10,000 award is appropriate here. In arriving at this amount, the Court considers the financial circumstances of defendant, as it is entitled to do. See Brink's Inc., 717 F.2d at 706-07; Softel, Inc., 891 F. Supp. at 945; Greenbaum, 67 F. Supp. 2d at 267-68. At trial, the Court specifically questioned defendant regarding her financial circumstances for the stated purpose of identifying an appropriate amount of punitive damages to impose, if any. (See Tr. 80:10-84:25.) The Court repeatedly invited defendant to bring any information she thought might be relevant to the Court's attention. (Id. 83:20-84:25.) During the course of that exchange, defendant testified regarding her and her husband's salaries, as well as their family planning, and primary assets and debts, as described below.

| b | "Under New York law, "`[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'" Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)); Farash v. Cont'l Airlines, Inc., 337 F. App'x 7, 9-10 (2d Cir. 2009) (same). "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" |

| c | "Under these circumstances, defendant's kick clearly altered the tenor of the |

> parties' interaction, shifting the encounter from an ordinary, nonaggressive interaction between two pedestrians to something more akin to a street brawl. As a result, defendant served as the initial aggressor at the outset of the encounter, rendering her liable to plaintiff for all ensuing assaults and batteries"

137.    The following related findings from the Second Circuit's decision in *Wright v. Musanti,* 887 F.3d 577 (2d Cir. 2018) that confirm that total household income may be used to calculate punitive damages:

> "Musanti also argues that the district court improperly considered her husband's salary and assets when determining the amount of punitive damages. In awarding $10,000 in punitive damages, the court considered Musanti's testimony that she had virtually no income, that her husband made around $65,000 a year, that the couple owned a home and two cars, and that her husband had debt in the form of student loans. The court's opinion makes clear that it seriously considered the amount of punitive damages to award, including requesting financial documents from Musanti, which Musanti failed to provide. New York law permits the fact finder to consider evidence of a defendant's wealth when setting the amount of punitive damages, in order to determine what amount would be sufficient to punish that particular defendant and deter "others of similar mind." *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904, 910 (4th Dep't 1975). Musanti presents no authority to support her assertion that consideration of her entire household's income and assets was improper."

138.    Since the City of New York clearly hasn't gotten the memo about the fact that it simply doesn't pay to allow its agencies and personnel to continue to violate First Amendment rights, this Court should make certain that the City of New York picks up a far greater check in response to this by awarding me damages for First Amendment retaliation that greatly exceed the $685,000 amount cited in the following excerpt from *Jennings v. Town of Stratford,* 263 F. Supp. 3d 391 (D. Conn. 2017) to make the City of New York and its personnel properly understand this point and have it function as an effective deterrent:

> "I conclude that an award of $230,000 in emotional distress damages was fair, reasonable, predictable, and proportionate in this case, and reasonably within the range found in other, more comparable cases. *See McClain v. Pfizer, Inc.,* 2011 WL 2533670, at *2 (D. Conn. 2011) (declining to disturb jury's award of $685,000 in non-economic damages for First Amendment retaliation), *aff'd,* 505 Fed.Appx. 59 (2d Cir. 2012); *Phillips v. Bowen,* 278 F.3d 103, 111 (2d Cir. 2002) (declining to disturb jury's award of

$400,000 in emotional distress damages for First Amendment retaliation); *Lore v. City of Syracuse*, 670 F.3d 127, 179 (2d Cir. 2012) (declining to disturb jury's award of $150,000 in emotional distress damages for retaliation)."

139.  The following excerpts from *People v. Howard*, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408

N.E.2d 908 (1980) clearly confirms that people have a right to be left alone by law-enforcement

personnel when they are conducting themselves in a lawful manner:

| a | "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away." |
|---|---|

| b | "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. As Mr. Justice BRANDEIS put it long ago in *Olmstead v United States* (277 US 438, 478), defendant had "the right to be let alone."" |
|---|---|

140.  The following is the plain text of New York City Charter §1116:

a.  Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall forfeit such office or employment, and be excluded forever after from receiving or holding any office or employment under the city government.

b.  Any officer or employee of the city or of any city agency who shall knowingly make a false or deceptive report or statement in the course of duty shall be guilty of a misdemeanor and, upon conviction, forfeit such office or employment.

141.  Upon information and belief, all employees of the City of New York are required to

submit and oath of affirmation upon beginning such employment in which the pledge to perform

their duties in such jobs to the best of the abilities and in accordance with the U.S. and New York State Constitution.

142.    What follows are pertinent excerpts from *Best v. New York City Dept. of Correction*, 14 F. Supp. 3d 341 (S.D.N.Y. 2014). That court decision is relevant in this complaint because I am pursuing selective-enforcement claims that correspond to the class-of-one legal theory that is based upon an illegitimate animus. *Best v. New York City Dept. of Correction*, 14 F. Supp. 3d 341 (S.D.N.Y. 2014) presents the legal standard for such claims.

a.    ""Plaintiff also purports to assert a Fourteenth Amendment equal-protection claim. (*See generally* Pl.'s Opp'n 10-19.) "Where... [a] [p]laintiff does not claim to be a member of a protected class, he may bring an equal protection claim under one of two theories: selective enforcement or `class of one.'" *Rankel v. Town of Somers,* 999 F.Supp.2d 527, 544, 2014 WL 715702, at *11 (S.D.N.Y. Feb. 25, 2014). Plaintiff does not claim to be a member of a protected class in his Amended Complaint, and the only two equal-protection theories that he discusses in his Opposition are selective enforcement and class of one. (*See* Pl.'s Opp'n 14-19 (discussing Plaintiff's selective-enforcement claim); *id.* at 10-14 (discussing Plaintiff's class-of-one claim).)

"To state a selective-enforcement claim, a plaintiff must plead: (1) he was `treated differently from other similarly situated' individuals and (2) `that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Rankel,* 999 F.Supp.2d at 544, 2014 WL 715702, at *11(quoting *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007)); *see also Martine's Serv. Ctr., Inc. v. Town of Wallkill,* 554 Fed.Appx. 32, 35, 2014 WL 321943, at *2 (2d Cir. Jan. 30, 2014) ("An equal protection claim premised on selective enforcement requires a showing that (1) compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitution rights, or by a malicious or bad faith intent to injure [the plaintiff]."")

b.    ""Under a class-of-one theory, a plaintiff must allege that he has been `intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Rankel,* 999 F.Supp.2d at 544, 2014 WL 715702, at *11 (quoting *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir.2010))"

143.   <u>Dolan v. Connolly</u>, No. 13 Civ. 5726 (GBD)(GWG) (S.D.N.Y. Mar. 2, 2017) states the

following:

> "An "official's conduct violates clearly established law when, at the time of the
> challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every
> reasonable official would have understood that what he is doing violates that
> right." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (alterations in original)
> (internal quotation marks omitted) (quoting <u>Anderson v. Creighton</u>, 483 U.S.
> 635, 640 (1987)).
>
> The Second Circuit has held "[a] right is clearly established if (1) the law is
> defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has
> recognized the right, and (3) 'a reasonable defendant [would] have understood
> from the existing law that [his] conduct was *16 unlawful.'" <u>Luna v. Pico</u>, 356
> F.3d 481, 490 (2d Cir. 2004) (alterations in original) (quoting <u>Anderson v.
> Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003)). "The question is not what a lawyer
> would learn or intuit from researching case law, but what a reasonable person in
> [the] defendant's position should know about the constitutionality of the
> conduct." <u>Abrams v. Dep't of Pub. Safety</u>, 764 F.3d 244, 255 (2d Cir. 2014)
> (alteration in original) (internal quotation marks omitted) (quoting <u>Young v.
> County of Fulton</u>, 160 F.3d 899, 903 (2d Cir. 1998)); <u>accord Luna</u>, 356 F.3d at
> 490 (quoting <u>McCullough v. Wyandanch Union Free Sch. Dist.</u>, 187 F.3d 272,
> 278 (2d Cir. 1999); and citing <u>Anderson</u>, 483 U.S. at 640).
>
> Even if there is not a case directly on point saying particular conduct is
> prohibited, a court may "nonetheless treat the law as clearly established if
> decisions from [the Second Circuit] or other circuits clearly foreshadow a
> particular ruling on the issue." <u>Terebesi v. Torreso</u>, 764 F.3d 217, 231 (2d Cir.
> 2014) (internal quotation marks omitted) (quoting <u>Scott v. Fischer</u>, 616 F.3d
> 100, 105 (2d Cir. 2010)). The degree to which such foreshadowing must occur
> has been articulated by the Supreme Court in recent decisions. Thus, in <u>White v.
> Pauly</u>, 2017 WL 69170 (U.S. Jan. 9, 2017), the Court emphasized:
>
>> [5] We reject defendants' argument that <u>Taylor v. Barkes</u>, 135 S. Ct. 2042
>> (2015), "indicate[s] that only Supreme Court precedent, not circuit
>> precedent, can establish clearly established law for qualified immunity
>> purposes." Defs. Reply at 12. The passage defendants cite from <u>Taylor</u>,
>> 135 S. Ct. at 2044, does not support defendants' argument. And to our
>> knowledge the Supreme Court has never so held.
>>
>> "'[E]xisting precedent must have placed the statutory or constitutional
>> question beyond debate.'" [<u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015)]. In
>> other words, immunity protects "'all but the plainly incompetent or those
>> who knowingly violate the law.'" <u>Ibid</u>. . . . "[C]learly established law" should

> not be defined "at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)."

144.    The following are relevant excerpts from _Hack v. President and Fellows of Yale College, 237 F.3d 81 (2d Cir. 2000)_:

   a.   "The district court has a duty to consider whether a plaintiff's allegations could provide relief under any available legal theory."

   b.   "complaint does not have to state a legal theory and specification of an incorrect theory is not fatal"

   c.   "federal pleading is by statement of claim, not by legal theory"

145.    The following finding from _Kassner v. 2nd Avenue Delicatessen Inc._, 496 F.3d 229 (2d Cir. 2007) is relevant because it confirms that district judges need to recognize and accept claims that plaintiffs present both explicitly and implicitly in their complaints and amended complaints:

   "we conclude that the district court properly dismissed Kassner's claims of alleged discriminatory assignments, erred in dismissing her implied claims"

146.    _Triestman v. Federal Bureau of Prisons_, 470 F.3d 471 (2d Cir. 2006) requires this Court to construe and interpret the information in my submissions in this case to raise the strongest arguments that they suggest and to grant me special solicitude.

147.    _Dornberger v. Metropolitan Life Ins. Co._, 961 F. Supp. 506 (S.D.N.Y. 1997) confirms that I'm entitled to plead matters upon information and belief, especially when the defendants possess the facts and evidence that cause me to need to do so until discovery occurs.

148.    What is shown next is a relevant excerpt from the last paragraph on page 13 that extends to the top of page 14 in the Second Circuit's 11/17/21 decision in _Jennings v. Yurkiw_, No. 19-4281-cv (L) (2d Cir. Nov. 17, 2021). That information was about an illegal cover-up that members of the NYPD committed that mirrors my claims in this case.

**Background Facts About Precursors for the 7/25/17 Illegal Acts and Omissions Against Me and Deliberate Indifference that Enabled that**

This section is about background facts that concern to a timeline of relevant events that relate to **a)** precursors for the 7/25/17 illegal acts and omissions against me that my claims in this complaint are about as well as **b)** deliberate indifference by Defendants de Blasio, O'Neill, and news censors that foreshadowed the 7/25/17 illegal acts and omissions while demonstrating that they were preventable and foreseeable.

A.      **My claims since 5/19/17 in my HRA lawsuit against members of the NYPD for Bill de Blasio and other members of the NYPD**

1.      On 5/19/17, I filed an order to show cause application ("OSC") in my HRA lawsuit in which I asserted entirely valid claims partly against Defendant Redmond partly in response to the fact that he and others illegally prevented me from attending the 4/27/17 town hall while I was conducting myself in a lawful manner in stark contrast to him and others. He did so after an attorney for HRA named Jeffrey Mosczyc engaged in illegal gamesmanship in my HRA lawsuit that caused my scheduled 4/12/17 oral arguments hearing in it to have been stolen by him and New York State Supreme Court Judge Nancy Bannon as a result of the fact that she illegally granted the illegal ex-parte adjournment application on 4/11/17 that Mr. Mosczyc faxed to her chambers on 4/5/17 without apprising me about that application. I had a hearing in parallel litigation on 4/11/17 against HRA about which I would have otherwise testified on 4/12/17 in my HRA lawsuit during its oral arguments hearing. The illegal adjournment of that 4/12/17 hearing caused it to be postponed until 6/7/17 while Judge Bannon was running for re-election as a corrupt judge. Prior to filing my 5/19/17 OSC in my HRA lawsuit, I reported a complaint to the CCRB on 4/27/17 partly against Mr. Redmond in response to the illegal acts and omissions he

and others committed against me on 4/27/17 in relation to my efforts to lawfully attend the

Mayor's 4/27/17 town hall that I intended to lawfully and mercilessly use as an alternate time,

place, and manner to present the oral arguments that I would have otherwise presented on

4/12/17 in my HRA lawsuit as I certainly would have lawfully gone after both Mr. Mosczyc and

Judge Bannon strictly by what I would have lawfully communicated to others while doing so. I

also intended to engage in whistleblowing and criticism about other matters of both public and

private concern then to the greatest extent possible. My 4/27/17 CCRB complaint against Mr.

Redmond and my 5/19/17 OSC in my HRA lawsuit also served to provide the City of New York

sufficient notice of the urgent need to discipline and fire Mr. Redmond for cause instead of

allowing him and his mob to continue to commit illegal acts and omissions against me.

2.      The fact that Judge Bannon is corrupt and illegally dismissed my HRA lawsuit on

1/31/18 while I continued to have claims in it that were pending to be addressed by a different

judge that were partly about and against Mr. Redmond before that case was reinstated doesn't

change the fact that I provided sufficient information repeatedly since 4/27/17 and prior to

7/25/17 to the City of New York to have its agencies, partners, and personnel diligently and

objectively investigate and discipline Mr. Redmond and his partners in crime. My e-mail records

show that all of the following are among those who I notified about him during that period:

    a.      IAB, DOI, the New York State Court System's Office of Inspector General.

    b.      People and organizations who I later learned are news censors that included

            Michael Gartland, Graham Rayman, Ewa Kern, Jon Cronin, ABC News,

            Spectrum News, New York Times, Pix11 News, and the New York Post.

**B.      5/19/17 perjury by Defendant Howard Redmond during a deposition about why he
          directed members of the NYPD to arrest Kalan Sherrard on 9/17/12 in front of the
          Manhattan Family Court**

1.     On 5/19/17, Mr. Redmond participated in a deposition that was in connection with the

case of *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that

hindsight confirms had a truly stupid jury assigned to it while I attended that trial and watched

and listened to Mr. Redmond like a hawk as he lied during his testimony partly by claiming that

he respect the rights that people have to protest and demonstrate. He certainly does not do so.

During his 5/19/17 deposition, he was asked questions that he answered while lying as he

answered a pair of critically significant ones. The Law Department thereafter provided me both a

copy of the written transcript from that deposition and copies of video recordings that it used at

trial in *Sherrard v. City of New York* in response to a FOIL demand that I submitted. One of the

video recording that it provided to me confirms that Mr. Redmond committed perjury during his

5/19/17 deposition in remarks that he made that appear on page 20 in the written transcript from

that deposition. I coincidentally discovered the lawsuit of *Sherrard v. City of New York* on

4/27/17 while doing preliminary research about Mr. Redmond after he violated my constitutional

rights on that date. *Sherrard v. City of New York* was about how Mr. Redmond illegally directed

other members of the NYPD's mafia to stop and arrest a bicyclist named Kalan Sherrard on

9/17/12 at the intersection of Lafayette Street and Leonard Street in Manhattan that is near the

Manhattan Family Court while Mr. Sherrard was lawfully riding a bicycle along the far-left side

of a roadway at the same time that Mr. Redmond was recklessly driving a car with just one hand

on its steering wheel in the middle of that roadway behind bicyclists who were between where

Mr. Sherrard was and Mr. Redmond's car. Mr. Redmond caused Mr. Sherrard to essentially and

pretextually be kidnapped by members of the NYPD on 9/17/12 for nearly 20 hours during a

period in which Occupy Wall Street demonstrations were occurring in lower Manhattan at which

Mr. Redmond committed further illegal acts on 9/17/12 that led to a legal settlement with a

journalist named Christopher Faraone. The New York City Comptroller's Office provided me a copy of that settlement agreement.

2.      The first screenshot shown next is of lines 11 thru 17 that appear on page 20 of the transcript from Mr. Redmond's 5/19/17 deposition for *Sherrard v. City of New York*. The second screenshot shown next is from the video recording that was recorded on 9/17/12 by a member of the NYPD of the black car that Mr. Redmond recklessly drove with just his right hand on its steering wheel as he drove it in the middle of a street on which Mr. Sherrard is clearly shown in the top-left area as he lawfully rode a bicycle along the far-left side of that street in front of other bicyclists while not blocking Mr. Redmond's car whatsoever.

```
11          Q      The question is, why did you stop at
12     that location?
13          A      Because I was blocked by
14     bicyclists.
15          Q      And was Mr. Sherrard any of those
16     bicyclists that were blocking you?
17          A      Yes.
```



### C.   5/24/17 Unusual Occurrence Report by New York State court officers confirming members of the Mayor's staff and NYPD security detail prevented me from attending the 5/23/17 resource fair

1.    On 5/23/17, Mr. Redmond was among others that partly included New York State court officers who illegally, jointly, and criminally prevented me from attending the Mayor's 5/23/17 resource fair that was held inside of the Veteran's Memorial Hall chamber within the Bronx Supreme Court that is located at 851 Grand Concourse in the Bronx. That occurred during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran. That also occurred while my HRA lawsuit was ongoing and 1 day after Judge Bannon issued an order in response to my 5/19/17 OSC while my HRA lawsuit was then sealed at my request. On 5/24/17, New York State court officer Captain Anthony Manzi completed a report that is known as a "Unusual Occurrence Report" for the UCS that was about interactions that he, other New York State court officers, members of the Mr. de Blasio's NYPD security detail, and members of Mr. de Blasio's staff had with me on 5/23/17 on the first floor in a public hallway

inside of the Bronx Supreme Court as I lawfully attempted to attend the Mayor's 5/23/17 resource fair. While I did so, Mr. Manzi as well as New York State court officers Matthew Brunner and Ramon Dominguez illegally acted in concert with Mr. Redmond, other members of Mr. de Blasio's NYPD security detail, and members of Mr. de Blasio's staff to illegally prevent me from attending the 5/23/17 resource fair. OCA thereafter provided me video recordings that were recorded on 5/23/17 by video security cameras that it controls that confirm this with a video recording that I recorded on 5/23/17 with my cell phone inside of the Bronx Supreme Court. The Unusual Occurrence Report that Mr. Manzi completed on 5/24/17 about me has the report number of 75089 and was issued to me on 8/28/20 by OCA in response to a FOIL demand. Mr. Manzi prepared that report in conjunction with Mr. Brunner and Mr. Mr. Dominguez while **a)** fraudulently omitting incriminating information about themselves in that report and otherwise **b)** lying about me somewhat in it. The report contains the following text that incriminates members of Mr. de Blasio's NYPD security detail and his staff in regards to the illegal acts and omissions that were committed against me on 5/23/17 inside of the Bronx Supreme Court:

> "AT ABOVE T/P/O, THE ABOVE UNKNOWN SUBJECT WAS DENIED ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL."

2.      Judge Schofield fraudulently refused to consider that report in _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) after I received that report from OCA and promptly thereafter apprised her about it in spite of the fact that it entitled me to partial summary judgment about some of my claims in that case. She instead chose to continue to be a corrupt judge while engaging in obstruction of justice in that case before she subjected me to pretextual First Amendment retaliation by dismissing that case on 9/27/21 that has caused it to now be pending appeal.

**D.** **My 6/14/17 testimony to the New York City Council in New York City Hall against the NYPD**

1.      On 6/14/17, I testified in City Hall's main chamber to the City Council's Committee on Public Safety during a public hearing that it conducted and arranged to be recorded on video that is available at https://councilnyc.viebit.com/player.php?hash=Yxl0VS6f0vsZ. My testimony in the video recording of that hearing spans from the elapsed time of **a)** 2 hours, 54 minutes, and 43 seconds to **b)** 2 hours, 58 minutes, and 29 seconds. That video recording confirms that I clearly apprised members of the City Council and anyone else who watched that hearing in-person or the video recording of it or otherwise read the written transcript of that hearing that the City Council also arranged to be prepared that members of Mr. de Blasio's NYPD security detail had been violating my constitutional rights to attend public meetings that were public forums.

**E.** **6/15/17 whistleblowing by me to news censors partly against members of the NYPD in response to illegal acts and omissions by them against me in public places in relation to public meetings**

1.      On 6/15/17, I attended a town hall meeting that CBS New York conducted in Corona in Queens with people who I later learned are news censors who generally pretend to be journalists. That town hall meeting was recorded on video and is available at https://www.youtube.com/watch?v=F1D7ZbWobbM. News censors that include Marcia Kramer, Juliet Papa, and Erin Durkin attended that meeting. I talked mainly with Ms. Kramer and Ms. Papa during that meeting. Mr. remarks to them are shown in that video during 2 separate segments in it. The first segment is between the elapsed times of **a)** 40 minutes and 22 seconds and **b)** 47 minutes and 17 seconds. The second segment is between the elapsed times of **c)** 56 minutes and 33 seconds and **d)** 57 minutes and 45 seconds. That video recording confirms that I clearly apprised Ms. Kramer, Ms. Papa, Ms. Durkin, and others that

members of Mr. de Blasio's NYPD security detail had been violating my constitutional rights to attend public meetings that were public forums.

**F.**   **Illegal acts on 6/21/17 by members of the NYPD to block members of the public from communicating information during a town hall meeting**

1.      On 6/23/17, a news organization named DNAinfo published a news article that was written by Allegra Hobbs that is entitled "Security Swiped Political Pamphlets at Mayor's Town Hall, Attendees Say" about what I just discussed about that 6/21/17 town hall. That news article is available at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-hall-margaret-chin-aaron-foldenauer/ and includes a video recording. That video recording is also available at https://www.youtube.com/watch?v=KRur-_QvbC0. At the elapsed time of 1 minute and 7 seconds in that video, former NYPD Lieutenant Ralph Nieves of Mr. de Blasio's NYPD security detail is shown near the center as he wore a dark gray suit and eyeglasses as his back faced the video camera that recorded that video while he then stood in front of an Asian woman. At that point, he is shown holding literature that he appeared to have coerced that woman to give to him as he illegally confiscated that from her prior to only then allowing her to attend that town hall meeting that was held in Chinatown in Manhattan. That was indicative of the criminal *modus operandi* of Mr. de Blasio's NYPD security detail to illegally stifle and strangle views that others had to express that could potentially be adversarial in public forums that Mr. de Blasio attended. Although I didn't attend that meeting, I was outside of it as it was conducted and observed Defendant Redmond standing near Mr. Nieves. That was indicative of the fact that Mr. Redmond was supervising the conditions in which members of the public were able to attend that public forum as that required them illegally have to surrender written materials to NYPD criminals to do so. A major fiasco erupted over the illegal seizure of such written

materials in relation to that town hall meeting.

**G.** **My 6/26/17 conversation with former NYPD Commissioner James O'Neill that was partly about illegal acts against me by members of Mr. de Blasio's NYPD security detail**

1.      On both 6/26/17, I talked with Defendant O'Neill face-to-face about illegal acts that had been committed against me by members of the Mayor's NYPD security detail at public forums that were conducted partly by the Mayor. My conversations with Mr. O'Neill on those dates occurred during public meetings that were conducted at the New York City Bar Association on 6/26/17 while the first meeting was recorded on audio. The following is a link to a report on the Internet that the New York City Bar Association issued and describes the meeting it conducted on 6/26/17 during which I talked with Mr. O'Neill:

https://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill

2.      The following is a link to the audio recording on the Internet that the New York City Bar Association arranged to be recorded on 6/26/17 of the meeting during which I talked with Defendant O'Neill:

http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3

3.      The next screenshot is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows Defendant O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



4.      The fact that no one reported anything in the news about what I discussed with Mr.

O'Neill on 6/26/17 at that meeting is related to my claims that this **complaint** concerns about

7/12/17 and 7/25/17. That also confirms that the following news outlets whose personnel

attended that 6/26/17 meeting are really whistleblower news censorship outlets that should burn

their journalism façade that masks egregious censorship they commit to allow New Yorkers who

value transparency, accountability, and a free instead of a complicit and subservient press to

realize that they should boycott them indefinitely because their censorship enable the NYPD's

mob to keep flagrantly violating civil rights of mine and many others in New York City:

        PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, ABC News

5.      The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

        https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sha
        ring

6.      During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that meeting **stretches from the elapsed time of a)** 32

minutes and 38 seconds from the beginning of that audio recording to **b)** 33 minutes and 36

seconds. My second conversation with him during that meeting stretches from the elapsed time

of **a)** 47 minutes and 4 seconds from the beginning of that audio recording to **b)** 49 minutes and

14 seconds. The following is entirely true and accurate about what Mr. O'Neill and I discussed

during that meeting:

a.       I told him that I was a military veteran and reminded him that he used the

comment of "a free and open society" in a speech that he gave during that meeting. I then

pointedly asked him why members of the NYPD who were inside of the Bronx Supreme Court

on 5/23/17 illegally directed court officers assigned to that courthouse to prevent me from

attending the public resource fair meeting that Mr. de Blasio conducted in that courthouse on that

date inside of the Veteran's Memorial Hall chamber within it and while members of the NYPD

have no jurisdiction in courthouses because jurisdiction for law-enforcement in New York State

courthouses belongs to New York State court officers instead of the NYPD. When he responded

to that by claiming that he wasn't aware of that situation, I told him that I had a video recording

that confirmed what I had just apprised him about had occurred and that I was willing to share

that video recording with him if he so desired. My conversation with him then about that matter

certainly relates back to my 5/23/17 claims in this action.

b.       I asked him when members of the NYPD would stop violating civil rights by

shoving military veterans standing legally on empty public sidewalks while Mr. Redmond

illegally discriminated against them by preventing them from attending public town hall

meetings that Mr. de Blasio holds. While asking him that question, I specifically referred to the

public town hall meeting that Mr. de Blasio held on 4/27/17 in Long Island City in Queens that

Mr. Redmond illegally prevented me from attending. In response, Mr. O'Neill was blatantly

evasive and deceitful by claiming that different issues applied to that question. When he asked

what I was talking about in particular with regards to my question, I told him that I was talking

about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision

that was issued in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that

concerns viewpoint discrimination, Mr. Redmond's status as a defendant at that time in *Sherrard*

*v. City of New York* about which I later discovered from a transcript and video that Mr. Redmond

committed perjury on 5/19/17 during a sworn deposition he gave concerning a critically

significant fact, and why Mr. Redmond was still being allowed to be a member of the NYPD

since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. When Mr.

O'Neill told me during that meeting that he would need t o talk with Mr. Redmond and that he

wasn't aware of *Sherrard v. City of New York*, I offered at the end of that meeting to give him a

printout that I had with me of information shown on its docket sheet that listed that case's case

number.

7.      A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that members of the Mayor's NYPD security detail were violating

my civil rights at public forums that Mr. de Blasio had been conducting and that Mr. O'Neill told

me in response that he would need to talk with Mr. Redmond about what I then discussed with

him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a

standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD

security detail immediately stop violating the civil rights of New Yorkers at public forums.

Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an

order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other

members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at

the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this **complaint** for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

**H.**     **6/28/17 e-mails about me between members of the Mayor's Office, Defendant Redmond, and Erin Durkin that were precipitated by an inquiry that Ms. Durkin made about illegal acts that had been committed against me by members of the NYPD since 4/27/17 in public places in relation to public meetings**

1.     All of the e-mail messages that appear in this section appear in the 374-page PDF file that I described in the "Preliminary Remarks" section in this complaint. On 6/28/17 and after she also attended the 6/15/17 meeting during which I talked with Marcia Kramer of CBS News and Juliet Papa of 1010 WINS, Ms. Durkin sent the e-mail message shown next that is about me to Eric Phillips while he worked for Mr. de Blasio as his mouthpiece.



From: Erin Durkin <​██████████​> on behalf of Erin Durkin <edurkin@nydailynews.com>
Date: Wednesday, June 28, 2017 at 1:53 PM
To: Eric Phillips <efphillips@cityhall.nyc.gov>
Subject: town halls

Hi Eric,
We're writing about a man named Towaki Komatsu who says he has been barred repeatedly from the mayor's town halls. He is filing a CCRB complaint, though I don't believe it's been filed yet. Shack is taking the lead on the story but asked us to reach out. He says he was barred from the town halls on 4/27 in Long Island City, May 23 at the Bronx Supreme Court, and June 8 in Rego Park, each time by members of the mayor's security detail. The first two he was barred from entering, the third he was sent to an overflow room with a video feed and not allowed into the main event after other people had left. Wondering if this is accurate, and if so why he's been barred?

Thanks,
Erin

2.      In her remarks in that e-mail message, Ms. Durkin referred to Graham Rayman as "Shack". Mr. Rayman also worked for the New York Daily News whistleblower news censorship business then while hindsight confirms that he and Mr. Durkin then really were loathsome whistleblower news censors. Ms. Durkin also established in that e-mail message that she couldn't be bothered to properly pay attention to details by erroneously claiming that the Mayor's 5/23/17 resource fair was a town hall meeting. Prior to 6/28/17, Mr. Rayman and I had been in contact in June of 2017 in regards to having the New York Daily News publish a news article that was supposed to have been about illegal acts and omissions by members of the Mayor's NYPD security detail, members of the Mayor's CAU, other members of the NYPD, and New York State court officers in illegally preventing me from attending the 4/27/17 town hall and 5/23/17 resource fair entirely and the 6/8/17 town hall from within the room in which was conducted.

3.      After Ms. Durkin asked Mr. Phillips in the preceding e-mail message to explain what the actual rationale was for why I was illegally **a)** barred from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair and **b)** discriminated against in regards to my efforts to attend the Mayor's 6/8/17 town hall by having been segregated from those who attended it in the room in which it was conducted by being restricted to an overflow room for that, Mr. Durkin's inquiry about me triggered a burst of e-mail communications that were full of lies, misleading remarks, and fraudulent pretexts about me on that date by and between Mr. Redmond and senior members of the Mayor's staff that partly included an ugly and wretched con artist named Jessica Ramos and Emma Wolfe. Ms. Ramos is now a New York senator and Ms. Wolfe was the Mayor's Chief of Staff. In those communications, Jaclyn Rothenberg and Ms. Ramos both fastened a causal nexus for the motivations for the illegal acts and omissions that were committed against me by

City of New York personnel in regards to my efforts to lawfully attend the 4/27/17 town hall, 5/23/17 resource fair, and 6/8/17 town hall to my HRA lawsuit and additional litigation that I was pursuing that was parallel to a claim that I asserted in my HRA lawsuit. My HRA lawsuit was ongoing litigation between January of 2017 and February of 2020. This establishes that the illegal acts and omissions that were committed against me partly by City of New York personnel in regards to my efforts to lawfully attend the 4/27/17 town hall, 5/23/17 resource fair, and 6/8/17 town hall were First Amendment retaliation that was driven by an invidious and discriminatory animus that was partly driven by intolerance of my HRA lawsuit.

4.       Although my HRA lawsuit was then sealed at my request and Ms. Durkin hadn't asked anyone about litigation activity that I had been engaged in, Ms. Rothenberg and Ms. Ramos sent the following e-mail messages about me on 6/28/17 that confirms what I just discussed, that Ms. Rothenberg and Ms. Ramos were in violation of the sealing order that New York State Supreme Court Judge Barry Ostrager issued on 1/17/17 in my HRA lawsuit, and that they exacerbated that by illegally republishing information about my HRA lawsuit:

**From:** Rothenberg, Jaclyn
**Sent:** Wednesday, June 28, 2017 17:18
**To:** Ramos, Jessica
**Cc:** Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject:** RE: town halls

Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

On Wed, Jun 28, 2017 at 5:42 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:

> Mr. Komatsu wanted a storage allowance, for which he was
> ineligible because he had an apartment. We also referred him to
> multiple legal services providers about this specifically and all of
> them denied him.
>
> Mr. Komatsu has been served an Order to Show Cause due to his
> appearance at HRA in June, when he showed disruptive behavior.
> That OSC and another pending matter were submitted to the
> court for a decision on June 7.  HRA is still waiting for the written
> decision.
>
> Sent from my BlackBerry 10 smartphone.

5.      The following facts apply to the information shown in the preceding two e-mail

messages:

        a.      "OSC" is an acronym for order to show cause application. "4WTC" is an acronym

for 4 World Trade Center in Manhattan that corresponds to 150 Greenwich Street and is where

HRA's headquarters are located.

        b.      Although Ms. Ramos was prohibited my law that partly includes my Fourteenth

Amendment rights from disclosing information to Ms. Durkin about government benefits that I

sought to be provided by HRA, she ignored that fact and illegally disclosed such information to

Ms. Durkin in the e-mail message that she sent on 6/28/17 at 5:42 pm about me.

        c.      Hindisght confirms that Ms. Ramos lied and made grossly misleading remarks on

6/28/17 about me by:

                i.      Claiming that I was ineligible to be provided the government benefit about

a storage allowance. The fact that HRA continuously providing me that benefit in 2017 confirms

that she and HRA lied by claiming that I wasn't eligible to receive it. That also confirms that the

legal services providers who refused to assist me about that matter in litigation against HRA

were wrong to have not assisted me about that.

    ii. She lied by claiming that I was served with an OSC. That was instead an OSC that I prepared and served upon HRA in my HRA lawsuit.

    iii. She lied by claiming that I engaged in disruptive behavior while visiting HRA.

6. The e-mail message shown next is about the fact that Ms. Ramos retracted a lie that she expressed to Ms. Durkin about me in which Ms. Ramos fraudulently claimed that I had threatened Mr. Banks.

> On Jun 28, 2017, at 6:01 PM, Ramos, Jessica
> <JRamos@cityhall.nyc.gov> wrote:
>
> On the former, there was only disruptive behavior.
>
> Working on latter.

7. The e-mail message shown next is about the fact that Ms. Ramos further lied about me by fraudulently claiming that I **a)** had never RSVP-ed with the Mayor's Office to attend a town hall meeting and **b)** made a physical threat against members of Mr. de Blasio's NYPD security detail.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

> Hi Erin,
>
> Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.
>
> Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.

8.     The e-mail message shown next is of one that Ms. Durkin sent to Ms. Ramos on 6/28/17 in which Ms. Durkin discreetly made Ms. Ramos aware of the fact that she (Ms. Durkin) knew that Ms. Ramos was lying about me in regards to Ms. Ramos' fraudulent claim in which she contended that I hadn't RSVP-ed with the Mayor's Office to attend the 4/27/17 town hall and 6/8/17 town hall.

> **From:** Erin Durkin
> **Sent:** Wednesday, June 28, 2017 17:51
> **To:** Ramos, Jessica
> **Cc:** Phillips, Eric
> **Subject:** Re: town halls
>
> Thanks. What was the threat against Banks?
>
> Also, on the RSVP issue - he has now provided emails he sent RSVP'ing for the LIC and Rego Park town hall. He also sent an RSVP confirmation from the Bronx Resource Fair (believe I said Bronx town hall before but it was actually the resource fair he was barred from). Want to double check on this?

1.     The e-mail message shown next is of one that Defendant Redmond sent about me to other

City of New York personnel. That e-mail message was provided to me in the way that it appears in the 374-page PDF file. It's also shown without redactions in discovery material that I received on 2/1/21 from the Law Department in *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.). That 2/1/21 discovery material is subject to the pretextual and irrational protective and confidentiality order that Judge Gorenstein obsequiously issued on 1/15/21 that block me for now from filing some of them in this case. I'm trying to have the Second Circuit vacate Judge Gorenstein's protective and confidentiality orders about that. As the subject line in that e-mail message suggest, that e-mail message is about the illegal acts that Mr. Redmond and other City of New York personnel committed against me on 4/27/17 at the Mayor's 4/27/17 town hall and lies that Mr. Redmond expressed about me about that town hall meeting and other town hall meetings that members of the public held with Mr. de Blasio and others.



From: Redmond, Howard DI.
Sent: Wednesday, June 28, 2017 2:18 PM
To: Phillips, Eric; Ramos, Jessica; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
Subject: Re: town halls

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**I.** **Members of the NYPD illegally prevented me from attending the public town hall meeting in the room in which it was held that members of the public held on 7/12/17 in the Bronx with Bill de Blasio and others after I RSVP-ed for it advance**

1.      On 7/12/17, Mr. Redmond attended the Mayor's 7/12/17 town hall as her supervised Mr. de Blasio's NYPD security detail while that members of that criminal mob illegally prevented me from entering the room in which it was conducted through a show of authority as they stood next to the entrance of that room and made it crystal clear that they wouldn't let me inside of that room. While making that point clear, I recorded video recordings of them that included a video

recording that shows Mr. Redmond as he entered that room while standing next to one of hi

gangsters who was illegally not letting me to enter that room. That occurred after I RSVP-ed

with the Mayor's Office to attend that town hall, while I lawfully conducted myself in it, and

after a journalist named Louis Flores wrote an article that is entitled "Dromm Pre-Screened De

Blasio Town Hall Audience ; Only Sycophants, Party Hacks Gained Admission [Updated]" that

was published on 11/12/15 by a news organization named "Progress Queens" that is available at

https://www.progressqueens.com/news/2015/11/12/dromm-pre-screened-de-blasio-town-hall-

audience-only-sycophants-party-hacks-gained-admission. That article reported that people who

worked for the Mayor's Office and Daniel Dromm while Mr. Dromm worked for the City

Council illegally discriminated against members of the public who weren't supporters of Mr. de

Blasio in Jackson Heights in Queens on that date as those members of the public sought to

exercise their First and Fourteenth Amendment right to lawfully attend a public town hall

meeting that was conducted partly by Mr. de Blasio and Mr. Dromm with members of the public

who were supporters of Mr. de Blasio inside of a public school that the New York City

Department of Education controls. In particular, that article pointed out that members of the

public who weren't supporters of Mr. de Blasio either weren't allowed to enter the school that

hosted that town hall meeting or they were otherwise able to do so on the condition that they

would have to watch how that town hall meeting would be conducted on television screens in a

separate room from while they were in an overflow room.

2.      What appears next are 2 screenshots that appear from left to right and are from video

recordings that I recorded on 7/12/17 at **a)** 9:20 pm and **b)** 7:50 pm, respectively. The screenshot

on the left shows Defendant Redmond right after he entered the room in which the Mayor's

7/12/17 town hall was held while Mr. Redmond stood in front of NYPD Officer Baez (shield #:

5984) of Mr. de Blasio's NYPD security detail while Mr. Baez was among those who were illegally preventing me from entering that room. The screenshot on the right shows former NYPD Detective Raymond Gerola while he stood right outside of the door to the room in which the Mayor's 7/12/17 town hall was held as he also was a member of Mr. de Blasio's NYPD security detail who was then illegally preventing me from entering that room.



**J.**     **My 7/16/17 conversation with Mr. de Blasio near news censors that was partly about illegal acts against me by members of his NYPD security detail**

1.      Following the Mayor's 7/12/17 town hall, I met Mr. de Blasio on 7/16/17 at about 1 pm in a small park in the Chelsea district of Manhattan that is named the Clement Clarke Moore

park. Michael Gartland and other trashy whistleblower news censors who then worked in journalism that included Grace Rauh were then in that park. Mr. Gartland then worked for the New York Post and Ms. Rauh then worked for Spectrum News.  All of those censors excerpt for possibly Ms. Rauh paid close attention to the conversation that I then had with Mr. de Blasio in that park. Back then, I asked Mr. de Blasio if he supported military veterans and civil rights. Mr. de Blasio lied to my face by claiming that he did so. He then accepted a report that I had prepared and handed to him that contained information about the following as he lied to me again by fraudulently claiming that he would look into the matters that it addressed:

a.      How members of Mr. de Blasio's NYPD security detail had been involved in illegally preventing me from attending public meetings that were public forums since 4/27/17 that were partly conducted by Mr. de Blasio.

b.      How his NYPD security detail and Rachel Atcheson of the Mayor's CAU had been flagrantly violating my civil rights at the Mayor's 5/23/17 resource fair by being among those who illegally prevented me from attending that public meeting that was a public forum. She now continues to work for New York City Mayor Eric Adams after having previously worked for him while he was the Brooklyn Borough President. She worked for him after she worked for Mr. de Blasio in 2017.

c.      How New York City government agencies under Mr. de Blasio's administration while he was New York City's Mayor were doing business with NTT that was funded by taxpayers as NTT was continuing to subject me to wage-theft that still persists that cements the fact that fact that Mr. de Blasio doesn't support labor rights and instead supports keeping too much money in the wrong hands by being a supporter of wage-theft and giving government business to firms that commit wage-theft.

d.      Hypocritical and disingenuous remarks that Mr. de Blasio made on Veteran's Day

in 2016 as he fraudulently suggested that he supported the hiring of military veterans. Contrary

to that deceit by him, the government agencies comprised Mr. de Blasio's administration while

he was New York City's Mayor consistently refused to grant me a job interview in spite of my

qualifications and work experience.

2.      At 5:26 pm on 7/16/17, I received an e-mail message from Mr. Gartland that contained

the following remarks in regards to me after I met Mr. de Blasio earlier that day as well as earlier

e-mail messages that Mr. Gartland and I had been sending to each other that were for a news

article that hindsight confirms that Mr. Gartland fraudulently led me to believe that the New

York Post would publish about illegal acts and omissions partly by members of Mr. de Blasio's

NYPD security detail in preventing me from attending public meetings that were public forums

in New York City since 4/27/17:

> **From:** Michael Gartland <mgartland@nypost.com>
> **Subject:** Re: 4-27-17 audio clip of NYPD Officer Gerola (badge #: 6577) proving Jessica Ramos lied to Jill Jorgensen
> **Date:** July 16, 2017 at 5:26:50 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> I doubt we'll keep your name private. You spoke with the mayor in public and identified yourself to more than one reporter.

> On Sun, Jul 16, 2017 at 3:38 PM, Towaki Komatsu <towaki_komatsu@yahoo.com> wrote:
> Thanks.
>
> Something you need to know is that the story is way bigger than what I told you.
>
> Also, is there a way to keep my identity private or at the very least use my middle name instead of my first name in your reporting?
>
> My concern in regards to this is being blacklisted.
>
> Also, let me know if you need additional information, such as others that can independently corroborate my claims to you or make their own independent and similar

claims to you that can be fully substantiated.

Regards,

Towaki

---

On Jul 16, 2017, at 3:31:27 PM, Michael Gartland <mgartland@nypost.com> wrote:

We're planning a story for tomorrow. Pls keep your cell handy.

---

On Jul 16, 2017, at 3:26 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

Hi Michael,

As discussed, attached is a video recording I accidentally recorded on 4-27-17 while talking with NYPD Officer Gerola at about 10:20 pm right outside of the school in Long Island City that hosted the Mayor's town hall on that date.

Although Mr. Gerola isn't seen in the video (except for his shoes and leg) because I didn't mean to be recording, he can be heard in it clearly expressing that the Mayor's staff controls who is allowed to attend his town halls. That remark directly contradicts Jessica Ramos' remark in Jill Jorgensen's article I shared with you.

Also, the video clip is part of a longer recording I made shortly after I was shoved 3 times in the chest by NYPD Officer Beato (badge #: 13326) of the 108th Precinct. Prior to shoving me, he illegally ordered me to move from where I legally stood on the sidewalk adjacent to that school in order to ask the Mayor from a sufficient distance away what he was willing to do about the fact that the head of his security detail (Howard Redmond) illegally subjected me to viewpoint discrimination by not letting me attend that town hall.

Since I was standing roughly 45 feet away from where the Mayor later left that building to ask him this question before Mr. Beato shoved me and Mr. Gerola let me stand within roughly 15 feet of him on April 11th in Staten Island, it was entirely clear I had a legal right to remain where I stood on the sidewalk to ask the Mayor my question.

People who witnessed Mr. Beato shoving me were Lieutenant Nieves, a 2nd ordinary NYPD officer, and Mr. Gerola.

Regards,

Towaki

Tel: 201-315-5484

<mime-attachment>
<Gerola 4-27 audio clip.m4v>

--
Michael Gartland
NY Post
551-208-6570
mgartland@nypost.com
@michaelgartland

**K.**     **My 7/18/17 conversation with Mr. de Blasio near news censors that was partly about illegal acts against me by members of his NYPD security detail**

1.      On 7/18/17, I recorded a video recording while I attended the Mayor's 7/18/17 resource fair shortly before I talked with Mr. de Blasio during that meeting. The next screenshot is from that video. Mr. Gartland and another trashy whistleblower news censor in journalism named Gloria Pazmino are shown in it as they sat and squatted near Mr. de Blasio and Jessica Ramos. Those censors didn't report anything about the conversation that I had with Mr. de Blasio during that meeting. This screenshot also shows NYPD Detective Andrew Berkowitz who then was a member of the Mr. de Blasio's NYPD security detail and was among people who illegally prevented me from attending both the Mayor's 4/27/17 town hall and 5/23/17 resource fair.



2.    The following shows an e-mail message that I received from the Mayor's office on

11/21/17 at 8:34:44 am in response to a FOIL demand that I submitted to it to have it provide me

the entire video recording that it arranged to be recorded of the Mayor's 7/18/17 resource fair:

> **From:** <openrecords@records.nyc.gov>
> **Subject:** [OpenRecords] Response Added to FOIL-2017-002-00687 - Link
> **Date:** November 21, 2017 at 8:34:44 AM EST
> **To:** <Towaki_Komatsu@yahoo.com>
>
> The Mayor's Office (OOM) has responded to your FOIL request FOIL-2017-002-
> 00687 with the following link.
>     Resource Fair
> 07/18/17: https://drive.google.com/file/d/1Mx1q3XQfZgJaEBgUQj89BpqzSboo9xK

w/view

Please visit FOIL-2017-002-00687 to view additional information and take any necessary action.

3.      The link that is shown in the preceding e-mail message to a video recording on the Internet no longer leads one that the public and I can access. I had to submit that FOIL demand to receive a copy of the Mayor's 7/18/17 resource fair video because the Mayor's office illegally didn't make that video recording publicly available within 3 days after the Mayor's 7/18/17 resource fair ended in violation of New York City Charter §1063 and my First and Fourteenth Amendment rights. I certainly had a First and Fourteenth Amendment right to have instant and continuous access to that video recording partly to share it with others use information in it in whichever lawful way I chose. By fraudulently concealing that video, those who did so violated 5 U.S.C. §1502(a)(1). This is partly because Mr. de Blasio used that 7/18/17 resource fair as a campaign event to attract publicity and support from voters, prospective voters, and others while he was running for re-election. Doing so served to boost his re-election prospects at the expense of his rivals in the illegally rigged 2017 re-election contest. By concealing that video from the public, the Mayor's office illegally engaged in voter suppression, voter fraud, and whistleblower retaliation in violation of the Voting Rights Act and other laws. This is true and accurate largely because that illegally deprived voters of substantive information about Mr. de Blasio that was detrimental to his re-election aspirations that included **a)** his unwillingness to promptly fight wage-theft and support the hiring of military veterans, **b)** his administration's commitment to keeping too much money in the wrong hands partly by the contracts that his administration's agencies had with NTT that taxpayers finance while NTT was continuing to commit wage-theft against me, and **c)** the deliberate indifference that he demonstrated while I talked with him on 7/18/17 about the fact that Defendant Redmond violated my rights pursuant to the First

Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to attend the Mayor's 4/27/17 town hall while Mr. Redmond was then a defendant in *Sherrard v. City of New York*.

4.     The following is a link to a short video clip that lasts for 2 minutes and 19 seconds and is from the video recording of the Mayor's 7/18/17 resource fair video that I downloaded before the Mayor's office illegally removed that video from the Internet or otherwise caused it to no longer be accessible to me while it continued to illegally not have that video otherwise available on the Internet for the public to view:

https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

5.     The beginning of that short video clip corresponds to what appears in the Mayor's 7/18/17 resource fair video at the elapsed time of roughly 1 hour, 8 minutes, and 25 seconds. The entirety of the interactions that I had with Mr. de Blasio during the Mayor's 7/18/17 resource fair is shown in that video clip. Besides me, the following additional people appear in that clip:

     a.     Mr. de Blasio and Mr. Banks.

     b.     NYPD Detective Raymond Gerola

     c.     NYPD 7/25/17 Kelly Bryant.

     d.     Marco Carrion.

     e.     Mr. Pierre-Louis. He is a big Black male who was then a member of Mr. de Blasio's NYPD security detail.

     f.     Jessica Ramos

     g.     NYPD Chief Juanita Holmes.

6.     The following table lists a few relevant screenshots from that short video clip that is from the Mayor's 7/18/17 resource fair video:

| # | Elapsed Time | Screenshot and comments |
|---|---|---|
| 1 | 10 seconds | <br><br>This shows Defendant Carrion illegally initiating physical contact with my backpack with his right hand without any legal justification as he directed me where to stand as I was about to talk with Mr. de Blasio. Mr. Gerola is shown behind Mr. Carrion's right shoulder. I genuinely don't like being touched by people I don't like and that includes every member of the NYPD and everyone who worked for Mr. de Blasio's administration while he was New York City's Mayor. In fact, I regard any physical contact with me by them that they initiate to be offensive. |
| 2 | 28 seconds | <br><br>This shows Mr. de Blasio as he stood next to Mr. Banks and was about to accept another copy of a report that I handed him on 7/16/17 that I discussed earlier. He told me on 7/18/17 that I could give him another copy of that report.<br><br>Mr. Pierre-Louis is shown standing to my left. |

| 3 | 37 seconds |  |
|---|---|---|
| | | This shows me as I was in the middle of asking Mr. de Blasio if he could arrange for me to be granted a job interview with an agency that was among those that comprised his administration while taking into account my status as a U.S. Navy veteran. He refused and instead irrelevantly referred to a personnel process. |
| 4 | 1 minute and 31 seconds |  |
| | | This shows me pointing to information about the settlement agreement that NTT reached in the case of *PoChue v. NTT Data, Inc.*, No. 14-CV-7975 (GBD) (S.D.N.Y. Mar. 31, 2015) that I included in the report that I handed to Mr. de Blasio while I met with him then.

I pointed to that as I was in the middle of asking him if he would immediately cancel New York City's government contracts with NTT because it was committing wage-theft against me. |

| 5 | 1 minute and 42 seconds |  This shows me as I asked Mr. de Blasio if he could persuade Mr. Banks to propose something that would resolve the litigation that I then had against HRA as I was referring to both my HRA lawsuit and related litigation that I was pursuing against it that was filed with OTDA as that included claims about storage expenses, my having been viciously assaulted on 7/2/16 due to HRA's negligence as well as fraud and negligence by Urban, and other matters that I intended to similarly talk with Mr. de Blasio and Mr. Banks about during the Mayor's 4/27/17 town hall, 5/23/17 resource fair, 6/8/17 town hall, and 7/12/17 town hall while within earshot of journalists, members of the public, and other government officials while our remarks would have been recorded on video that was broadcast on the Internet. In essence, the part of the conversation that I was then having with Mr. de Blasio that is shown above and that I sought to have at those earlier public forums was equivalent to out-of-court settlement conference. |
|---|---|---|

| 6 | 2 minutes |  |
| | | This shows me as I was in the middle of apprising him of the fact that Defendant Redmond illegally prevented me from attending his 4/27/17 town hall in violation of New York State's Open Meetings Law and that he was then a defendant in a civil rights lawsuit as I was then referring *Sherrard v. City of New York.* |
| | | Mr. de Blasio told me during that 7/18/17 conversation that he didn't know anything about that lawsuit and that he wouldn't talk with me about lawsuits. |

| 7 | 2 minutes and 9 seconds |  |
|---|---|---|
| | | Mr. Pierre-Louis illegally initiated physical contact with my backpack with his right hand without any valid legal justification as Mr. de Blasio was about to try to touch the area by my right shoulder with his left hand without any valid legal justification.

My arms and hands are clearly shown as being close to my chest instead of in some other way that could be regarded as offensive or threatening. I was not resisting any instruction that I had been given to leave where I then stood. For these reasons, no valid grounds existed for me or my property to be touched by others. |
| 8 | 2 minutes and 10 seconds |  |

| | | |
|---|---|---|
| | | Mr. Pierre-Louis continued to illegally have his right hand on my backpack as Mr. de Blasio was trying to harass me as well by trying to touch the area by my right shoulder with his left hand without any valid legal justification as I clearly leaned away from them both to avoid that physical contact while using such body language to silently and lawfully convey to them and those who were watching us that I regarded Mr. de Blasio as trash partly because of what he said to me during that meeting as he engaged in stonewalling instead of being helpful. |
| 9 | 2 minutes and 12 seconds | <br>Mr. Pierre-Louis continued to illegally have his right hand on my backpack as I lawfully conducted myself in stark contrast to him while I walked away from him, Mr. Banks, and the Mayor. |

| 10 | 2 minutes and 12 seconds |  |
| | | Mr. Pierre-Louis continued to illegally have his right hand on my backpack as his right arm was clearly extended as he illegally pushed me from behind. |

7.     The attempt by the Mayor to illegally make physical contact with my body during the 7/18/17 resource fair and Mr. Pierre-Louis assault against me then by succeeding in doing so then as he pushed me from behind for no reason that he didn't do to everyone who talked with the Mayor during that meeting were precursors that foreshadowed illegal acts and omissions against me by other members of the NYPD against me in which they continued to illegally initiate physical contact with me without an objectively valid legal justification that hindsight confirms I should have decisively and immediately responded to by shattering the body parts that they used to initiate physical contact with me.

**L.**   **Mr. Redmond's 7/19/17 acts to block labor rights activists from lawfully communicating information during a town hall meeting I attended**

1.      On 7/19/17, a trashy whistleblower news censor named David Goodman who works for the New York Times censorship business posted a tweet on Twitter at 11:28 am that is available at https://twitter.com/jdavidgoodman/status/887695592549384192 by using a Twitter account that has the username of "@jdavidgoodman". According to that tweet, someone was able to get and hold a protest sign at a news conference that Mr. de Blasio conducted as it was a rarity then that that person was able to get and hold such a sign at such an event that Mr. de Blasio conducted. That indicated that people who work for Mr. de Blasio had a practice of violating the First and Fourteenth Amendment right that people have to freely carry signs, literature, and similar things of an expressive nature that aren't inherently disruptive. The next screenshot shows that Twitter posting.



2.      While I attended the Mayor's 7/19/17 town hall, I took a pair of photographs at 8:38 pm

and 8:41 pm of other members of the public who attended it as they lawfully exercised their First

and Fourteenth Amendment right to display signs to communicate their views in non-disruptive

manner to others and I while I wholeheartedly welcomed that. Their signs were about their

opposition to the policies and practices of the management of Spectrum News in relation to their

efforts to be provided better working conditions for themselves and a labor union that they

seemed to be members of. The next screenshot is from the photograph that I took at 8:38 pm on

7/19/17 during that meeting that show a pair of men as they stood and held their signs during it.



3.      The next screenshot is from the photograph that I took at 8:41 pm on 7/19/17 during that

meeting that show 5 additional signs being displayed by members of that same group in a

different area in that room while they sat as Defendant Redmond was among members of Mr. de

Blasio's NYPD security detail who illegally interfered with the First and Fourteenth Amendment rights of those people to publicly exhibit their signs during that public forum for the benefit of me and others who support their views and were quite receptive to receiving information from them then and there in that manner and others.



**M.      7/21/17 equal protection and due process precedent set by Vickie Paladino to be near Mr. de Blasio and news censors in public places in New York City while loudly berating him and not be interfered with by members of the NYPD for doing so**

1.      Throughout the entire time that I was in the subway station on 7/25/17 near where the Mayor conducted his illegal publicity stunt in it, I had a Fourteenth Amendment equal protection right to loudly criticize him and engage in whistleblowing as a lovely woman named Vickie Paladino did in July of 2017 prior to that date as she followed him in the middle of a street in

Queens in front of whistleblower news censors in journalism that included Grace Rauh and who reported the sum and substance of Ms. Paladino's criticisms of the Mayor then. On 7/21/17, CBS New York published a news article on the Internet at

https://newyork.cbslocal.com/2017/07/21/woman-confronts-de-blasio/ that a journalist named Marcia Kramer wrote that is entitled "You Let Your Police Officers Down:' Queens Woman Confronts de Blasio About Germany Trip". That article reported about how Ms. Paladino demonstrated her leadership and outspokenness by loudly criticizing the Mayor in that street in Queens. That news report includes a video of Ms. Paladino as she criticized him then. The following is a relevant excerpt from that news article that reported that the Mayor ordered one or more members of his NYPD security detail to get Ms. Paladino away from him or him away from her then:

> "She was also furious about his high-handed treatment of her, Kramer reported. She said **the mayor turned to his security detail and said, "very quietly — you need to get this woman away from me, or get me away from this woman**."
>
> Political consultants say that for a man seeking reelection, that was a big mistake.
>
> "It's the wrong strategy. It's a bad attitude, frankly. When you're the mayor, you serve the people. When you run into the public and they may not agree with you, you still have to deal with them," political consultant O'Brien Murray said. "How you handle that is really indicative of how you treat all voters.""

> (boldface formatting added for emphasis)

### Statement of Facts

**A.**    **Illegal acts and omissions against me on 7/25/17 inside of the MTA subway station near New York City Hall below Broadway near Warren Street in Manhattan**

1.    The next screenshot is from a Twitter posting that was posted on the Internet at

https://twitter.com/chayesmatthew/status/889983369018298377 on 7/25/17 at 6:59 pm by a

Twitter account that has the username of "@chayesmatthew" and is registered to a whistleblower

news censor named Matthew Chayes. It includes a photograph of a an announcement that was issued by the Mayor's office on 7/25/17 in which it indicated that Mr. de Blasio would conduct a press conference at 5:30 pm on that date at the street level for the City Hall subway station that is located by Broadway and Warren Street in Manhattan. Nothing in that announcement suggests that Mr. de Blasio would enter that subway station in relation to that press conference that hindsight confirms was a publicity stunt.

> *On Tuesday, Mayor de Blasio will hold a media availability at the R/W City Hall Subway Station. This event is open press. There will be Q-and-A.*
>
> **Press Schedule**
>
> **5:30 PM – Holds Media Availability**
>
> **R/W City Hall Subway Station (Street Level)**
>
> **Southeast corner of Broadway and Warren Street**

2.     After that announcement was issued, I happened to learn about it prior to the start of that publicity stunt and was at the City Hall subway station on the street level as I waited for it to begin there. While doing so, I noticed that people who worked for the Mayor's office were entering that subway station while bringing various signs into it and quickly followed them into it while realizing that there had apparently been a last-minute change of plans that would cause that publicity stunt to instead be conducted inside of that subway station. Upon entering that subway station, I saw that people had illegally setup that publicity stunt to have it occur in an area in that subway station next to a staircase and where I instantly knew it would illegally

obstruct the movements of members of the public in that subway station in flagrant violation of the rights that ordinary people had pursuant to the First Amendment, Fifth Amendment, and Fourteenth Amendment to freely and lawfully move about and assemble in all public areas in that subway station. That subway station is operated by the same MTA that Mr. de Blasio has repeatedly stated he didn't control. I also instantly knew that there was no possible way that the Mayor's office had a permit that would allow it to conduct that publicity stunt in that specific area of that subway station because its personnel decided at the last minute to conduct that publicity stunt there. Consistent with its *modus operandi* of frequently violating applicable laws at public meetings that were public forums, members of the NYPD illegally allowed Mr. de Blasio to conduct his publicity stunt in that subway station next to that staircase. They did so in spite of the fact that the MTA Rules of Conduct explicitly prohibited Mr. de Blasio from being able to do so and also prohibited him from being able to use a microphone while doing so that he used anyway during that publicity stunt.

3.      By having illegally conducted that publicity stunt in that subway station on 7/25/17 with whistleblower news censors in journalism, the MTA Rules of Conduct indicate that the Mayor, members of his staff, members of the NYPD, whistleblower news censors in journalism, and those who operated news cameras while setting up, conducting, and attending that publicity stunt committed the following violations with fines shown for them:

|   | Violation | Fine ($) |
|---|-----------|----------|
| a | Unnecessary noise | 50 |
| b | Breach of Peace | 50 |
| c | Unauthorized non-transit use | 25 |
| d | Activity in prohibited area | 25 |
| e | Interfere with passenger movement | 25 |
| f | Excessive noise | 25 |
| g | Carrying long objects | 75 |
| h | Carrying obstructive objects | 75 |
| i | Non-transit use of facilities | 50 |

| j | Unauthorized Commercial activity/solicitation | 50 |
| k | Posting notices or signs | 25 |
| l | Sound production device | 25 |
| m | Unauthorized photography, filming | 25 |

4.      The following is a link to the video recording on the Internet that the Mayor's office arranged to be recorded of the publicity stunt that Mr. de Blasio illegally conducted next to a staircase on 7/25/17 inside of the City Hall subway station:

https://www.youtube.com/watch?v=Hq2Q4tPrN2A

5.      On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large group of whistleblower news censors in journalists, Mr. de Blasio, members of the Mayor's staff, and members of the public inside of the City Hall subway station.

6.      The screenshot that follows is from a video recording that I recorded at 5:35 pm inside of that subway station near the bottom of a staircase that Mr. de Blasio and I used to enter it on that date to attend the Mayor's illegal publicity stunt in that subway station. That video recording is available on the Internet at https://drive.google.com/file/d/1lttcGv99UJR8zSfrlnzrWCbLExM-ieNq/view?usp=sharing.



7.      Mr. Redmond is shown in the preceding screenshot as he wore a tie and stood to the left of Defendant Taylor. Mr. de Blasio and numerous censors in journalism were then present nearby and behind where Mr. Redmond stood.

8.      When I recorded that video, Defendants Taylor and Redmond were flagrantly violating my rights pursuant to the First Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct as they also were violating 18 U.S.C. §241 and 18 U.S.C. §245(b)(5) by illegally directing me to move away from where I lawfully stood near that illegal publicity stunt that Mr. de Blasio was illegally conducting inside of a public area in that subway station.

9.      The following is entirely true and accurate about what is seen and heard in that video:

        a.      That video begins with me saying that members of the NYPD who I was recording on video were illegally subjecting me to viewpoint discrimination there and then.

        b.      I then asked Mr. Mansharamani to tell me his NYPD badge number and he complied.

c.        Defendant Taylor then irrelevantly told me that I could have sight and sound access to the Mayor's illegal publicity stunt in an area in that subway station that was located behind where I then stood. He next lied to me by fraudulently claiming that I wasn't permitted to stand among the whistleblower news censors who were gathered behind him as they waited for Mr. de Blasio to arrive there to conduct his illegal publicity stunt. He lied to me by claiming that I needed to have a press pass for that in spite of the fact that Mr. de Blasio was about to conduct an illegal publicity stunt there that was explicitly prohibited by the MTA's Rules of Conduct. I knew he was lying. I immediately responded to his lie about that by pointing that where I was standing then as I talked with him was outside of an area that he regarded as a "press area". He then acknowledged that what I just said was totally true and accurate. By doing so, that confirmed that he had no legal grounds whatsoever to direct me to move from where I was standing by claiming that I needed to do so because I was not allowed to be in the "press area". Since my experiences with members of the NYPD's mob that include him have shown that they lack intelligence and the ability to reason properly, I knew that it was futile to engaged in a debate with him largely because all that he represented then was a thug and what amounts to a schoolyard bully simply because he had a badge and a gun. Shortly thereafter, he lied to my face by fraudulently claiming that he and other members of the NYPD support military veterans like myself. He lied about that in response to a remark that I made to him as I told him that he didn't support them. I then clarified that remark to him by pointing out that though I took an oath when I enlisted in the military to protect and defend the U.S. Constitution against all enemies and he took an oath to protect and serve when he joined the NYPD, I was upholding my oath while he was violating his at my expense. I next told him that he was full of shit by claiming that he supports military veterans. After he expressed irritation about my use of profanity in making that

remark, I pointed out to him that I had a First Amendment right to express profanity then. I then told him that he was ignoring applicable laws then and there. He responded to that by lying as he fraudulently claimed that he and his colleagues in the NYPD weren't then ignoring applicable laws. I then rehashed information that I told him before I started recording that video as I confirmed that I told him about the relevance of the U.S Supreme Court 's decision in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) about viewpoint discrimination. Next, I cited several federal statutes to him that included 18 U.S.C. §1512, 42 U.S.C. §1985, and 18 U.S.C. §242.

d.     At the elapsed time of 1 minute and 21 seconds in that video, I'm heard engaging in whistleblowing at the Mayor's expense as he walked down a staircase near me into that subway station.  The first remark to that effect that I made concerned his lack of support for hiring military veterans after I talked with him about that on 7/16/17 near Michael Gartland in a park. Mr. de Blasio totally ignored me throughout the entire time that I was in that subway station on 7/25/17. I next engaged in whistleblowing at the Mayor's expense by criticizing him for his administration's business with a business with a firm that was subjecting me to wage-theft. I was referring to NTT then. Defendant Redmond then illegally directed me to leave where I then lawfully stood. Defendant Taylor then reiterated what Mr. Redmond just said while both of them were barred by estoppel from ordering me to move on account of the fact that they were illegally allowing the Mayor's illegal publicity stunt to occur nearby in a public area of that subway station. That set of circumstances confirmed that both of them were illegally subjecting me then to selective-enforcement, discrimination, and an abuse of process that I was entirely aware of and lawfully resisted for that specific reason. I'm next heard in that video as I told Defendant Taylor to please not put his hand on me after he had just illegally done so without any

legal justification. Mr. Redmond then glared at me like the idiot he is for saying that. Defendant

Taylor then illegally again told me to move away while people were standing directly behind

where I then was that made it impossible for me to comply with his illegal order and I replied to

him by pointing out that fact.

10.     Also, before I reluctantly complied with the illegal orders by Defendants Taylor,

Redmond, and Mansharamani to move from where I lawfully stood as I sought to stand closer to

where the whistleblower news censors in journalism then were near where Mr. de Blasio was

about to speak during his illegal publicity stunt, I recall that a member of the regular public who

was male and stood near me then made remarks to me in which he agreed that we had a legal

right to remain where we then were.

11.     Furthermore, while I talked with Defendant Taylor there and then, all of the following

defendants were present in that immediate area while they had a legal duty because of their status

as law-enforcement personnel and due to their oath of office as personnel of the City of New

York to detect the illegal acts that were then being committed against me in violation of my

constitutional rights and/or otherwise promptly intervene on my behalf to uphold my

constitutional rights as they instead illegally didn't try to intervene on my behalf:

> Mr. de Blasio, Mr. Redmond, Mr. Fowler, Mr. Carrion, Mr. Finan, Ms. Dann-Allel,
> Jim Doe 7/25/17, Mr. Mansharamani, Mr. Lemorin, NYPD 7/25/17 Kelly Bryant,
> NYPD 7/25/17 John Doe2, Mr. Sendroff, Mr. Briscoe

12.     After I reluctantly complied with the patently illegal orders that I was issued by

Defendants Taylor, Redmond, and Mansharamani to move away from where I lawfully stood, I

promptly used a brilliant flanking maneuver to move to an area on the nearby subway platform

for uptown trains that was located on the opposite side of the vertical partition shown in the

background of the preceding screenshot. Once I arrived there, I promptly resumed exercising my

constitutional rights as well as those pursuant to the MTA's Rules of Conduct that pertain to public speaking in subway stations to lawfully engage in protected whistleblowing activity against the Mayor, his administration, and others. I did so while I wasn't obstructing the movements of others and wasn't intentionally causing alarm, unreasonable noise, and a breach of the peace in what was a very noisy subway station largely because Mr. de Blasio was illegally using a microphone for his illegal publicity stunt and there was a lot of noise from subway trains. As I continued to lawfully engage in such whistleblowing there and then, members of the NYPD illegally stalked me in violation of NYPL §120.45, CPL §140.50(1), NYPL §240.26, NYPL §195.00, other applicable laws and findings in *People v. Howard*, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980) that confirm that I had a right to be left alone on 7/25/17 while I attended the Mayor's illegal publicity stunt in that subway station. They illegally stalked me by following me to the area on the subway platform where I then was. Mr. Redmond, Mr. Fowler, Mr. Taylor, Mr. Carrion, Ms. Dann-Allel, and Jim Doe 7/25/17 were among those who stalked me in this way.

13.    The next screenshot was created from what is shown at the elapsed time of 1 minute and 28 seconds from the beginning of the video that the Mayor's Office arranged to be recorded of the illegal publicity stunt that Mr. de Blasio conducted inside of that subway station on 7/25/17.



14.     The preceding screenshot shows Mr. de Blasio and I as I lawfully carried out a flanking maneuver to lawfully position myself on that subway platform in close proximity to him and whistleblower news censors in journalism who were then gathered in front of and to the side of him while I would be physically separated from them by a vertical metal partition. From that location, it was my intent to resume lawfully engaging in protected whistleblowing activities in accordance with my constitutional rights and those pursuant to the MTA's Rules of Conduct at the expense of the Mayor, others in his administration, the NYPD, business partners of the Mayor's administration that included NTT and Urban, whistleblower news censors in journalism, and more.

15.     The next screenshot was created from that same video corresponds to what is shown in

that video at the elapsed time of 1 minute and 29 seconds.



16.      The preceding screenshot shows Defendants de Blasio and Fowler as Mr. Fowler illegally

stalked me after he left the area where I first encountered him, Mr. Redmond, and Mr. Taylor in

that subway station near the bottom of the staircase that I used to enter that subway station to

attend that illegal publicity stunt. The next screenshot was created from what is shown at the

elapsed time of 2 minutes and 4 seconds from the beginning of the video from which the

preceding screenshot was created. Defendants Taylor and Jim Doe 7/25/17 appear on the far-left

in it as they stood on a subway platform near where I was because they decided to stalk me to

there for no valid reason. Mr. de Blasio also appears in it.



17.    The next screenshot was created from what is shown at the elapsed time of 2 minutes and

37 seconds from the beginning of the video from which the preceding screenshot was created.

Defendant Redmond appears on the far-left in it as he stood on a subway platform near where I

was because he decided to stalk me to there for no valid reason. Mr. de Blasio also appears in it.



18.     The next screenshot was created from what is shown at the elapsed time of 3 minutes and

14 seconds from the beginning of the video from which the preceding screenshot was created.

Defendant Redmond is shown on the far-left in it as he temporarily left the area where I was on

that subway platform as I continued to lawfully engage in protected whistleblowing. Mr. de

Blasio also appears in it.



19.     The next screenshot was created from what is shown at the elapsed time of 4 minutes and 42 seconds from the beginning of the video from which the preceding screenshot was created. Defendants Redmond and Carrion are shown with Jeff Lynch of the Mayor's office on the far-right side in that screenshot as they stood behind the staircase that is shown in it and were having a conversation about which it's objectively reasonable to infer from the totality of the circumstances and hindsight was about having measures taken to illegally silence my speech in that subway station in violation of my constitutional rights. Mr. de Blasio also appears in that screenshot.



20.     The next screenshot was created from what is shown at the elapsed time of 4 minutes and

51 seconds from the beginning of the video from which the preceding screenshot was created.

Defendant Carrion, Defendant Finan, Defendant Redmond, and Mr. Lynch are shown from left

to right on the far-right side in that screenshot as they stood behind the staircase and were having

a conversation about which it continues to be objectively reasonable to infer from the totality of

the circumstances and hindsight was about having measures taken to illegally silence my speech

in that subway station in violation of my constitutional rights. Mr. de Blasio also appears in that

screenshot.



21.    The next screenshot was created from what is shown at the elapsed time of 5 minutes and

8 seconds from the beginning of the video from which the preceding screenshot was created.

Defendants Gabrielle Dann-Allel and Carrion appear on the far-left in it as they stood on a

subway platform near where I was because they decided to stalk me to there for no valid reason.

Mr. de Blasio also appears in it.



22.     The next screenshot was created from what is shown at the elapsed time of 5 minutes and

16 seconds from the beginning of the video from which the preceding screenshot was created.



23.     The preceding screenshot shows **a)** Mr. Redmond on the left as he stood on a subway

platform behind a vertical metal partition and **b)** the Mayor. It also confirms that Mr. Redmond

left the area in that subway station where I first encountered him in it on 7/25/17 and chose to

illegally stalk me by following me to the area where I lawfully stood on the subway platform

after I treated them like an infectious disease and abandoned them differently than how the

Mayor's father did with him and Judge Schofield did with her mother.

24.     As I discussed earlier in this complaint, the next screenshot is from a photograph that was

posted on the Internet on 7/25/17 at 5:40 pm by a Twitter account that is registered to a

whistleblower news censor in journalism named Ben Max.



25.     The preceding screenshot shows the Mayor, additional whistleblower news censors in journalism that have censored whistleblowing information of public concern that I have shared with them and otherwise discussed in their presence, Defendant Fowler, and me. Such additional news censors who appear in the preceding screenshot include Jillian Jorgensen, J. David Goodman of the New York Times, and Mara Gay who now works for the New York Times. Mr. Fowler and I are shown on the far-right side of that screenshot. When the photograph from which the preceding screenshot was taken, I was talking into the right ear of Mr. Fowler as he continued to illegally and intentionally position his body in front of me after I arrived before him to that spot on the subway platform and resumed lawfully engaging in protected whistleblowing to the detriment of the Mayor. My decision to lawfully engage in such protected whistleblowing at that time and place was largely due to **a)** the fact that I presciently believed that there would be

a large number of journalists present there to cover the Mayor's illegal publicity stunt, **b)** Mr. de Blasio having refused to intervene in response to the information I shared with him on 7/18/17 about Mr. Redmond, and **c)** my desire to lawfully expose fraudulent remarks that Mr. de Blasio and other members of his administration had made that caused me substantial harm.

26. The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18 seconds in the video that was recorded of the Mayor's illegal publicity stunt as a result of arrangements that the Mayor's office made.



27.    The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal partition near Mr. de Blasio and Eric Phillips while Mr. Phillips worked a mouthpiece for Mr. de Blasio by illegally dragging me by my left arm along the subway platform where I had been standing as I was lawfully conducting myself as I engaged in whistleblowing near Mr. de Blasio and censors in journalism. That occurred behind the vertical metal partition shown in that

screenshot. By deliberately making physical contact with me and dragging me in that subway

station on 7/25/17, Mr. Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, and NYPL

§195.00 in the process of causing irreparable harm to my rights pursuant to the First

Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's

Rules of Conduct to continue to lawfully engage in protected whistleblowing near Mr. de Blasio

from where I had been standing on that subway platform after he and Defendant Taylor illegally

coerced me to move away from where I stood earlier inside of that subway station by having

directed me to do so. This information is significant because while Mr. Redmond testified on

6/13/18 under oath in *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13,

2018), Mr. Redmond fraudulently claimed that he respects the right of people to legally protest.

28.     The next screenshot was created from what is shown at the elapsed time of 10 minutes

and 50 seconds from the beginning of the video from which the preceding screenshot was

created. Defendant Redmond appears in it as he walked back to the area on that subway platform

where I had just been before he illegally assaulted me by grabbing my arm and dragging me

away from it. Mr. de Blasio also appears in that screenshot.



29.     The next screenshot was created from what is shown at the elapsed time of 11 minutes

and 3 seconds from the beginning of the video from which the preceding screenshot was created.

Defendant Redmond appears in it after he reversed direction on that subway and walked back

toward the area where he illegally dragged me on that subway platform before he released me to

the custody of NYPD 7/25/17 John Doe3 as Mr. Redmond illegally ordered him to escort me out

of that subway station and criminally threatened me by telling me that I would be arrested if I re-

entered it. Mr. de Blasio also appears in that screenshot.



30.    Estoppel certainly barred members of the NYPD and other New York City government

personnel from taking any adverse action against me while I was in that subway station on

7/25/17 in relation to attending the Mayor's 7/25/17 illegal publicity stunt because Mr. de Blasio

was illegally conducting that publicity stunt in it and members of the NYPD were illegally

allowing that to occur in flagrant violation of the MTA's Rules of Conduct. They also couldn't

legitimately object to how I was projected my voice with just my lungs because Mr. de Blasio

was illegally using a microphone at the same time that I had to compete against along with noise

from subway trains in order to be heard as a speaker in accordance with my First Amendment

and Fourteenth Amendment due process and equal rights that apply to freedom of expression and

equal protection.

31.    The following screenshot is from records that I have for what my cell phone service was

on 7/25/17 with AT&T. Those records include telephone calls that I made and received on

7/25/17 with the cell phone that I then used with that cell phone service. The information in this

screenshot shows that I had 3 telephone calls that I received and otherwise made with my cell

phone between 5:47 pm and 5:50 pm on 7/25/17. The telephone call that I received at 5:47 pm

on 7/25/17 was from a prominent civil rights attorney named Norman Siegel. The two telephone

calls that I made at 5:49 pm as well as 5:50 pm that is shown as having lasted for roughly 27

minutes were to Mr. Siegel. The telephone call that I received from him at 5:47 pm occurred as I

was exiting the subway station that I had just been in and in which the Mayor's 7/25/17 illegal

publicity stunt was conducted. It was sheer coincidence that I received a telephone call from Mr.

Siegel on 7/25/17 at 5:47 pm after I had been in contact with him earlier that month. Although he

has never been my attorney, he confirmed to me during the telephone call that I had with him at

5:50 pm on 7/25/17 that I had a legal right to have screamed or shouted in the subway station on

7/25/17 as I attended the Mayor's illegal publicity stunt in it. After he told me that, I pointed out

that I never did either of that in that subway station on that date and that I had instead merely

projected my speech with my lungs in order to be heard effectively while I was inside of that

noisy subway station. I can be much louder when I scream and shout than I was on 7/25/17.

However, I never did so on that date.

| Tuesday, 07/25 | | | | |
|---|---|---|---|---|
| 05:47p | INCOMI CL | 212-455-0300 | SDDV | 1 |
| 05:49p | NEW YO NY | 212-455-0300 | SDDV | 1 |
| 05:50p | NEW YO NY | 212-455-0300 | SDDV | 27 |

32.     On 7/25/17, the New York Post published a news article that is entitled "Angry

commuter tears into de Blasio at press conference" and was written by Michael Gartland on the

Internet at https://nypost.com/2017/07/25/angry-commuter-tears-into-de-blasio-at-press-

conference/. That article includes the following photograph of Mr. de Blasio in a subway train as

his lip-service continued to attract a rat pack comprised of news censors:



33.     The following are relevant excerpts from that news article that confirms that members of

the public besides me also paid proper respect to Mr. de Blasio during his illegal publicity stunt

in that subway station on 7/25/17 by loudly criticizing him:

> Mayor de Blasio got an earful from commuters Tuesday when he held a press
> conference inside a subway station next to City Hall about the sorry state of the
> system.
>
> "Fix the trains," yelled Lainie Durnin of Bay Ridge, Brooklyn. "That's what New
> York wants."
>
> Another woman repeatedly yelled "Sandinista," an apparent reference to de Blasio's
> past radical leanings.
>
> Durnin wound up taking the same R train to Brooklyn as the mayor after the event.
>
> She was furious that he got special treatment when a train arrived.
>
> "I think this is a f—g joke. They'll hold the train for the mayor but not anybody else,"
> she said.

34.     Throughout the entire time that I was in the City Hall subway station on 7/25/17 near where Mr. de Blasio conducted his illegal publicity stunt in it, I had a Fourteenth Amendment and First Amendment equal protection right to vociferously criticize him and engage in whistleblowing against him, his administration, and his administration's business partners since other members of the public also loudly criticized him then and there without being retaliated against for doing so and Vickie Paladino was also allowed to loudly criticize Mr. de Blasio on 7/21/17 in a street in Queens that I discussed earlier in this complaint.

35.     Many video security cameras existed in the areas in that subway station where I was on 7/25/17 and all of them would confirm by the video recordings that they then recorded that I conducted myself in an entirely lawful manner while I was in it then. Also, the fact that Defendant Fowler never took any action to cause me to stop engaging in criticism and whistleblowing against Mr. de Blasio for the benefit of the public while I was in that subway station is very significant because that fact causes it to be objectively reasonable to infer that he didn't regard my behavior as being unlawful in that subway station.

36.     The table that will be shown shortly contains a compilation of information from relevant Twitter postings that is presented in condensed form and in chronological order that were posted on the Internet mainly by whistleblower news censors in journalism who attended the illegal publicity stunt that Mr. de Blasio conducted on 7/25/17 inside of the City Hall subway station that describe how it was conducted, setup, and attended by various people. Information in its first column will be presented on separate lines in each row:

      a.     Date and time when the Twitter posting was posted on the Internet.

      b.     Name of the person or organization to whom the Twitter account is registered that was used to post the Twitter posting.

    c.     The username of the Twitter account that was used to post the Twitter posting on

the Internet.

    d.     The name of the news organization that employed the person when that Twitter

posting was posted.

37.    The following information in that table's second column will be presented on separate

lines in each row:

    a.     The text of that Twitter posting.

    b.     Screenshots of any photograph or video recording that it contains.

    c.     The link to that Twitter posting on the Internet.

| 7/25/17 at 5:01 pm<br>Josh Einiger<br>@JoshEiniger7<br>ABC News | Waiting for @BilldeBlasio to react to @MTA subway rescue plan. Live at 5:30 #abc7ny<br><br><br><br>https://twitter.com/JoshEiniger7/status/889953879407853569 |
|---|---|
| 7/25/17 at 5:22 pm<br>Shant Shahrigian<br>@ShantRS<br>Employer: New York Daily News? | Close quarters at the de Blasio presser on the MTA about to begin at the City Hall R stop - underground. |



https://twitter.com/ShantRS/status/889959025005264898

| | |
|---|---|
| 7/25/17 at 5:25 pm<br>Courtney Gross<br>@courtneycgross<br>Spectrum News/<br>NY1 | <br><br>https://twitter.com/courtneycgross/status/889959941435510789 |

| | |
|---|---|
| 7/25/17 at 5:28 pm<br>Jillian Jorgensen<br>@Jill_Jorgensen<br>New York Daily<br>News | The glamorous life of a newspaper reporter includes sitting on the ground of a subway station awaiting the mayor<br><br><br><br>https://twitter.com/Jill_Jorgensen/status/889960693834895367 |
| 7/25/17 at 5:29 pm<br>Josh Einiger<br>@JoshEiniger7<br>ABC News | Press conference now downstairs in hot subway station. Signage indicates @BilldeBlasio still unlikely to pay for @MTA "rescue." #abc7ny<br><br><br><br>https://twitter.com/JoshEiniger7/status/889960856217407489 |

| | |
|---|---|
| 7/25/17 at 5:29 pm<br>Shant Shahrigian<br>@ShantRS<br>Employer: New<br>York Daily News? | Getting ready for story time with the mayor.<br><br>https://twitter.com/ShantRS/status/889960746003681280 |
| 7/25/17 at 5:31 pm<br>Mara Gay<br>@MaraGay<br>Employer: Wall<br>Street Journal? | Waiting for Mayor de Blasio to respond to MTA turnaround plan<br><br>https://twitter.com/MaraGay/status/889961343612268545 |

| | |
|---|---|
| 7/25/17 at 5:34 pm<br>Marc Santia<br>@MarcSantia4NY<br>Employer: NBC News | Set for @NYCMayor to respond to @MTA plans to overhaul subway, asking city to split bill. @NBCNewYork will carry live<br><br>https://twitter.com/MarcSantia4NY/status/889962090211012612 |
| 7/25/17 at 5:35 pm<br>Mara Gay<br>@MaraGay<br>Employer: Wall Street Journal? | Is it possible mayor is trying to recreate the summer of hell in a single press conference?<br><br>https://twitter.com/MaraGay/status/889962346956955648 |

| | |
|---|---|
| 7/25/17 at 5:36 pm<br>Josh Einiger<br>@JoshEiniger7<br>ABC News | ... and now the signs are gone... out of the area, facing away from us.<br><br>https://twitter.com/JoshEiniger7/status/889962592864751618 |
| 7/25/17 at 5:36 pm<br>Courtney Gross<br>@courtneycgross<br>Spectrum News/<br>NY1 | .@BilldeBlasio signs just removed, perplexing media<br><br>https://twitter.com/courtneycgross/status/889962682434154502 |
| 7/25/17 at 5:37 pm<br>Courtney Gross<br>@courtneycgross<br>Spectrum News/<br>NY1 | Can barely hear the mayor as a subway rolls past |



https://twitter.com/courtneycgross/status/889962888370237440

| | |
|---|---|
| 7/25/17 at 5:40 pm<br>Josh Einiger<br>@JoshEiniger7<br>ABC News | NOW: @BilldeBlasio says @MTA plan is "step in right direction." But MTA must "spend the money it has." #abc7ny<br><br>https://twitter.com/JoshEiniger7/status/889963652060774400 |

| | |
|---|---|
| 7/25/17 at 5:40 pm<br>Ben Max<br>@TweetBenMax<br>Gotham Gazette | As uptown R arrives, mayor can't really be heard, but he continues<br><br>https://twitter.com/TweetBenMax/status/889963675372617730 |
| 7/25/17 at 5:40 pm<br>Gloria Pazmino<br>@GloriaPazmino<br>Employer: Politico<br>New York? | There's a heckler here at the mayor's press conference. He's known to the mayor's detail, shows up routinely at some events<br><br>https://twitter.com/GloriaPazmino/status/889963505138499584 |
| 7/25/17 at 5:46 pm<br>Audrey Wachs<br>@gridwachs<br>Employer:<br>Unknown | BdB=rly into 🚨 now? Moved subway presser to City Hall R train platform. Nearly impossible to hear remarks over rush hour train traffic<br><br>https://twitter.com/gridwachs/status/889965048109682689 |



| 7/25/17 at 5:48 pm Spectrum News NY1 @NY1 Spectrum News/ NY1 | Spectrum News NY1 @NY1<br><br>The @NYCMayor says the city is ready to assist and support the #MTA when necessary.<br><br>768 views   0:00 / 0:43<br><br>https://twitter.com/NY1/status/889965727263993856 |
|---|---|
| 7/25/17 at 5:55 pm Allegra Hobbs @AllegraEHobbs Employer: Unknown? | yes I understand THE VISUALS but this is literally the worst place you could have a press conference twitter.com/NoahHurowitz/s...<br><br>https://twitter.com/AllegraEHobbs/status/889967355643801601 |
| 7/25/17 at 5:57 pm Madina Toure @madinatoure Employer: Observer? | .@NYCMayor press conference in the City Hall subway station. Lady yells, "Fix the trains! That's what the people want."<br><br>https://twitter.com/madinatoure/status/889967961708134401 |

| 7/25/17 at 6 pm<br>Jillian Jorgensen<br>@Jill_Jorgensen<br>New York Daily<br>News | .@NYCMayor was interrupted by people yelling thrice. One was a gentleman who often shows up at mayoral events.<br><br>https://twitter.com/Jill_Jorgensen/status/889968551091724294 |
| 7/25/17 at 6:23 pm<br>Audrey Wachs<br>@gridwachs<br>Employer:<br>Unknown | Also do people in other cities heckle their mayor's press conferences? Ppl were yelling "fix the trains" &"Sandinista!" today<br><br>https://twitter.com/gridwachs/status/889974335712223232 |

38.     I'm shown in a few of the photographs that were included in the Twitter postings that appear in the preceding table. In particular, I appear in the following Twitter postings that appear in it:

a.     The Twitter posting that was posted on 7/25/17 at 5:36 pm by a Twitter account that has the username of @JoshEiniger7 and states "... and now the signs are gone... out of the area, facing away from us." I appear in the upper-left corner of the second photograph that was included in that posting that appears like this as I lawfully exercised my First Amendment right to peacefully assemble while standing in front of Defendant Taylor:



b.     The Twitter posting that was posted on 7/25/17 at 5:36 pm by a Twitter account that has the username of @courtneycgross and states ".@BilldeBlasio signs just removed,

perplexing media". I appear on the far-right corner of the photograph that was included in that posting. The following is a screenshot from it in which I'm seen standing in front of Defendant Taylor near the bottom of a staircase as I wore a white sweater:



c.       The Twitter posting that was posted on 7/25/17 at 5:40 pm by a Twitter account that has the username of @TweetBenMax and states "As uptown R arrives, mayor can't really be heard, but he continues". I appear on the far-right corner of the photograph that was included in that posting. The following is a screenshot from it in which I'm seen standing next to Defendant Fowler as I appear to be speaking to him near his right ear as we stood behind a vertical metal partition on a subway platform near a whistleblower news censor named Mara Gay and a white vertical support pole:



39.     The discussion that follows addresses the relevance of the information about the Twitter postings that is **shown** in the table that spans between pages 148 and 158. The following facts are true about what this Court can and must conclude from the information about those Twitter postings that concern the Mayor's 7/25/17 illegal publicity stunt in the City Hall subway station:

a.      It was asinine instead of merely both stupid and illegal for the Mayor's office to have tried to conduct that publicity stunt in that subway station by virtue of the fact that subway stations are very noisy and certainly not conducive to hosting press conferences. The whistleblower news censors in journalism who attended that publicity stunt made that point perfectly clear in their remarks in their Twitter postings as they stated that that they couldn't hear Mr. de Blasio during that publicity stunt mainly because of trains instead of me while Mr. de Blasio illegally used a microphone during it.

b.      It could reasonably be expected that Mr. de Blasio was bound to be criticized and yelled at lawfully by multiple members of the public in that subway station on 7/25/17 as he conducted that illegal publicity stunt partly because he was illegally inconveniencing members of the public whose public space in that subway station he, his NYPD security detail, members of his staff, and the whistleblower news censors illegally occupied while Mr. de Blasio illegally conducted his publicity stunt in it. By illegally occupying that public space and otherwise illegally having signs, a podium, and tripods in it, Mr. de Blasio and the rest of them were illegally obstructing the ability of members of the public to move freely throughout all public areas in that subway station.

c.      It could also reasonably be expected that Mr. de Blasio was bound to be criticized and yelled at lawfully by multiple members of the public in that subway station on 7/25/17 as he conducted that illegal publicity stunt some people who really hate and otherwise dislike Mr. de

Blasio may have been in that subway station besides me and didn't want to have to hear anything that he had to say while they were in it and didn't want to have to use headphones to drown him out.

       d.     The signs that members of the Mayor's office brought into that subway station for that illegal publicity stunt were removed by that staff right before that publicity stunt got underway. That fact confirmed that all that was achieved by bringing them in there was to have them act as illegal obstructions for people who sought to freely move about in that subway station as they rested on easels.

40.     One of the primary reasons I was in that subway station on 7/25/17 near where Mr. de Blasio was while he conducted his illegal publicity stunt in it and as he arrived in it for that while I engaged in protected whistleblowing about matters of public concern was to lawfully communicate views and messages of mine to ordinary members of the public who would be inside of that subway station outside of and near the publicity stunt that Mr. de Blasio illegally conducted in it. I wanted to give them an opportunity to witness firsthand that journalism in New York City is dead. They would be able to do so by being able to realize that the news censors who attended that publicity stunt wouldn't report anything about me. I was hoping that that would lead to a widespread and permanent boycott of those censors and the organizations that employed them. I also then sought to ascertain whether any actual journalists and reporters were attending that publicity stunt besides the censors who were there that I recognized. One of the ways that I would be able to make that determination would by baiting Defendant Redmond and other members of the NYPD to showcase their stupidity then and there by committing patently illegal acts and omissions against me. In the event that they did so, they would be doing so in the immediate vicinity of video security cameras as well as a large group of people that included

news censors, perhaps a few reporters, and members of the public. Since it was then rush hour and naturally noisy as a result in that subway station and Mr. de Blasio illegally used a microphone during his illegal publicity stunt in that subway station, those circumstances established that I needed to loudly project what I had to say then to have that pass through Mr. de Blasio's amplified drivel to reach ordinary members of the public in that subway station.

41.    A test that I performed on 7/25/17 while I stood near the Mayor's illegal publicity stunt in that subway station and conducted myself in a lawful manner was designed to determine which, if any, of those who attended that publicity stunt and worked for news censorship organizations that partly include the New York Daily News, New York Post, New York Times, Bloomberg News, NBC New York, Spectrum News, Politico, ABC, Newsday and Gotham Gazette would properly do their job by reporting what I said instead of censoring that as I lawfully attended that publicity stunt and was illegally harassed, stalked, seized, and assaulted by members of the NYPD while I lawfully exercised my constitutional rights while doing so. In short, I intended for my presence there to be a setup to see if those who attended that illegal publicity stunt and worked in journalism, were members of the NYPD, were members of the Mayor's staff, and were Mr. de Blasio would prove me right by clearly demonstrating that they were whistleblower news censors in journalism and would otherwise commit illegal acts and omissions against me while I was in that subway station. I performed that test as I lawfully engaged in whistleblowing at the expense of the Mayor, his administration, his NYPD security detail, and business partners of the Mayor's administration largely in response to the fact that I hadn't received any press coverage after the following occurred:

a.    I had face-to-face and telephone conversations and/or exchanged e-mail messages about getting press coverage with people who censors in journalism then, earlier in 2017, and

even earlier that included Michael Gartland, Yoav Gonen, Graham Rayman, Erin Durkin, Juliet

Papa, Marcia Kramer, Bobby Cuza, Rich Calder, and Courtney Gross for matters that were of

public concern that included **a)** judicial misconduct; **b)** civil rights crimes at public forums by

members of the Mayor's NYPD security detail, Mayor's CAU, and New York State court

officers that amounted to acts of voter fraud, voter suppression, and whistleblower retaliation; **c)**

and fraud and negligence by HRA and its business partners, **d)** wage-theft by NTT, and **e)** my

having been viciously assaulted on 7/2/16 due to fraud and negligence by HRA and Urban.

      b.      I had face-to-face conversations with Mr. de Blasio and Mr. Banks about those

same matters while I was in the presence of trashy censors in journalism that included Grace

Rauh, Madina Toure, Gloria Pazmino, and Michael Gartland.

42.     In hindsight, I genuinely regret having not exercised my legal right to have engaged in

self-defense against Defendant Redmond by breaking the hand and arm that he used on 7/25/17

to grab me in that subway station largely because he continued to flagrantly violate my civil

rights at additional public forums thereafter and otherwise ordered other members NYPD's

criminal mob to do so while I was conducting myself in a lawful manner. I should have broken

his hand and arm on 7/25/17 before promptly and decisively shoving him away from me onto the

nearby subway tracks to permanently retire his addiction to violating the civil rights of New

Yorkers and the addiction that whistleblower news censors in journalism have had to censoring

newsworthy information about my interactions with members of the NYPD and Mayor's staff.

**B.**     **Mr. de Blasio's NYPD security detail having illegally caused the delay of a downtown subway train following Mr. de Blasio's illegal publicity stunt in the City Hall subway station**

1.     Following the end of the Mayor's publicity stunt in that subway station, members of the

NYPD illegally delayed a subway train that was headed downtown and had ordinary passengers

on it as Mr. de Blasio boarded it with Defendant Redmond, other members of his NYPD security

detail, and whistleblower news censors in journalism as Mr. de Blasio illegally resumed

engaging in a publicity stunt on that subway train that was prohibited by the MTA's Rules of

Conduct. On 7/27/17, the New York Post published a news article that is entitled "MTA Rips De

Blasio for Apparently Holding a Subway Train" and was written by Carl Campanile on the

Internet at https://nypost.com/2017/07/27/mta-rips-de-blasio-for-apparently-holding-a-subway-

train/. That article includes the following photograph of Mr. de Blasio in a subway train as he

illegally interacted with them at the expense of ordinary passengers on that train:



2.      By interacting with the whistleblower news censors in journalism on that subway train in

the manner that he did on 7/25/17 after his publicity stunt in that subway station, Mr. de Blasio

flagrantly violated section 1050.6 of the MTA's Rules of Conduct that includes the following

restriction:

> "(1)  Permitted nontransit uses may be conducted in the transit system except:
>     (i)  **when on or within: a subway car**"

(boldface formatting added for emphasis)

3.      The following relevant excerpt from the news article entitled "MTA Rips De Blasio for

Apparently Holding a Subway Train" that I briefly discussed above confirms that members of

the NYPD illegally delayed the subway train that Mr. de Blasio boarded immediately after he

finished his publicity stunt in the subway station on 7/25/17:

> Transit officials are investigating why a packed subway train was delayed by a news conference Mayor de Blasio held in the station, MTA Chairman Joe Lhota said Thursday.
>
> Lhota called the apparent special treatment "unacceptable," saying: "No one should stop a train for a single individual to get on."
>
> "It's a people's system — it's not one over another," he told reporters following a speech by Gov. Cuomo in Manhattan.
>
> "Causing a delay is what I want to want to avoid in every possible way."
>
> Lhota also noted that "we know when a train comes into a station. We know how long it needs to stay."
>
> Mayoral Press Secretary Eric Phillips publicly denied Wednesday that the train was held inside Manhattan's City Hall/Broadway station Tuesday evening.
>
> But an MTA official told The Post on Thursday that the agency had confirmed that "the train was held at the station for a police check."

4.      Also, a journalist named Melissa Russo of NBC New York wrote a news article that is

entitled "City Hall Pushes Back as MTA Head Investigates Reports

Mayor Held Subway Train for Himself" that was published on the Internet at

https://www.nbcnewyork.com/news/local/city-hall-reports-subway-train-held-for-mayor-de-

blasio-mta-chair-lhota/226575/ on 7/27/17 about the fact that members of the NYPD illegally

caused the downtown subway train to be held up inside of the City Hall subway station on

7/25/17 after Mr. de Blasio's illegal publicity stunt inside of that subway station to facilitate Mr.

de Blasio's ability to board that train and conduct a publicity stunt in it to the detriment of other

passengers who were on that train and otherwise waiting for its arrival in other subway stations. When asked about reports that members of the NYPD illegally intervened to delay that subway train on 7/25/17 inside of the City Hall subway station, Mr. de Blasio was recorded on video as he told news reporters that that didn't matter as he also stated that he didn't care about that. His response about that firmly establishes municipal liability about that illegal delay of that subway train because he tacitly approved and condoned that.

5.      On 7/27/17, the New York Daily News published an article that is entitled, "'Police Check' Held Subway for De Blasio — Despite City Hall Fibs, Evidence Shows" that is available at https://www.nydailynews.com/new-york/police-check-held-subway-de-blasio-city-hall-fibs-article-1.3359399 and was written by Jillian Jorgensen. The following are several relevant excerpts from that article that are about the fact that members of the NYPD illegally delayed the departure of the downtown subway train on 7/25/17 inside of the City Hall subway station following Mr. de Blasio's illegal publicity stunt in that subway station to enable him to board that train and resume his publicity stunt in it:

    a.      "Attention, passengers: This train is being held due to a mayoral photo op, despite phony claims by the mayor's staff.

        Documents reviewed by the Daily News show that despite vehement denials from his staff, Mayor de Blasio's Brooklyn-bound R train was indeed held in the station for him at the end of his press conference Tuesday.

        The documents relating to the dispatch of the specific train de Blasio was boarding contain notes from a dispatcher listing a stop for a "police check" at City Hall station at 6 p.m. — just when he made his hasty exit from a subterranean press conference where he insisted the city should not foot the bill for fixing up the subways."

    b.      "The documents were shown to The News by a source with knowledge of the situation, who would not allow them to be copied or photographed."

    c.      "But the documents aren't the only evidence the train was held. An announcement on the platform said as much — telling commuters the train was being held at

City Hall for a "police investigation." While many officers staffed the mayor's event, they did not appear to be investigating anything.

A News reporter also boarded the train with the mayor. After the mayor was on board snapping pics, a uniformed police officer told a member of the mayor's detail: "I told him to stop. Should I tell him to go?"

The member of the detail responded, "Go, go, go."

6.     By having illegally delayed that train, those responsible for having caused that to occur

violated the MTA's rules in a way that is subject to a $100 fine according to the following

excerpt from its Rules of Conduct:

"Interference with Movement: $100 Fine
Riders are not allowed to obstruct movement of trains by means of preventing subway doors from closing, activating the emergency brake cord in a non-emergency or other interference that will create delays or accidents."

7.     By having conducted a publicity stunt on that subway train on 7/25/17 with

whistleblower news censors in journalism as it headed downtown, the MTA Rules of Conduct

indicate that Mr. de Blasio committed the following additional violations with fines shown for

them:

|   | Violation | Fine ($) |
|---|-----------|----------|
| a | Unnecessary noise | 50 |
| b | Breach of Peace | 50 |
| c | Unauthorized non-transit use | 25 |
| d | Activity in prohibited area | 25 |
| e | Interfere with passenger movement | 25 |
| f | Excessive noise | 25 |

8.     The next screenshot is from a Twitter posting that was posted on the Internet at

https://twitter.com/chayesmatthew/status/889968793434370050 on 7/25/17 at 6:01 pm by the

Twitter account that is registered to Matthew Chayes that I discussed earlier. That posting

includes 2 photographs that together with the text in that posting indicate that Mr. de Blasio was

illegally causing a subway train to be delayed as he was illegally doing a photo-op in the subway

train that he took immediately after he completed his illegal publicity stunt in that subway station.



9.  The member of the NYPD shown in the first photograph that was included in that Twitter posting and was wearing a black uniform as he stood outside of the subway train is Defendant **Mansharamani**. The member of the NYPD who is shown in that same photograph who was wearing a white shirt is Defendant Taylor.

10.  The next screenshot is from a Twitter posting that was posted on the Internet at https://twitter.com/JoshEiniger7/status/889970550025723904 on 7/25/17 at 6:08 pm by a Twitter account that has the username of "@JoshEiniger7" and is registered to a whistleblower news censor named Josh Einiger who works for ABC News. That posting includes a video recording that shows Defendant Redmond and Mr. de Blasio inside of the subway train that that they took immediately after the Mayor's illegal publicity stunt in that subway station on that date. It also shows Defendant Lemorin as he stood directly outside of that train with his back facing it in a

manner that clearly suggested that he and Defendant Redmond were personally involved in having illegally delayed that subway train from having its doors closed and leaving that subway station. The text in that posting confirms that Mr. de Blasio was conducting a photo-op on that subway train. That video clearly shows Defendant making a remark to someone immediately before the doors for that subway train closed and that train left that subway station. That further suggests based on the totality of the circumstances that Defendant Redmond was personally involved in having illegally caused that subway train to have been delayed from leaving and its doors from being closed. That video confirms that Mr. Redmond was then wearing an earpiece by his left ear that was presumably to engage in radio communications.



**C.** **Negligence and a probable cover-up by the CCRB and NYPD after 7/25/17 about the illegal acts and omissions that were committed against me on 7/25/17 inside of the City Hall subway station**

1.      On 3/19/21, I filed a letter in _Komatsu v. City of New York_, No. 18-cv-3698

(LGS)(GWG)(S.D.N.Y.) that was addressed to Judge Schofield that was in response to audio

recordings that I received from the CCRB on 3/19/21 in response to a FOIL demand that I

submitted to it about complaints that I had reported to the CCRB against members of the NYPD.

Audio recordings that I received then included the audio recordings that the CCRB recorded of

all of the members of the NYPD that the CCRB's personnel interviewed in response to an

entirely valid complaint that I reported to the CCRB against members of the NYPD who were

involved in the illegal acts and omissions on 7/25/17 inside of the City Hall subway station.

2.      The only members of the NYPD that the CCRB interviewed for my complaint to it about

the illegal acts and omissions that were committed against me on 7/25/17 inside of the City Hall

subway station were Defendants Redmond and Taylor. The fact that the CCRB didn't interview

other members of the NYPD who likely had probative information about that matter is plainly

indicative of the fact that **a)** personnel of the CCRB engaged in obstruction of justice about that

matter partly by not interviewing them, **b)** people who the NYPD's personnel commit illegal acts

and omissions against can't rely on the CCRB, and **c)** the CCRB and its personnel are

incompetent and biased in favor of the NYPD. The CCRB needed to have also interviewed

Defendants Fowler, Mansharamani, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 John

Doe2, NYPD 7/25/17 Kelly Bryant, and NYPD Officer Paul Briscoe because they were

witnesses about the 7/25/17 set of incidents inside of the City Hall subway station.

3.      The simple fact the CCRB never bothered to **a)** pay attention to the fact that access to

subway platforms in subway stations in New York City is through the use of MTA Metrocards

confirms that the uptown subway platform on which I stood on 7/25/17 inside of the City Hall

subway station during Mr. de Blasio's illegal publicity stunt in that train station is MTA property

and **b)** check the MTA's rules to determine whether the Mayor was authorized to conduct his illegal 7/25/17 public stunt inside of that train station then in the location and manner that he illegally both did so clearly demonstrates that the CCRB is incompetent and useless. No one from the CCRB asked members of the NYPD who they interviewed in response to my complaints against members of the NYPD that pertain to my 7/25/17 claims in this case the following relevant questions:

      a.      Does the City of New York or Mr. de Blasio control the MTA?

      b.      Has Mr. de Blasio previously stated that he and/or the City of New York does not control the MTA?

      c.      Does the MTA control the subway system in New York City?

      d.      Does the MTA control how subway stations in New York City are operated and rules that apply to things that are permissible and prohibited in them?

      e.      What do the MTA rules say about whether it's permissible for activities to occur in subway stations in New York City that involve public speaking when that involves having that occur near staircases with microphones and physical obstructions that partly include podiums?

      f.      What do the MTA rules say about whether it's permissible for activities to occur in subway stations in New York City that involve public speaking and gatherings that obstruct the movements of others in public areas inside of such subway stations?

4.      The CCRB assigned the complaint number of 201703371 to the complaint that I reported to it about the illegal acts and omissions that were committed against me on 7/25/17 by members of the NYPD inside of the City Hall subway station. The CCRB interviewed Defendants Redmond and Taylor on 8/18/17 and 8/29/17 in response to that complaint respectively.

**Discussion of remarks by Defendants Redmond and Lê on 8/18/17 during Ms. Lê's interview of Mr. Redmond in response to my complaint to the CCRB about the illegal acts that Mr. Redmond and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station**

5.    The discussion that follows addresses relevant remarks that were made by **a)** Defendants Redmond and Lê, **b)** an unknown female colleague of Ms. Lê at the CCRB to whom I will refer as "Jane Doe", and **c)** an attorney for Mr. Redmond on 8/18/17 while Ms. Lê interviewed Mr. Redmond in response to the complaint that I reported to the CCRB about the illegal acts that Mr. Redmond and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station. The CCRB's audio recording of that interview is available at

https://drive.google.com/file/d/1bdvEZSznI-m4zg0hzkXMTCGDiQ2Qx37g/view?usp=sharing.

The elapsed times in that audio recording that are referenced below are shown in the time format of "[minute:second.fraction of a second]". This means that an elapsed time of 8:32.16 represents the elapsed time of 8 minutes and 32.16 seconds. The CCRB illegally muted the recording of that audio recording for 39 seconds between the elapsed times of **a)** 38 seconds and **b)** 1 minute and 7 seconds that constitutes and illegal cover-up in violation of my rights pursuant to the First Amendment, my Fourteenth Amendment liberty rights to due process and receive valuable information, and New York State's Freedom of Information Law as well as other laws.  The muting of that also violated the following:

    a.    Findings from **a)** *Trump v. Vance,* **b)** *Piesco v. City of New York, Dept. of Personnel,* **c)** *Buckley v. American Constitutional Law Foundation, and* **d)** *Elrod v. Burns* that appear in this complaint's "Legal Standards" section.

6.    On 10/4/18, New York State Supreme Court Judge Alexander Tisch issued an order in my HRA lawsuit. Through that order, he caused that case to be unsealed as of that date. Earlier

in this complaint I included a screenshot of an e-mail message that Jaclyn Rothenberg sent on 6/28/17 at 5:18 pm partly to Defendant Redmond that illegally contained information about my HRA lawsuit while that case was then sealed. This meant that Ms. Rothenberg and everyone to whom she sent that e-mail message were violation of Judge Ostrager's 1/17/17 sealing order in my HRA lawsuit. Prior to that date, I filed an OSC in my HRA lawsuit on or about 5/30/17 in which I asserted further claims against Mr. Redmond in response to the fact that he was among people who illegally prevented me from attending the Mayor's 5/30/17 resource fair.

7.       By being in violation of my privacy rights in my HRA lawsuit while it was sealed by having access to information about that case that I didn't provide to him, that fact and circumstance decisively establishes that Mr. Redmond reciprocally doesn't have any privacy rights as far as I'm concerned. This means that the fact that the CCRB didn't provide me a complete and unmuted audio recording of its 8/18/17 interview of him in response to a complaint that I reported against him violates my First and Fourteenth Amendment rights to have such a complete and unmuted audio recording of that. The concept of offsetting penalties that exists in football applies to this circumstance to highlight the fact that Mr. Redmond doesn't have any privacy rights as far as I'm concerned because he was among people who first illegally violated mine. *Porritt v. Erico International Corporation*, No. 10-cv-0545-JPG-SCW (S.D. Ill. May 25, 2011) addresses the issue of offsetting penalties.

8.       At the elapsed time of 16 minutes and 19.924 seconds in the CCRB's 8/18/17 audio recording of its interview of Mr. Redmond, he lied about me by fraudulently claiming that I was next to a gate on 7/25/17 inside of the City Hall subway station as I stood on the uptown subway platform while I loudly projected my voice with my lungs during rush hour in that naturally noisy train station over and past the unnatural din that Mr. de Blasio was illegally causing then

by illegally using a microphone for his illegal publicity stunt that he illegally conducted in an area in that subway station next to a staircase while obstructing the movements of people in that train station as all of those facts about that illegal publicity stunt and the fact that Mr. de Blasio used a podium for it were in violation of the MTA's rules. Contrary to Mr. Redmond's claim that I stood next to a gate then, it wasn't and still isn't a gate. It was and remains a vertical metal partition that stretched from the ground to the ceiling in that subway station that physically separated the uptown train platform from the area in which Mr. de Blasio conducted his illegal publicity stunt. There was no way for me to pass through that partition in stark contrast to what is true about gates. No door was part of that partition in regards to the immediate vicinity of where I then stood.

9.      At the elapsed time of 3 minutes and 6.103 seconds in that recording, Mr. Redmond confirmed that Mr. de Blasio was originally going to conduct the publicity stunt that he illegally conducted on 7/25/17 inside of the City Hall subway station outside of it and that a decision was made at the last minute to instead conduct that illegal publicity stunt inside of that subway station. That information sufficiently establishes the fact that Mr. de Blasio nor anyone who worked for him applied for and was granted a permit by the MTA that would possibly have authorized Mr. de Blasio to conduct his illegal publicity stunt inside of the City Hall subway station on 7/25/17.

10.     At the elapsed time of 3 minutes and 6.103 seconds in that recording, Mr. Redmond also confirmed that I complied with request that were made to me partly by him inside of the City Hall subway station on 7/25/17 to move away from where Mr. de Blasio was conducting his illegal publicity stunt in it. This is relevant partly because Mr. Redmond's remarks about that confirm that I wasn't attending an event that Mr. de Blasio was conducting because I stood in an

area that was located outside of area in which that event was being conducted.

11.     At the elapsed time of 11 minutes and 56.749 seconds in that recording, Mr. Redmond stated that the area in which Mr. de Blasio conducted his illegal publicity stunt inside of that subway station had then been sectioned off to cause it to be reserved for people with a press pass through the use of ropes and stands.

12.     At the elapsed time of 27 minutes and 4.403 seconds in that recording, Mr. Redmond stated that the press reported something about a woman who shouted something at Mr. de Blasio at the end of the illegal publicity stunt that Mr. de Blasio conducted inside of the City Hall subway station. That confirmed that Mr. Redmond and other defendants in this case subjected me to First Amendment retaliation and illegal selective-enforcement in violation of my Fourteenth Amendment equal protection, liberty, and due process rights through their acts and omissions against me on 7/25/17 while I was inside of that subway station as Mr. de Blasio conducted his illegal publicity stunt.

13.     At the elapsed time of 29 minutes and 29.536 seconds in that recording, Mr. Redmond made a remark about the fact that how I expressed myself while I stood on the uptown subway platform inside of the City Hall subway platform had caused a distraction to occur from Mr. de Blasio's illegal publicity stunt in that train station that was among factors that caused people to look at different people and things that included Mr. Redmond then in that train station. He made it clear that he didn't appreciate that.

14.     Mr. Redmond made several remarks during that 8/18/17 CCRB interview about the fact that I read from a spiral notebook on 7/25/17 while I was inside of the City Hall subway station. However, there is nothing illegal about exercising First and Fourteenth Amendment rights to read and to do so from a notebook. He made remarks about me reading from that notebook at

elapsed times in the audio recording of that interview that include **a)** 3 minutes and 6.103

seconds, **b)** 14 minutes and 17.747 seconds, **c)** 18 minutes and 5.616 seconds, **d)** 27 minutes and

11.109 seconds. Although it has been said that the pen is mightier than the sword, the last time

that I checked, a spiral notebook isn't a pen and it's also not a gun, knife, bomb, chemical spray,

slingshot, rubber band, crossbow, bat, club, hammer, chain, or other object that I could have used

to cause physical harm to the Mayor. This is partly because Defendant Fowler stood between me

and the vertical metal partition that separated where we then were on the uptown train platform

from the area where Mr. de Blasio conducted his illegal publicity stunt. Mr. Fowler faced me

while he functioned as a human shield then. It simply wasn't possibly or likely for me to throw

my spiral notebook through that partition and have it strike Mr. de Blasio. This confirms that I

wasn't a security risk inside of that subway station on 7/25/17.

15.     At the elapsed time of 16 minutes and 10.396 seconds in the CCRB's audio recording

from its 8/18/17 interview of Mr. Redmond, he lied while making a remark in which he claimed

that a member of the Mr. de Blasio's NYPD security detail was on the uptown subway platform

during Mr. de Blasio's illegal publicity stunt on that date in the City Hall subway platform before

I reached that platform. Mr. Redmond was then referring to Defendant Fowler as the member of

the security detail. Mr. Fowler stalked me to that platform and reached it after I did so. This

means that Mr. Redmond totally screwed up by allowing a security hole to exist on that uptown

subway platform that my foray to that platform forced him to immediately fix. I simply and

instantly recognized that major deficiency while I first interacted with Mr. Redmond inside of

that subway station on 7/25/17 and lawfully took advantage of Mr. Redmond's stupidity and

incompetence by brilliantly executing what amounts to a flanking maneuver in a circuitous route

around the area in which Mr. de Blasio conducted his illegal publicity stunt to reach an area on

the uptown subway platform that enabled me to be within 10 feet from Mr. de Blasio then. I then proceeded to lawfully use him and trashy censors in journalism that were gathered like rats near him as a sideshow while I exercised my First and Fourteenth Amendment rights to loudly engage in public speaking to the expense of Mr. de Blasio to reach other people inside of that subway platform largely to provide them information in support of the Voting Rights Act to help them make informed decisions about whether to vote in the 2017 New York City government elections and to fire Mr. de Blasio and his entire administration while doing so. In other words, one of my primary purposes then was to serve as a whistleblower to the detriment of Mr. de Blasio, his administration, his administration's business partners, the trashy censors in journalism who were gathered there and the censorship businesses that employed them, and Mr. de Blasio's NYPD security detail.

16.     At the elapsed time of 27 minutes and 57.351 seconds in the CCRB's audio recording from its 8/18/17 interview of Mr. Redmond, he made remarks in which he confirmed that I was being consistently censored by the trash in journalism that attended Mr. de Blasio's 7/25/17 illegal publicity stunt in that subway station, their colleagues, and the censorship businesses that employed them. That fact and circumstance firmly established that a valid reason for me to attend that illegal publicity stunt by Mr. de Blasio was to publicly and prominently expose that trash in journalism through the eyes and ears of members of the general public in that subway station and video security cameras in it by making it as clear as possible that such garbage were vile accomplices of Mr. de Blasio and the rest of his mob. Sometimes people have to go to extremes to get their point across and how I conducted myself on 7/25/17 inside of that subway station during Mr. de Blasio's illegal publicity stunt was about that. In fact, I recall a conversation that I had in 2017 about what I just discussed in Brooklyn with a censor in

journalism who works for ABC News. I believe that person is named NJ Burkett. The conversation that we had then occurred near Mr. de Blasio's 2017 reelection campaign headquarters. I asked that ABC News censor what it would take for the press to report something about me that was related to Mr. de Blasio's administration and was told that I might need to create a scene for that to occur.

17.    At the elapsed time of 7 minutes and 57.586 seconds in the CCRB's audio recording from its 8/18/17 interview of Mr. Redmond, he stated that he didn't think that I'm a violent person.

18.    At the elapsed time of 7 minutes and 25.312 seconds in that recording, he stated that there were several issues that I had that I sought to be properly redressed by Mr. de Blasio's administration that weren't being addressed and that such issues included the following:

        a.    Matters pertaining to military veterans.

        b.    My having been assaulted by my former roommate for the apartment in which I reside.

        c.    The outcome of the criminal case that was commenced against that roommate in response to that assault.

        d.    A housing matter that was about having been relocated from Queens to the Bronx that was related to HRA and Mr. Banks.

19.    All of those matters were matters about which I would have and/or otherwise did engage in whistleblowing and/or criticism against Mr. de Blasio and his administration while I was inside of the City Hall subway station on 7/25/17 in areas near Mr. de Blasio's illegal publicity stunt in that train station. Those matters were about issues that were of both public and private concern and the expression that I engaged in about them then was protected First Amendment expression.

20.     At the elapsed time of 9 minutes and 7.924 seconds in the CCRB's audio recording from its 8/18/17 interview of Mr. Redmond, he lied by fraudulently claiming that I was allowed to attend public events that were conducted partly by Mr. de Blasio and that I wasn't barred from attending such events.

21.     At the elapsed time of 9 minutes and 23.388 seconds in that audio recording, he lied by fraudulently claiming that if there were issues that I had that I sought to receive proper redress for, he would put me in contact with the Commissioner of the City of New York government agency that I could speak to about that.

22.     At the elapsed time of 24 minutes and 48.101 seconds in that recording, he lied by fraudulently claiming that he would assist me in any way that he could.

23.     At the elapsed time of 24 minutes and 36.313 seconds in that recording, he lied by fraudulently claiming that if there was an issue that I had that needed to be addressed by an agency that was part of Mr. de Blasio's administration, then it would be addressed. Contrary to his lie about that, such issues were illegally and routinely caused, exacerbated, condoned, ignored, and covered-up by Mr. de Blasio's administration. In fact, I testified in February of 2017 to Bronx Criminal Court Judge Cori Weston who Mr. de Blasio appointed as a judge before she fraudulently suppressed admissible evidence in the criminal prosecution against my former roommate for my apartment for assaulting me in it that HRA proximately enabled by illegally subjecting me to a bait-and-switch fraud and forgery by changing the binding and fully-enforceable apartment lease agreement without my prior knowledge nor consent that I signed on 2/16/16 to be issued a private apartment with no roommate in the building in which I still reside.

24.     At the elapsed time of 7 minutes and 57.586 seconds in that recording, he stated that remarks that I make are sometimes "off-putting". That remark is sufficient to enable me to

prevail on the merits in this case for my 7/25/17 claims that pertain to viewpoint discrimination and First Amendment retaliation.

25.     At the elapsed time of 5 minutes and 43.964 seconds in that recording, he explicitly incriminated censors in journalism in New York City by pointed out that they were accomplices of Mr. de Blasio, his administration, and Mr. de Blasio's NYPD security detail by stating that the press warns him when I arrive at public events that are conducted partly by Mr. de Blasio.

26.     At the elapsed time of 6 minutes and 17.273 seconds in that recording, he lied by fraudulently claiming that I hadn't RSVP-ed in advance to attend the Mayor's 4/27/17 town hall.

27.     At the elapsed time of 7 minutes and 57.586 seconds in that recording, he stated that a woman with 8 students with her told him on 4/27/17 at the site of the Mayor's 4/27/17 town hall that he was making her nervous after I apprised her there that he was violating my rights then and there. I must have told her there that he was illegally not allowing me to attend that town hall meeting.

28.     At the elapsed time of 13 minutes and 57.716 seconds in that recording, he lied by fraudulently claiming that he tries not to upset me.

29.     At the elapsed time of 22 minutes and 02.699 seconds in that recording, he stated that he would have allowed me to continue to stay on the uptown subway platform inside of the City Hall subway station during Mr. de Blasio's illegal publicity stunt in it if I had been quiet.

30.     At the elapsed time of 24 minutes and 19.196 seconds in that recording, he stated that he didn't think that I conducted myself in a disorderly manner on 7/25/17 while I was inside of the City Hall subway station.

31.     At the elapsed time of 4 minutes and 55.767 seconds in that recording, he confirmed that he assaulted me on 7/25/17 in that subway station and violated my Fourth Amendment, First

Amendment rights of assembly, and Fourteenth Amendment rights by stating that he grabbed my left arm while I stood on the uptown subway platform in that subway station and walked me between 8 and 10 feet with Defendant Taylor. He also stated then that he had Mr. Taylor and Defendant NYPD 7/25/17 John Doe3 to walk me to the top of the exit for that subway station to perform an "ejection report".

32.     At the elapsed time of 18 minutes and 22.366 seconds in that recording, Mr. Redmond lied by fraudulently claiming that the area of the uptown subway platform on which I stood on 7/25/17 during the Mr. de Blasio's illegal publicity stunt as I was reading from a notebook was very thin. Also, the fact that I then stood in very close proximity to the vertical metal partition that separated that platform from the area in which Mr. de Blasio conducted his illegal publicity stunt matters because that confirms that I wasn't in anyone's way then.

**Discussion of remarks by Defendants Taylor and Lê on 8/29/17 during Ms. Lê's interview of Mr. Taylor in response to my complaint to the CCRB about the illegal acts that Mr. Taylor and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station**

33.     The discussion that follows addresses remarks that were made by **a)** Defendants Taylor and Lê on 8/29/17 while Ms. Lê interviewed Mr. Taylor in response to the complaint that I reported to the CCRB about the illegal acts that Mr. Taylor, Mr. Redmond, and other members of the NYPD committed against me on 7/25/17 inside of the City Hall subway station. The CCRB's audio recording of that interview is available at

https://drive.google.com/file/d/1Ippmh878bm3XgIZ70PRILtp1S_zBDOAc/view?usp=sharing.

The elapsed times in that audio recording that are shown in this discussion with the same time format that was used in the preceding discussion. The CCRB illegally muted the recording of that audio recording for 39 seconds between the elapsed times of **a)** 47 seconds and **b)** 1 minute

and 5 seconds. The CCRB also illegally muted the recording of that audio recording for 36 seconds between the elapsed times of **c)** 2 minutes and 19 seconds and **d)** 2 minutes and 55 seconds that constitutes an illegal cover-up in violation of my rights and laws that I cited earlier.

34.    At the elapsed time of 14 minutes and 13.034 seconds in that recording, Mr. Taylor stated I discussed a U.S. Supreme Court decision near him on 7/25/17 inside of the City Hall subway station in an area near where Mr. de Blasio conducted his illegal publicity stunt in that train station. He was referring to in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S. 744, 188 L. Ed. 2d 1039 (2014). I brought that up then in response to the fact that he and other members of the NYPD were illegally subjecting me to viewpoint discrimination and First Amendment retaliation by trying to coerce me to move away from where I lawfully then stood. *Wood v. Moss* **a)** is about viewpoint discrimination as well as violations of Fourteenth Amendment equal protection, liberty, and due process rights and **b)** states the following:

    a.    "It is uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express. See, *e.g.*, *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972)."

    b.    "It may be, the agents acknowledged, that clearly established law proscribed the Secret Service from disadvantaging one group of speakers in comparison to another if the agents had "no objectively reasonable security rationale" for their conduct, but acted solely to inhibit the expression of disfavored views."

35.    At the elapsed time of 11 minutes and 47.391 seconds in that recording, Mr. Taylor discussed one of the matters about which I engaged in whistleblowing and criticism against Mr. de Blasio on 7/25/17 while I was inside of the City Hall subway station. Mr. Taylor did so by stating that such matters included the following:

    a.    Lies by Mr. de Blasio that partly concerned supporting military veterans and others who need assistance. Mr. Taylor stated that such remarks by me and others were

politically motivated and that remark by him confirms that my statements then was protected

First Amendment expression pursuant to *Elrod v. Burns*.

36.     At the elapsed time of 13 minutes and 51.332 seconds in that recording, Mr. Taylor stated

that one or more members of the NYPD told him on 7/25/17 inside of the City Hall subway

station that they would let me speak in it and wouldn't interfere with my ability to do so during

and near Mr. de Blasio's illegal publicity stunt in that train station. He specifically claimed that I

wouldn't be targeted then for speaking then and there.

37.     At the elapsed time of 4 minutes and 18.310 seconds in that recording, Mr. Taylor

confirmed that microphones were used in conjunction with Mr. de Blasio's illegal publicity stunt

on 7/25/17 inside of that train station. The fact that he was aware of that proves a point that I

made to Mr. Taylor on 7/25/17 inside of that train station as I told him then that he was ignoring

laws. One of the ways that he was doing so then was by allowing Mr. de Blasio to illegally

conduct that publicity stunt in a location and manner that violated the MTA's rules and my

constitutional rights as well as those of others in that train station that required Mr. Taylor and

other members of the NYPD to immediately break up and disperse Mr. de Blasio's illegal

publicity stunt in that train station partly because it was a physical obstruction and nuisance to

people in that train station who didn't take part in it.

38.     At the elapsed time of 4 minutes and 34.119 seconds in that recording, Mr. Taylor lied by

fraudulently claiming that I was treated with respect in that subway station on 7/25/17 by Mr. de

Blasio's NYPD security detail. Contrary to his lie, those gangsters illegally allowed Mr. de

Blasio to conduct his illegal publicity stunt in that subway station and targeted me for illegal

First Amendment retaliation, viewpoint discrimination, and other violations of my First

Amendment, Fourth Amendment, and Fourteenth Amendment rights while other members of the

public also criticized Mr. de Blasio during that illegal publicity stunt and weren't treated in the same nor similar way as me.

39.     At the elapsed time of 5 minutes and 4.863 seconds in that recording, Mr. Taylor lied by fraudulently claiming that I stood in a location that was behind Mr. de Blasio on 7/25/17 inside of that train station while I stood on the uptown subway platform. I stood to Mr. de Blasio's right then instead.

40.     At the elapsed time of 5 minutes and 9.835 seconds in that recording, Mr. Taylor stated that a black iron fence instead of a gate separated where I stood on that uptown subway platform during Mr. de Blasio's illegal publicity stunt from the area in which that illegal publicity stunt was held in that train station.

41.     At the elapsed time of 5 minutes and 24.715 seconds in that recording, Mr. Taylor lied by claiming that I screamed while I was inside of that train station on 7/25/17. I never did so. I simply used my lungs to project my voice in what was naturally a noisy train station during rush hour at the same time that I had to compete against Mr. de Blasio's illegal use of a microphone during his illegal publicity stunt in order to be effectively heard by members of the public in that train station who were more than 15 feet from where I stood. This is analogous to delivering a speech or giving a class lecture in a large auditorium to cause it to be heard in the back row while no microphone is available.

42.     At the elapsed time of 6 minutes and 35.676 seconds in that recording, Mr. Taylor confirmed that he witnessed Mr. Redmond's illegal seizure of one of my arms on 7/25/17 inside of that train station while I stood on the uptown subway platform as Mr. Taylor illegally didn't try to intervene on my behalf in response to that. He also fraudulently stated that I caused a disruption and chaos in that train station then instead of properly acknowledging the material fact

that it was actually him, other members of the NYPD, Mr. de Blasio, trashy censors in journalism, and members of the Mr. de Blasio's staff who were causing chaos and disruptions in that train station by allowing Mr. de Blasio to conduct his illegal publicity stunt in that train station in the first place instead of enforcing applicable laws and rules that clearly prohibited that.

43.     At the elapsed time of 6 minutes and 54.006 seconds in that recording, Mr. Taylor lied by fraudulently claiming that it was Mr. Redmond who walked me out of that train station on 7/25/17. Contrary to his lie about that, NYPD 7/25/17 John Doe3 did so.

44.     At the elapsed time of 7 minutes and 27.298 seconds in that recording, Mr. Taylor confirmed that Mr. de Blasio's illegal publicity stunt in that train station on 7/25/17 was held near a staircase.

45.     At the elapsed time of 8 minutes and 6.709 seconds in that recording, Mr. Taylor confirmed that he and members of Mr. de Blasio's NYPD security detail illegally prioritized violating the general public's First and Fourteenth Amendment rights of assembly in any public area in that train station on 7/25/17 during Mr. de Blasio's illegal publicity stunt over the duty that all members of the NYPD have to clear obstructions that include illegal publicity stunts by Mr. de Blasio involving trashy censors in journalism inside of train stations in areas where they're prohibited.

46.     At the elapsed time of 8 minutes and 24.819 seconds in that recording, Mr. Taylor facetiously made remarks in which he claimed to support making sure subway stations remain open and accessible instead of allowing public nuisances to exist in them. He made such remarks then in spite of the fact that Mr. de Blasio's illegal publicity stunt directly and materially established that Mr. Taylor's remarks then were that of a con artist and crooked cop. That was

my impression of Mr. Taylor throughout all of my interactions with him on 7/25/17.

47.     At the elapsed time of 8 minutes and 59.144 seconds in that recording, Mr. Taylor

confirmed that members of the public who sought to walk down a staircase into the City Hall

subway station on 7/25/17 during Mr. de Blasio's illegal publicity stunt in it weren't able to turn

to their right at the bottom of that staircase to access a public area in it. That flagrantly violated

the MTA's rules, First Amendment and Fourteenth Amendment rights with no objectively valid

legal justification to have warranted that.

48.     At the elapsed time of 9 minutes and 29.861 seconds in that recording, Mr. Taylor gave

an estimate about the total number of NYPD gangsters that included him and Mr. Redmond who

were present on 7/25/17 near Mr. de Blasio's illegal publicity stunt in that train station. He stated

that there were roughly between 10 and 12 such gangsters present then. Those gangsters illegally

ignored their legal duties as members of the NYPD to break up and disperse that illegal publicity

stunt and intervene on my behalf against Mr. Redmond and Mr. Taylor when they illegally

directed me to move away from where I lawfully stood in that train station and otherwise

illegally seized my arm in it.

49.     At the elapsed time of 9 minutes and 41.010 seconds in that recording, Mr. Taylor

confirmed that members of the general public were prevented from accessing the area in which

Mr. de Blasio conducted his illegal publicity stunt in that train station. Mr. Taylor stated then that

extendable rope that is used in banks for similar purposes was used to establish a boundary and

perimeter around Mr. de Blasio's illegal publicity stunt then. He also confirmed that Mr. de

Blasio used a podium for that publicity stunt in spite of the fact that that violated the MTA's

rules and New York City Administrative Code §16-122(b).

50.     At the elapsed time of 10 minutes and 38.416 seconds in that recording, Mr. Taylor lied

by fraudulently claiming that he attended Mr. de Blasio's illegal publicity stunt in that train station to make sure that members of the NYPD were doing their jobs. He was actually there to make sure that they weren't doing that.

51.     At the elapsed time of 11 minutes and 22.439 seconds in that recording, Mr. Taylor stated that there were a lot of different topics that I discussed when he first encountered me on 7/25/17 inside of the City Hall train station. He stated that such topics included the following:

    a.      Matters about military veterans.

    b.      Mr. de Blasio not keeping promises and lying instead.

52.     At the elapsed time of 11 minutes and 38.971 seconds in that recording, Mr. Taylor stated that I wasn't with anyone while I was in that train station on 7/25/17. This contradicted a remark by Mr. Redmond.

53.     At the elapsed time of 18 minutes and 54.047 seconds in that recording, Mr. Taylor fraudulently omitted the material fact that Mr. de Blasio didn't conduct his illegal publicity stunt inside of the City Hall subway station on 7/25/17 because he was interested in riding a subway train then as Mr. Taylor stated that people enter subway stations to ride trains.

54.     At the elapsed time of 19 minutes and 34.532 seconds in that recording, Mr. Taylor lied by fraudulently suggesting that the exact area where I stood on the uptown subway platform on 7/25/17 inside of the City Hall subway station wasn't out of the way of others on that platform.

55.     At the elapsed time of 22 minutes and 13.635 seconds in that recording, Mr. Taylor lied by fraudulently claiming that I expressed myself in an animated manner with my hands on 7/25/17 inside of the City Hall subway station while I stood on the uptown subway platform. I minimally used my hands then and didn't do so in an animated manner.

56.     At the elapsed time of 29 minutes and 54.681 seconds in that recording, Mr. Taylor lied

by fraudulently claiming that members of the NYPD wouldn't subject someone to censorship if that person had someone to say in close proximity to a press conference that was conducted in a public place. Contrary to his lie about that, that is exactly what Defendant Redmond committed against me on 7/25/17 inside of that train station while I stood on the uptown subway platform when Mr. Redmond illegally grabbed my arm and caused me to be ejected from that train station.

57.    At the elapsed time of 31 minutes and 32.205 seconds in that recording, Ms. Lê stated that she had the video recordings that were recorded on 7/25/17 inside of the City Hall subway station by video security cameras.

58.    At the elapsed time of 32 minutes and 42.886 seconds in that recording, Ms. Lê played back a video recording that I legally recorded partly of Mr. Taylor on 7/25/17 inside of the City Hall subway station in a location that was located near the bottom of the staircase that I used to enter that subway station then. I recorded that video at roughly 5:35 pm.

59.    At the elapsed time of 33 minutes and 17.298 seconds in that audio recording of the CCRB's 8/29/17 interview of Mr. Taylor, Mr. Taylor is heard in the video recording that Ms. Lê was then playing back as he told me that I wasn't then in the press area for Mr. de Blasio's illegal publicity stunt inside of the City Hall subway station on 7/25/17. However, he still proceeded to illegally tell me that I had to move backwards from where I then lawfully stood.

60.    At the elapsed time of 33 minutes and 48.877 seconds in that audio recording of the CCRB's 8/29/17 interview of Mr. Taylor, I'm heard telling Mr. Taylor in the video recording that Ms. Lê was then playing back that he was ignoring applicable laws then in that subway station that prompted Mr. Taylor to immediately lie to my face then by fraudulently claiming that he wasn't ignoring that.

61.    At the elapsed time of 34 minutes and 33.181 seconds in that audio recording of the

CCRB's 8/29/17 interview of Mr. Taylor, I'm heard telling loudly asking Mr. de Blasio a question as he walked down or near the staircase that I then stood near. The question that I then asked him was about one that I previously asked him on 7/18/17 during the Mayor's 7/18/17 resource fair. The question to which I'm referring was about having the City of New York cancel its contracts with NTT that is still subjecting me to wage-theft.

**D.    Additional Facts**

1.      The following is entirely true and accurate about my claims in this case that are against Defendants Mansharamani, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, and Briscoe:

a.      All of those defendants were inside of the City Hall subway station on 7/25/17 during Mr. de Blasio's illegal 7/25/17 publicity stunt in or near the area in which it was conducted.

b.      These defendants chose to ignore their duties pursuant to NYC Charter §435(a) as well as the Fourteenth Amendment affirmative legal duties that **a)** *Marom v. City of New York,* **b)** *Marom v. NYPD Sergeant Fior Blanco*, and **c)** *Portillo v. Webb* addressed and are shown in this complaint's "Legal Standards" section to have intervened on my behalf against Defendants Redmond, Taylor, and Fowler on 7/25/17 inside of the City Hall subway station to immediately end their unconstitutional acts and omissions against me that partly consisted of Mr. Redmond's illegal seizure of me and termination of my verbal expression in the direction of others, Mr. Taylor's directive to me to move from where I lawfully stood, and Mr. Fowler's stalking of me that violated my Fourteenth Amendment equal protection, liberty, and due process rights.

c.      Those defendants also needed to uphold my Fourteenth Amendment liberty rights to socially-distance myself from their trashy colleagues that included Defendants Redmond,

Taylor, and Fowler instead of having allowed them to illegally stalk me and block my view of Mr. de Blasio while I was on the uptown subway platform by standing in front of me for no valid reason. Mr. Fowler did exactly that.

2.      The following is entirely true and accurate about my claims in this case that are against Defendants Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, and Sendroff:

        a.      Upon information and belief, the decision that was made to conduct Mr. de Blasio's illegal 7/25/17 publicity stunt inside of the City Hall subway station instead of somewhere else was a joint effort that involved Defendants Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Sendroff, Mr. Redmond and other members of Mr. de Blasio's NYPD security detail, and perhaps others who then worked for Mr. de Blasio too. This was similar to the fact that Mr. de Blasio repeatedly conducted town hall meetings in 2017 inside of public schools that are controlled by the New York City Department of Education without complying with binding prerequisites that required all political rivals of those who conducted those meetings to be invited to participate in those meetings in order for it to have been permissible for those meetings to have been held in such schools. Information about that perquisite exists in *Bloomberg v. the New York City Department of Education*, No. 17-cv-3136 (PGG) (S.D.N.Y. Sept. 24, 2019). Everyone who was involved in making the decision to have Mr. de Blasio's illegal 7/25/17 publicity stunt to be conducted inside of the City Hall subway station and carrying out that decision's terms are liable for violating the following rights of mine on 7/25/17 inside of the City Hall subway station during Mr. de Blasio's illegal publicity stunt in it and shortly beforehand due to but-for causation:

                i.      My rights pursuant to the First and Fourteenth Amendment to assemble outside of the boundaries of that event by assembling directly next to that area by standing next

to extendable ropes and floor stands that were used to section off the segregated area in which that publicity stunt was held.

ii.   My rights pursuant to the First and Fourteenth Amendment to communicate and receive information from that particular location during that period and not necessarily from nor to anyone who was in the area in which Mr. de Blasio's illegal publicity stunt was held.

iii.   My rights pursuant to the First and Fourteenth Amendment to record video recordings and take photographs from that particular location during that period.

iv.   My rights pursuant to the First and Fourteenth Amendment to engage in expressive association with others from that particular location during that period and not necessarily with those who were in the area in which Mr. de Blasio's illegal publicity stunt was held.

v.   My Fourteenth Amendment due process, equal protection, and liberty rights and property rights to have unfettered access to all public areas that exist inside of the City Hall subway station on 7/25/17.

vi.   My Fourteenth Amendment due process, equal protection, and liberty rights to not have needed to compete against amplified noises that were caused by Mr. de Blasio's illegal use of a microphone during his illegal publicity stunt on 7/25/17 inside of that train station in order for me to be effectively heard by others inside of that train station and people who I may have chosen to have a telephone call with by using the speakerphone feature on my cell phone. While I was in that train station during Mr. de Blasio's illegal publicity stunt in it, I received a telephone call from a civil rights attorney named Norman Siegel.

3.   All of the City of New York personnel who were responsible for deciding to have Mr. de

Blasio's illegal 7/25/17 publicity stunt conducted inside of the City Hall subway station could have sought out someone who had intelligence and commonsense that they lacked to realize that they needed to first understand the restrictions that the MTA established for public speaking inside of subway stations in New York City instead of throwing caution to the wind while paying no attention to possible legal repercussions from the violations by them and other City of New York personnel of applicable laws by conducting that illegal publicity stunt inside of the City Hall subway station. What they did then was analogous to shopping for a camping tent, barbecue grill, portable electrical speakers, and picnic supplies before setting those things up on the front lawn of someone's house that they had no connection with nor permission from to do so before that homeowner came home while they were on his lawn. In such a scenario, it would be appropriate for the homeowner to quickly **a)** activate the sprinklers on his lawn while his uninvited guests were using electrical speakers on it and **b)** direct his insatiable, ravenous, territorial, fast, and angry pit bulls to quickly get their lunch on that lawn after the shocks strike and the sprinklers are turned off to again prove that they truly are a man's best friend.

4.      The following is entirely true and accurate about my claims in this case that are against Defendants Lê and Darche:

    a.      Mr. Darche is a defendant in *Buchanan et al v. City of New York*, No. 21-cv-660 (SHS)(S.D.N.Y.). That case is a wrongful termination lawsuit filed by people who worked for the CCRB who alleged that they were fired from the CCRB in response to complaints that they made partly about how CCRB investigations were handled by the CCRB's management that apparently sought to curry favor with Mr. de Blasio that may have caused investigations that were conducted by the CCRB in response to complaints that were reported against members of the NYPD to not be investigated properly due to such bias and prejudice within the CCRB. On

10/4/19, I talked with Mr. Darche face to face at the New York Law School in Manhattan during a public meeting after I previously talked with him about complaints that I reported against the NYPD to the CCRB. When I talked with him on 10/4/19, I recorded a video recording of that 1:11 pm. That video recording is available at

https://drive.google.com/open?id=1p2b0KLCopeyKPuN-Nm7gZiJapHWzuEjO. That video recording confirms that he acknowledged that he and I had previously talked and that he was aware that I wasn't pleased with the outcomes of investigations that the CCRB conducted in response to complaints that I reported to the CCRB against members of the NYPD. That video also confirms that he stated in it that he previously advised me that I could contact DOI in the event that I wasn't pleased with how the CCRB conducted investigations in response to my complaints against members of the NYPD. However, that video also confirms that I told him in response then that I had followed his advice by having met with DOI about how the CCRB conducted its investigations as I suggested to him then that it had doing pointless in doing so. I told Mr. Darche at the end of that meeting that DOI's personnel told me that there was nothing that DOI could do about how the CCRB conducted investigations. As the Executive Director of the CCRB, that was something that Mr. Darche should have known instead of sending me on a wild goose chase about that. The fact that he wasn't aware of that established that Mr. Darche is incompetent.

      b.    Although Defendant Fowler was a key witness for my claims about 7/25/17 in this case because he stood directly in front of me on the uptown subway platform inside of the City Hall subway station during Mr. de Blasio's illegal publicity stunt in that train station, the CCRB unconscionably didn't interview him in response to the complaints that I reported to the CCRB about 7/25/17 and Mr. Redmond. Mr. Fowler was the primary person who would was

best suited to telling others **a)** what I said while he stood directly in front of me on that subway platform, **b)** how loudly Mr. de Blasio was heard where Mr. Fowler and I then stood through Mr. de Blasio's illegal use of a microphone then, **c)** how close to the vertical metal partition I stood, **d)** whether members of the general public who also stood on the uptown subway platform seemed to be disturbed by how I conducted myself or whether they didn't seem to mind that.

     c.     The incompetence that Defendants Lê and Darche demonstrated by how abysmally the CCRB conducted its investigation in response to my complaint to it about the illegal acts and omissions that were committed against me on 7/25/17 by members of the NYPD wasn't new and was predictable instead. This is because Defendants Lê totally screwed up the investigation that the CCRB conducted in response to the complaints that I reported to it about the illegal acts and omissions that members of the NYPD committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall. She totally screwed up that investigation by stupidly having not done the following:

     i.     Caused all video recordings that were recorded on 4/27/17 at that site by video security cameras that the New York City Department of Education controls to be immediately preserved and provided to the CCRB in unedited form for the entire period that I was at that site on 4/27/17. This pertains to both the video recordings that were recorded by video security cameras that were installed on the exterior of the school that hosted that town hall meeting and inside of it. Those video recordings showed me, witnesses, and City of New York personnel that committed illegal acts and omissions on 4/27/17 at that site in them. Those video recordings also would show how City of New York personnel interacted with one another in regards to me and witnesses of mine.that consist of someone who I know and people who I don't know. By having caused those video recordings to be preserved and provided to the CCRB,

some of those recordings were overwritten by the video security cameras that recorded them. Since I reported my initial complaint to the CCRB about the illegal acts and omissions that were committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall by members of the NYPD by telephone on 4/27/17 at roughly 7:31 pm, Ms. Lê and the CCRB had ample time to have caused those video recordings to be preserved and provided to the CCRB before they were overwritten.

ii.      Interviewed all of the members of the NYPD who I interacted with on 4/27/17 at the site of the Mayor's 4/27/17 town hall. Members of the NYPD who the CCRB didn't interview about my complaints to the it about 4/27/17 who I interacted with on 4/27/17 at the site of the Mayor's 4/27/17 town hall included NYPD Detective Andrew Berkowitz, NYPD Lieutenant Karl Pfeffer, people who worked for the NYPD as school safety officers, and at least 2 additional members of the NYPD.

iii.      Interviewed all of the other members of the NYPD who otherwise observed interactions that I had with other members of the NYPD and members of the Mayor's CAU on 4/27/17 at the site of the Mayor's 4/27/17 town hall.

iv.      Asked the members of the NYPD who she interviewed in response to my complaints to the CCRB about 4/27/17 whether they and/or others that they were aware of had been involved in electronic communications about me prior to 4/27/17 and whether they would provide the CCRB with copies of those communications partly because they could possibly suggest that the illegal acts and omissions that they and others committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall were continuing, foreseeable, and preventable violations that may have also involved others as a conspiracy to violate my rights due to ulterior motives and hidden agendas that were related to litigation and whistleblowing that I was then

involved in against HRA leading up to the 2017 New York City government elections that required proper attention to be paid by the CCRB to the timeline of relevant events and context in which such illegal acts and omissions against me occurred.

        v.        Kept jurisdiction over my complaint against Defendant Redmond that concerned his illegal acts and omissions against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall instead of having allowed that to be reassigned to the NYPD to conduct a sham investigation about.

        vi.        Asked the members of the NYPD who she interviewed in response to my complaints to the CCRB about 7/25/17 whether they had checked whether it would be suitable for Mr. de Blasio to conduct his illegal publicity stunt inside of the City Hall subway station in the location and manner in which it was conducted by first determining whether that needed to be authorized by the MTA.

        vii.        Asked the members of the NYPD who she interviewed in response to my complaints to the CCRB about 7/25/17 whether **a)** they and other members of the NYPD who were inside of the City Hall subway station on 7/25/17 while I was there and **b)** others that they were aware of engaged in electronic communications about me on 7/25/17 and/or thereafter about matters that were related to my complaints to the CCRB about 7/25/17 and whether they would provide the CCRB copies of those communications.

        viii.        Asked the members of the NYPD who she interviewed in response to my complaints to the CCRB about 4/27/17 whether **a)** they and other members of the NYPD who were at the site of the Mayor's 4/27/17 town hall on 4/27/17 and **b)** others that they were aware of engaged in electronic communications about me on 4/27/17 and/or thereafter about matters that were related to my complaints to the CCRB about 4/27/17 and whether they would provide

the CCRB copies of those communications.

**Causes of Action**

**1st Claim for Relief:**  Violations of the First Amendment

**(Against Defendants City of New York, Redmond, Taylor, Fowler, Mansharamani, NYPD 7/25/17 John Doe3, Sendroff, de Blasio)**

**A.        Against Defendant City of New York**

1.        As discussed in this complaint, the City of New York has violated my First Amendment right to have the Mayor's 7/18/17 video stored on a web site that is administered by the City of New York that would enable the public to watch that video anytime.

2.        The City of New York's personnel have been willfully violating this First Amendment right since July of 2017 that belongs both to me as a speaker and the public to receive all of the information that is available from the entire video for the Mayor's 7/18/17 video.

3.        By depriving me and the public of that information from a web site that the City of New York administers, the City of New York and its personnel who are responsible for having caused this to occur and condoned it have been causing me and the public substantial and irreparable harm partly by depriving the public of political speech that I engaged in during the Mayor's 7/18/17 resource fair while talking with Mr. de Blasio that could have otherwise heavily factored into decisions that New Yorkers made about the 2017 New York City government elections and other decisions as I have discussed in this complaint.

4.        By their acts and omissions with respect to having that video available for access by the public from a web site that is administered by the City of New York, the City of New York and its personnel who are responsible for having caused that denial of access and condoned it, acted under color of law and without lawful justification, intentionally, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts,

callously and wantonly caused me and the public irreparable harm and damage in violation of our constitutional rights that are guaranteed through 42 U.S.C. §1983 and the United States Constitution. The City of New York and the unknown individual defendants to whom I refer in this regard were personally involved in causing and condoning this abuse.

5.      By doing so, the City of New York and its personnel who are responsible for this illegally silenced my speech from a wide audience that partly consists of those who subscribe to the Mayor's YouTube web site that hosts video recordings of public town hall meetings that Mr. de Blasio conducts with other government officials in a manner that is similar in material ways to how they conduct public resource fair meetings.

6.      By doing so, the City of New York and its personnel who are responsible for this illegally prevented me from being able to access that entire video recording on the Internet whenever I chose to from a web site that is operated by the City of New York.

7.      As I discussed earlier in this complaint, the City of New York has been required by New York City Charter §1063(d), New York State Public Officers Law §103, and my First Amendment rights to have had the entire video for the Mayor's 7/18/17 video stored on a web site that the City of New York operates 3 days after it was recorded and kept there in a manner that would allow the public to access it whenever it chose.

**B.      Against Defendants Redmond, Taylor, Fowler, Mansharamani, NYPD 7/25/17 John Doe3, Sendroff, de Blasio**

1.      This claim concerns violations of my First Amendment rights that occurred on 7/25/17 inside of the City Hall subway station in relation to the Mayor's illegal publicity stunt in it on that date.

2.      This claim also concerns violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to

take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances.

3.      Mr. de Blasio violated my First Amendment right during his 7/25/17 illegal publicity stunt in that subway station by using a podium and microphone during it that he was prohibited from using. Mr. de Blasio illegally drowned out much of my speech in violation of my First Amendment rights during his illegal publicity stunt in that subway station by using a microphone.

4.      Whoever was responsible for setting up the barricades, podium, signs, easels, seats, and a platform on which people stood in the immediate area where the Mayor's 7/25/17 illegal publicity stunt was setup violated my First Amendment right to assemble in that specific area while those things were illegally there in violation of both the MTA's Rules of Conduct and New York City Administrative Code §16-122(b). I need to engage in discovery to fully determine who was involved in moving those things in that area and setting them up there and otherwise directing and condoning that.

5.      By having drowned out my speech by using a microphone during his illegal publicity stunt on 7/25/17 in that subway station, Mr. de Blasio also illegally violated my First Amendment right to protest and to have that clearly heard and understood by people who **a)** stood on the subway platform for downtown trains in that subway station, were assembled in the area in which he conducted that illegal publicity stunt, and other areas in that subway station to

whom I was trying to project my voice like a speaker in a packed auditorium who seeks to have those in the back of it to be able to clearly hear and understand a speech that is delivered from the front of it without the benefit of a functioning microphone.

6.      Through his actions during that illegal publicity stunt, Mr. de Blasio also violated the following additional First Amendment rights that I had:

a.      To record audio and video recordings in a public forum without having his remarks in them.

b.      To take photographs and record video in a public forum. He violated that partly by using a podium that blocked what I could otherwise photograph and record video of.

c.      To receive information in a public forum. He violated that by using a microphone that blocked me from being able to clearly hear from members of the public during his illegal publicity stunt.

d.      To have the opportunity to talk with journalists in a public forum. He violated that by using a microphone. None of those who attended the Mayor's illegal publicity stunt reported anything about the substance of the remarks that I made partly because of the Mayor's use of a microphone during it illegally drowned out my speech.

e.      To engage in freedom of expression in a public forum. He violated that by using a microphone.

f.      To otherwise engage in whistleblowing and criticism of government officials in a public forum. He violated that by using a microphone.

g.      To engage in expressive association with members of the public and whistleblower news censors in journalism. He violated that by using a microphone.

h.      To effectively petition the Mayor, members of the NYPD, and members of the

Mayor's staff for redress of grievances. He violated that by using a microphone.

i.      To distribute whistleblowing literature in a public forum. He violated that by virtue of the fact that his illegal publicity stunt prevented me from exercising my constitutional rights to have lawfully walked throughout the area in which it was being conducted as it was being conducted that I could have otherwise done to distribute such literature then and there.

j.      To act in accordance with the Voting Rights Act to be able to effectively encourage members of the public to fire Mr. de Blasio and his entire administration while he was New York City's Mayor through the 2017 New York City government elections. He violated that through his illegal use of a microphone during his illegal publicity stunt in that train station on 7/25/17 as well as the fact that I was illegally prevented from standing next to the area in which he conducted that publicity stunt and near the downtown subway platform while I could then have otherwise attempted to strike up conversations with members of the public who were nearby while they would be on that downtown subway platform. I could have then engaged in a loud discussion with such members of the public while mercilessly and lawfully criticizing and engaging in whistleblowing against Mr. de Blasio, his administration, their business partners, and trashy censors in journalism nearby while standing next to the ropes that were used to section off the area in which he conducted his illegal publicity stunt.

7.      Defendants City of New York, Redmond, Taylor, Fowler, Mansharamani, and NYPD 7/25/17 John Doe3 share liability with Mr. de Blasio for having violated my First Amendment rights during the Mayor's illegal publicity stunt and shortly prior to it in that subway station that I just discussed for the following reasons:

a.      Defendants City of New York and its personnel are responsible for having illegally setup and conducted that publicity stunt in a manner that violated those rights through

the use of various obstructions that included a microphone, podium, seats, barricades, a platform, signs, and easels that violated my First Amendment rights that correspond to peaceful assembly and the ability to be clearly heard and have my expression clearly seen for the purposes that I just discussed.

       b.      Defendants Redmond, Taylor, Fowler, Mansharamani, and NYPD 7/25/17 John Doe3 were all personally involved in violating my First Amendment rights that I discussed above that illegally chilled my speech and other forms of expression such as body language by illegally:

       i.      Preventing me from being able to assemble in public areas in that subway station. Defendants Redmond, Taylor, Fowler, Mansharamani, and NYPD 7/25/17 John Doe3 were personally involved in that by issuing unlawful orders to me to move and otherwise blocking me with their bodies from being able to access public areas in that subway station that included the area in which Mr. de Blasio illegally conducted his publicity stunt in it.

       ii.      Preventing me from being able to remain where I stood in that subway station. Defendants Redmond, Taylor, Fowler, Mansharamani, and NYPD 7/25/17 John Doe3 were personally involved in that by issuing unlawful orders to me to move.

       iii.      Having Defendant Fowler deliberately stand directly in front of me while I engaged in whistleblowing and criticism against Mr. de Blasio, his administration, its business partners, and other matters in that subway station near his publicity stunt mostly while I stood on a subway platform for the uptown trains.

       iv.      Illegally seizing me in that subway station to coerce me to move from where I lawfully stood in it. Defendants Redmond and NYPD 7/25/17 John Doe3 illegally both did so.

**2nd Claim for Relief:** First Amendment Retaliation and Viewpoint Discrimination

**(Against Defendants City of New York, Redmond, Fowler, Taylor, Mansharamani,**

1.      For the reasons that I have discussed in this complaint, the following defendants are liable for having illegally subjected me to First Amendment retaliation and viewpoint discrimination in response to the content of my speech and/or how loudly I tried to project it with my lungs in accordance with my constitutional rights to overcome the Mayor's illegal use of a microphone during his illegal publicity stunt on 7/25/17 inside of the subway station in which he conducted it:

> The City of New York, Howard Redmond, NYPD Detective Christopher Fowler, NYPD Inspector Ritchie Taylor, Mansharamani

2.      Mr. de Blasio is liable for this claim primarily because the other defendants that it concerns acted on his behalf to subject me to illegal viewpoint discrimination and First Amendment retaliation during his illegal publicity stunt in that subway station on 7/25/17. The other defendants that this claim concerns are liable for it due to the facts that I articulated earlier in this complaint.

**3rd Claim for Relief:** Violations of the Fourth Amendment

**(Against Defendants Redmond, Taylor, Fowler, Mansharamani, NYPD 7/25/17 John Doe3)**

1.      Defendants Redmond, Fowler, Taylor, and NYPD 7/25/17 John Doe3 were all personally involved in having illegally violated my Fourth Amendment rights on 7/25/17 in the subway station in which Mr. de Blasio conducted his illegal publicity stunt in it as it was conducted and after 5:15 pm before it began while I was in that station. They did so in violation of the findings about the Fourth Amendment that are expressed in *People v. Alba* and *Dotson v. Farrugia* that I cited in the "Legal Standards" section. Defendants Redmond and NYPD 7/25/17 John Doe3 violated my Fourth Amendment rights then and there by illegally seizing me and coercing me to

leave that subway station while issuing illegal orders to me to do so. Defendants Fowler and Taylor did so by having illegally condoned that illegal seizure of me that occurred in their immediate presence. Defendants Fowler and Taylor also did so by having issued illegal orders to me and otherwise demonstrated a show of authority to me that terminated and restrained my freedom of movement through means intentionally applied. Two of the ways that Mr. Fowler did this was by having used the positioning of his body to physically block me from being able to **a)** walk past him toward the area where Mr. de Blasio conducted his illegal publicity stunt in that subway station when I first encountered Mr. Fowler near the bottom of a staircase in that subway station and **b)** stand directly in front of the vertical metal partition that separated the subway platform on which I stood with him from where Mr. de Blasio and whistleblower news censors were nearby in that subway station. I have no reason to believe that anyone else who stood in that subway station on subway platforms that were physically separated from where that illegal publicity stunt was conducted by vertical metal partitions that stretched from the ground to the ceiling were similarly obstructed by having a member of the NYPD stand directly in front of them during that illegal publicity stunt while facing them. Mr. Fowler had absolutely no valid legal grounds whatsoever to have then stood in front of me on that platform. I didn't conduct myself in any disorderly nor threatening manner in that subway in contrast to him and other members of the NYPD's criminal mob. Defendants Redmond, Taylor, and Mansharamani violated my Fourth Amendment rights while I stood near the bottom of a staircase by issuing illegal orders for me to move away from where I stood in a direction that would be away from where Mr. de Blasio conducted his illegal publicity stunt in it. Estoppel barred them from being able to issue those orders in the first place on account of the fact that they were illegally allowing that illegal publicity stunt by Mr. de Blasio to occur there.

**4th Claim for Relief:** Assault

**(Against Defendants Redmond, NYPD 7/25/17 John Doe3)**

1.      As I stated in the Legal Standards section in this complaint, *Wright v. Musanti*, No. 14-cv-8876 (KBF) (S.D.N.Y. Jan. 20, 2017) confirms that "assault" is defined in the following way under New York law:

> "Under New York law, "`[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'" Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)); Farash v. Cont'l Airlines, Inc., 337 F. App'x 7, 9-10 (2d Cir. 2009) (same). "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'"

2.      As I discussed in this complaint, Defendants Redmond and NYPD 7/25/17 John Doe3 illegally assaulted me on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity stunt on that date. They assaulted me then by having illegally made physical contact with my body that I immediately regarded as offensive. Both of them illegally assaulted me by grabbing me in that subway station then. Mr. Redmond also assaulted me by dragging me as he illegally seized me then.

**5th Claim for Relief:** False Arrest

 **(Against Defendants City of New York, Redmond, NYPD 7/25/17 John Doe3, Taylor, Fowler, Mansharamani)**

1.      For the reasons that I have discussed in this complaint, the defendants are liable for having illegally subjected me to a false unofficial arrest on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity after 5:15 pm in relation to that illegal publicity stunt. Also, illegal acts and omissions that were committed against me inside of that subway station that blocked the forward progress of my movements to prevent me from reaching public areas in it constituted a false arrest. Findings that I discussed in the "Legal Standards"

section in this complaint that are from **a)** _Re v. the State of New York_, Ct Cl, Dec. 9, 2010, Marin, A., claim No. 11517, UID No. 2010-016-069, **b)** _People v. Alba_, and **c)** _Dotson v. Farrugia_ sufficiently confirm this point.

**6th Claim for Relief:** Excessive Force

 **(Against Defendants Redmond, NYPD 7/25/17 John Doe3)**

1.      For the reasons that I have discussed in this complaint, the defendants are liable for having illegally used excessive force against me on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity after 5:15 pm in relation to that illegal publicity stunt. The reason for this is that Defendants Redmond and NYPD 7/25/17 John Doe3 had no legal grounds whatsoever to have made any physical contact with me intentionally while I was in that subway station. However, they illegally and willfully did so.

**7th Claim for Relief:** Violations of the Fifth Amendment

 **(Against Defendants City of New York, de Blasio, Redmond, Fowler, Taylor, Mansharamani, NYPD 7/25/17 John Doe3)**

1.      The defendants that this claim concerns illegally deprived me of my liberty and property interests on 7/25/17 after 5:15 pm in the subway station in which Mr. de Blasio conducted his illegal publicity stunt as I have discussed in this complaint. I clearly had liberty and property rights that were applicable to being able to freely and continuously access all public areas inside of that train station on 7/25/17 and board any subway train that I wanted to by using my MTA Metrocard. The defendants that this claim concern clearly and flagrantly violated those rights.

**8th Claim for Relief:**  Violations of the Fourteenth Amendment

**(Against Defendants City of New York, de Blasio, Redmond, Fowler, Taylor, Mansharamani, NYPD 7/25/17 John Doe3)**

1.      The defendants that this claim concerns illegally deprived me of my rights pursuant to the

Fourteenth Amendment due process, liberty, and equal protection provisions as well as its terms that prohibit selective-enforcement and discrimination on 7/25/17 after 5:15 pm in the subway station in which Mr. de Blasio conducted his illegal publicity stunt as I have discussed in this complaint.

2.      My selective-enforcement claims are based on the class-of-one legal theory that corresponds to an illegitimate animus toward me by the defendants. Mr. Taylor made remarks to the CCRB during his interview by it on 8/29/17 about my claims in this case as he told the CCRB personnel then that members of Mr. de Blasio's NYPD security detail regarded me as an agitator. Such remarks by him then sufficiently establish that it's objectively reasonable to infer that the reason why members of the NYPD singled me out on 7/25/17 to be quiet during Mr. de Blasio's illegal publicity stunt and caused me to be ejected from that train station was due to an invidious discriminatory animus by members of the NYPD and staff members who worked for Mr. de Blasio towards me. Other members of the public who criticized Mr. de Blasio then and on other dates in that subway station and in other public places weren't treated in the manner that I was by being seized and ejected from that train station and wherever else that they criticized Mr. de Blasio in public places.

3.      While violating my Fourteenth Amendment rights on 7/25/17 in that subway station during that period, those who did so engaged in standardless discretion against me. For that reason, findings in *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan. Feb. 17, 2017) that I cited in the Legal Standards section confirm that I don't need to establish a discriminatory intent that applied to the customs, policies, practices, and acts that were committed against me on 7/25/17 in that subway station.

**9th Claim for Relief:** Harassment, Selective-Enforcement, Discrimination, and Abuse of Process in Violation of the Fourteenth Amendment Due Process and Equal Protection Provisions

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      The defendants that this claim concerns pertaining to my claims in this case that are about my presence in the City Hall subway station on 7/25/17 during Mr. de Blasio's illegal publicity stunt in it and shortly beforehand are liable for this claim due to what I discussed earlier in this complaint.

**10th Claim for Relief:** Failure to Train and Supervise

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      The City of New York, the Mayor, Mr. O'Neill have and otherwise had a duty to have the members of the NYPD properly trained and supervised to comply with all applicable laws and regulations consistently. However, that training and supervision hasn't existed or otherwise hasn't been complied with and my constitutional rights were violated on 7/25/17 in the subway station that I have been discussing in this complaint partly and proximately because of that.

2.      The City of New York, the Mayor, and Mr. Carrion have had a duty to have the members of the Mayor's staff that include Mr. de Blasio and Mr. Carrion properly trained and supervised to comply with all applicable laws and regulations consistently. However, that training and supervision hasn't existed or otherwise hasn't been complied with and my constitutional rights were violated on 7/25/17 in the subway station that I have been discussing in this complaint partly and proximately because of that.

3.      Defendants City of New York and Darche had a duty to have the members of the CCRB properly trained and supervised to **a)** comply with all applicable laws and regulations, **b)** conduct

investigations properly, and **c)** gather all relevant evidence for CCRB investigations. However, that training and supervision hasn't existed or otherwise hasn't been complied with and my constitutional rights to petition for redress, be accorded proper due process, and receive valuable information partly in relation to CCRB investigations were violated as a result.

**11th Claim for Relief:** Failure to Intervene

**(Against the City of New York, Defendants de Blasio, O'Neill, Redmond, Fowler, Taylor, Mansharamani, NYPD 7/25/17 John Doe3, Lemorin, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Briscoe, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Sendroff)**

1.      The defendants that this claim concerns are liable for it as it relates to my claims in this case that concern 7/25/17 and the illegal publicity stunt that Mr. de Blasio conducted inside of the City Hall subway station due to information that I discussed earlier in this complaint.

2.      Defendants de Blasio and O'Neill are also liable for this claim due to their failure to intervene on my behalf against members of the NYPD in response to conversations that I had with them prior to 7/25/17 about illegal acts and omissions that were committed against me partly by Defendant Redmond.

3.      Defendant City of New York is also liable for this claim due to its failure to intervene on my behalf against members of the NYPD in response to complaints that I reported to the CCRB, IAB, and DOI partly against Mr. Redmond prior to 7/25/17 and as early as 4/27/17.

4.      Mr. de Blasio had a duty to intervene then on my behalf partly because he has stated that he is ultimately responsible for policing.

5.      As a reminder, what is shown next is a description of legal duties that all members of the NYPD have that is from NYC Charter §435. The members of the NYPD who were inside of the City Hall subway station during Mr. de Blasio's illegal publicity stunt in it and shortly beforehand illegally didn't perform these duties in regards to those who were assembled inside of

the sectioned off area in which Mr. de Blasio conducted his illegal publicity stunt and other City

of New York personnel who otherwise illegally blocked access to that area during that publicity

stunt and shortly before it began.

> **NYC Charter §435(a)**:
>
> "**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages** and assemblages **which obstruct the free passage of public** streets, sidewalks, parks and **places; protect the rights of persons and property**, guard the public health, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,\* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes to **arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**."
>
> (boldface formatting added for emphasis)

6.      The NYPD defendants that this claim concerns had the ability to and did, in fact, observe

the nature of my interactions with other members of the NYPD in that subway station on 7/25/17

as they violated my constitutional rights in it. However, they illegally didn't try to intervene on

my behalf then.

7.      As employees of the City of New York on 7/25/17 while they were in the subway station

after 5:15 pm in which Mr. de Blasio conducted his illegal publicity stunt in it, Defendants

Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, and Sendroff had a legal, ethical, and/or inherent

duty partly pursuant to New York City Charter §1116 and the oath of office that they made upon

becoming employees of the City of New York in which they pledged to perform their jobs to the

best of their abilities and in accordance with the U.S. Constitution to have tried to intervene on

my behalf while my rights were being violated by members of the NYPD in that subway station while they were in it and they were aware of the actions that were being committed against me by members of the NYPD. However, none of them did so. Defendants Carrion, Dann-Allel, Jim Doe 7/25/17, and Sendroff were recorded on video on 7/25/17 in that subway station while they were in close proximity to me and members of the NYPD who were violating my rights in their immediate presence. Austin Finan was recorded on video as he appeared to be urging Marco Carrion to arrange for my rights to be violated or continue to be violated in that subway station while I stood on a subway platform near Mr. Fowler. As an attorney, Mr. Sendroff had special obligations that applied to him due to a code of conduct that apply to attorneys to have intervened on my behalf to uphold my rights in that subway station instead of allowing barricades to be setup that violated the constitutional rights of the public in that subway station.

8.      Due to the information that I provided to Mr. de Blasio on 7/16/17 and 7/18/17 against Defendant Redmond and other members of the NYPD concerning illegal acts and omissions that they committed against me at public forums that he conducted on 4/27/17 and 5/23/17, Mr. de Blasio had a clear duty to have appropriate corrective action taken immediately that would prevent similar crimes and other abuses from being committed against me by members of the NYPD in public areas where he was present. He certainly didn't do so. When Mr. Redmond illegally seized me on 7/25/17 on the subway platform for the uptown trains in that subway station, he did so within the Mayor's line of sight and Mr. de Blasio illegally didn't direct Mr. Redmond to stop violating my rights. As Mr. Fowler illegally stood in front of me on that platform, Mr. de Blasio could clearly see that and he illegally didn't order Mr. Fowler to move away from me.

9.      Due to the information that I provided to the Defendant O'Neill on 6/26/17 while he was

the NYPD's Commissioner against Mr. Redmond and other members of the NYPD who violated

my rights at public forums, Mr. O'Neill had a clear duty to have appropriate corrective action

taken immediately that would prevent similar crimes and other abuses from being committed

against me by members of the NYPD in public areas. He certainly didn't do so and my

constitutional rights were violated on 7/25/17 in the subway station in which Mr. de Blasio

conducted his illegal publicity stunt partly as a result of Mr. O'Neill's inexcusable complacency

in that regard.

**12th Claim for Relief:** Municipal Liability

**(Against Defendant City of New York)**

1.      Defendant City of New York is liable for this claim because unofficial illegal policies,

customs, and practices that had the force of law on 7/25/17 inside of the subway station in which

Mr. de Blasio conducted his illegal publicity event on 7/25/17 were established and maintained

partly by Mr. Redmond and Mr. de Blasio against the public and I on 7/25/17 as Mr. de Blasio

illegally conducted that illegal publicity stunt, shortly before it began, and shortly after it ended

as members of the NYPD illegally delayed a downtown bound subway train that Mr. de Blasio

boarded with Defendant Redmond after members of the NYPD illegally delayed that train from

leaving the City Hall subway station.

**13th Claim for Relief:** Violation of the Hatch Act (5 U.S.C. §1502(a)(1))

**(Against Defendant City of New York)**

1.      By having deprived the public of access to the Mayor's 7/18/17 resource fair video, the

City of New York's personnel illegally used their official authority or influence for the purpose

of interfering with and affecting the results of the 2017 New York City government elections for

the benefit of Mr. de Blasio and themselves with respect to their interest in having job security

by silencing whistleblowing and criticism of the Mayor's administration that I discussed as I talked with Mr. de Blasio on 7/18/17 to prevent it from reaching many others prior to the 2017 New York City government elections.

**14th Claim for Relief:** Unjust Enrichment

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      I incorporate by reference the information set forth in all of the preceding paragraphs in this complaint as though fully set forth herein.

2.      In spite of their illegal acts and omissions against me on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity stunt, the following defendants that this claim concerns were unjustly enriched as a result of the jobs they then held as personnel of the City of New York that corresponded to their presence in that subway station while I was in it in relation to the Mayor's illegal publicity stunt in it:

> Defendants City of New York, de Blasio, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe

3.      In spite of their illegal acts and omissions against me concerning the shoddy investigation that the CCRB conducted in response to my complaints to it that concern my 7/25/17 claims in this case, the Defendants Lê and Darche were unjustly enriched as a result of the jobs they then held as personnel of the City of New York.

4.      In spite of their illegal omissions against me concerning the complaints that I reported to them against members of the NYPD that included Defendant Redmond prior to 7/25/17, Defendants de Blasio and O'Neill were unjustly enriched as a result of the jobs they then held as personnel of the City of New York.

**15th Claim for Relief:** Conspiracy to Violate Civil Rights

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      The defendants that this claim concerns are liable for it due to the information that I discussed earlier in this complaint. They performed different functions in furtherance of that conspiracy to violate my rights. The following applies to the defendants that this claim applies to:

a.      Roles that Defendants Redmond, Taylor, Mansharaman, and NYPD 7/25/17 John Doe3 performed on 7/25/17 inside of the City Hall subway station intentionally and otherwise as agents, proxies, and tools of others were in furtherance of that conspiracy were to harass me, try to intimidate me, and coerce me to move from where I lawfully stood and expressed myself inside of the City Hall subway station on 7/25/17 to pretextually marginalize, minimize, and illegally interfere with my ability and First Amendment and Fourteenth Amendment right to express myself and be heard by members of the public through the area in which Mr. de Blasio conducted his illegal publicity stunt on 7/25/17 inside of the City Hall subway station while I was hoping that my expression then would possibly and spontaneously trigger an unrestrained chorus and cacophony by other members of the public inside of that train station of lawful criticism and whistleblowing against Mr. de Blasio, his administration, its business partners, the NYPD, and trashy censors in journalism to function like a wildfire that would spread by word-of-mouth advertising and video recording on the Internet that could be spread through social media to ultimately cause a sufficient number of people to vote in the 2017 New York City government elections to cause Mr. de Blasio and his administration to be fired, censors in

journalism and their employers to be boycotted and fired, the contracts that the City of New York has with certain companies to be terminated. In short, I sought for a snowball and domino effect to occur then.

b.       Roles that Defendants de Blasio and O'Neill performed on 7/25/17 inside of the City Hall subway station and otherwise prior to it outside of that train station on an ongoing basis were in furtherance of that conspiracy by deliberate indifference and inaction in response to my complaints against members of the NYPD that included Mr. Redmond as they tacitly approved and ratified such illegal acts that allowed such members of the NYPD to continue to freely violate my constitutional rights and other laws on and after 7/25/17 that helped Mr. de Blasio and Mr. O'Neill keep their jobs after the 2017 New York City government elections through illegal acts that were committed against me directly and the general public by extension that amounted to voter suppression, whistleblower retaliation, viewpoint discrimination, and First Amendment retaliation.

c.       Roles that Defendants Lemorin, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, and Briscoe performed on 7/25/17 inside of the City Hall subway station intentionally and otherwise as agents, proxies, and tools of others were in furtherance of that conspiracy were to harass me by failing to intervene on my behalf to immediate break up and disperse Mr. de Blasio's illegal publicity stunt; arrest Defendants Redmond, Taylor, Fowler, Mansharaman, and NYPD 7/25/17 John Doe3 in response to their illegal acts against me to pretextually support the illegal acts and omissions by other members of the NYPD and other City of New York then that were continuing to illegally marginalize, minimize, and illegally interfere with my ability and First Amendment and Fourteenth Amendment right to express myself and be heard by other members of the public through the area in which Mr. de Blasio conducted his

illegal publicity stunt on 7/25/17 inside of that train station for the purposes that I sought to
achieve.

d.      Roles that Defendants Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, and Sendroff
performed on 7/25/17 inside of the City Hall subway station intentionally and otherwise as
agents, proxies, and tools of others were in furtherance of that conspiracy were to make it
superficially appear to others like a Halloween mask that they were willing to assist me and/or
cause me to be assisted for whatever issues that I then had and was seeking to draw attention to
in order to have Mr. de Blasio and his administration fired through the 2017 New York City
government elections. However, Mr. Carrion and Mr. Redmond had already demonstrated in
April of 2017 in e-mails that he sent that are subject to a confidentiality and protective order that
he wasn't sincere about being willing to cause me to be assisted for various issues. The e-mail
messages to which I'm referring are e-mail messages that I received on 2/1/21 in *Komatsu v. City
of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.). U.S. Magistrate Judge Gabriel
Gorenstein issued that pretextual confidentiality and protective orders on 1/15/21 that apply to
those e-mail messages. He did so **a)** after he previously worked as HRA's General Counsel and
**b)** while I continued to have litigation against HRA that was related to those e-mails that I
received from the Law Department on 2/1/21. Defendants Finan, Dann-Allel, Jim Doe 7/25/17,
and Sendroff acted as tools, proxies, and agents for principals who were involved in that
conspiracy against me.

e.      Roles that Defendants Lê and Darche performed in relation to my claims in this
case that are about 7/25/17 inside of the City Hall subway station were as agents, proxies, and
tools of others in furtherance of that conspiracy to continue to conduct what were sham
investigations in response to the complaints that I reported to the CCRB against members of the

NYPD that allowed such illegal acts and omissions against me by members of the NYPD and other City of New York personnel to persist as continuing violations instead of risking **a)** blocking the path that led Ms. Lê to become an attorney for Mr. de Blasio and **b)** Mr. Darche being replaced as the Executive Director of the CCRB.

**16th Claim for Relief:** Negligence

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      The defendants that this claim concerns are liable for it for the reasons that I discussed earlier in this complaint.

**17th Claim for Relief:** Violation of New York State General Business Law 349

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Mansharaman, NYPD 7/25/17 John Doe3, Lê, Darche)**

1.      Defendant City of New York is a corporation. As such, it's subject to New York State General Business ("GBS") Law §349 that includes the following terms:

> "Deceptive acts and practices unlawful. (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

2.      New York GBS §349(h) allows individuals to pursue a civil action for violations of New York GBS §349 that they experience.

3.      The defendants that this claim concerns are liable for it for the reasons that I discussed earlier in this complaint.

**18th Claim for Relief:** Intentional and Negligent Infliction of Emotional Distress

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John**

Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)

1.   The defendants that this claim concerns are liable for it for the reasons that I discussed earlier in this complaint.

2.   The defendants that this claim concerns are liable for having illegally subjected me to intentional and negligent infliction of emotional distress that I experienced mainly in the form of rage, humiliation, and stress that I outwardly exhibited and otherwise felt as a direct result of their illegal acts and omissions against me on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity after 5:15 pm in relation to that illegal publicity stunt.

3.   Those defendants' illegal acts and omissions against me then were extreme and outrageous conduct that were committed with an intent to cause me and/or with a reckless indifference as to the substantial probability of causing me severe emotional distress. A clear connection exists between the illegal acts and omissions that they committed against me in that subway station and the rage, humiliation, and stress that I experienced from it.

4.   Defendants Redmond, NYPD 7/25/17 John Doe3, and Fowler illegally, arbitrarily, and capriciously singled me out in that subway station on that date in relation to that illegal publicity stunt as they illegally subjected me to intentional and negligent infliction of emotional distress by illegally arresting me unofficially, blocking my ability to freely move directly next to a vertical metal partition to more effectively and lawfully exercise my constitutional rights as I stood on a subway platform near Mr. de Blasio, seizing me, and dragging me mostly in full view of members of the public, whistleblower news censors in journalism, other members of the NYPD, and members of the Mr. de Blasio's staff.

5.   Defendants Taylor, Redmond, Fowler, and Mansharaman illegally, arbitrarily, and capriciously discriminated against me in that subway station on 7/25/17 in relation to that illegal

publicity stunt as they illegally prevented me from standing next to the illegal publicity stunt that Mr. de Blasio conducted in that train station to block me from being able to engage in criticism and whistleblowing about matters of public and private concern to members of the public in that train station in support of the Voting Rights Act and other laws as Mr. Taylor and other members of the NYPD angered a lot by refusing to properly do their jobs then by illegally and selectively enforcing applicable laws while violating others for Mr. de Blasio's benefit. Defendant Taylor and Fowler also angered me enormously by illegally not intervening on my behalf when Mr. Redmond illegally seized and assaulted me in that train station on 7/25/17.

6.      Defendants City of New York, the Mayor, and Defendant O'Neill arbitrarily and capriciously subjected me to intentional and negligent infliction of emotional distress by illegally not taking appropriate corrective action immediately against Defendant Redmond and other members of the Mayor's NYPD security detail in response to my conversations with them about them on 6/26/17, 7/16/17, and 7/18/17 that could and should have otherwise prevented the illegal acts and omissions that were committed against me on 7/25/17 inside of the subway station in which Mr. de Blasio conducted his illegal publicity after 5:15 pm in relation to that illegal publicity stunt.

**19[h] Claim for Relief:** Conversion and Violation of the U.S. Constitution's Contracts Clause

 **(Against Defendants City of New York, Redmond, Fowler, Taylor, Mansharamani, NYPD 7/25/17 John Doe3)**

1.      For the reasons that I have discussed in this complaint, the defendants that this claim concerns illegally violated the Contracts Clause of the U.S. Constitution insofar as that concerned my ability to lawfully use my MTA Metrocard without unreasonable interference by them while I was in the subway station on 7/25/17 in which Mr. de Blasio conducted his illegal

publicity stunt. Those defendants impaired my ability to access public areas in that subway station in violation of my rights and privileges that I had partly by virtue of having a metrocard to use to access a subway platform in that station and wait for a train to ride that could and would have otherwise been the train that Mr. de Blasio boarded with Defendant Redmond at the end of his illegal publicity stunt in that subway station. Through their illegal acts and omissions against me on 7/25/17 while I was in that subway station, they illegally deprived me of my use of my metrocard and that constitutes conversion of my property.

**20th Claim for Relief:** Public and Private Nuisance

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      For the reasons that I have discussed in this complaint and are supported by findings in

_Cangemi v. US_, No. 12-cv-3989 (JS)(SIL) (E.D.N.Y. Mar. 31, 2017) that addresses what a private nuisance is, the defendants that this claim concerns committed both a private nuisance against me and a public nuisance against both others and I **a)** on 7/25/17 inside of the City Hall subway station, **b)** in relation to the CCRB's investigations about that, and **c)** by engaging in deliberate indifference and inaction in response to complaints that I reported to Mr. de Blasio and Mr. O'Neill as well as others against Mr. Redmond and other members of the NYPD prior to 7/25/17.

**21st Claim for Relief:** Violations of the Voting Rights Act

**(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1.      The defendants that this claim concerns are liable for it for the reasons that I have discussed in this complaint.

2.      The illegal acts and omissions that Defendants Redmond, Taylor, and Fowler committed against me on 7/25/17 inside of the subway station that my claims concern were partly motivated by intolerance that they had for whistleblowing and criticism that I was lawfully engaging in then against Mr. de Blasio, his New York City Mayor's administration, and that administration's business partners. Through such public whistleblowing and criticism then, I sought to communicate such information to voters, prospective voters, and others in that subway station in furtherance of an initiative that would hopefully lead to widespread word-of-mouth advertising about that and would, in turn, spur a sufficient number of voters to vote against Mr. de Blasio and his administration in the 2017 New York City government elections that would cause them to be belatedly fired. This is sufficient for a Voting Rights Act claim. I also have e-mail messages that Mr. Redmond, Mr. Carrion, and other City of New York personnel sent about me since April of 2017 that included on 6/28/17 that further supports this claim. Some of those e-mail messages are from discovery material that I received on 2/1/21 in *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.).

**22nd Claim for Relief:** Stalking

 **(Against Defendants Redmond, Fowler, Taylor, NYPD 7/25/17 John Doe3)**

1.      Defendants Redmond, Fowler, Taylor, and NYPD 7/25/17 John Doe3 are liable for stalking me on 7/25/17 inside of the City Hall subway station to and along the uptown subway platform in that subway station.

**23rd Claim for Relief:** Deliberate Indifference

 **(Against Defendants City of New York, de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Finan, Dann-Allel, Jim Doe 7/25/17, Mansharaman, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, Briscoe, Lê, Darche)**

1. The defendants that this claim concerns are liable for it for the reasons that I have discussed in this complaint.

2. The defendants against whom I have asserted this claim who were inside of the City Hall subway station on 7/25/17 during Mr. de Blasio's illegal publicity stunt in it are liable for this claim partly because they demonstrated deliberate indifference about whether it was permissible for that publicity stunt to be conducted their in the way that it was done so at the expense of my legal rights partly to freely walk through and stand within the exact area in which it was conducted during the period in which it was conducted.

3. The defendants against whom I have asserted this claim who were inside of the City Hall subway station on 7/25/17 during that illegal publicity stunt in it are also liable for this claim because they demonstrated deliberate indifference about the illegal acts and omissions that other City of New York personnel committed against me while I was inside of that train station during that publicity stunt and shortly before it began as defendants in this case illegally directed me to move from where I stood in that subway station, seized me, stalked me, and needlessly and discriminatorily blocked my line of sight (Mr. Fowler) while I was on the uptown subway platform.

4. The defendants against whom I have asserted this claim who were CCRB personnel are also for this claim because they demonstrated deliberate indifference about how the CCRB investigated matters pertaining to the complaints that I reported to the CCRB about my 7/25/17 claims in this case by conducting a shoddy investigation partly by not interviewing all relevant witnesses among the NYPD and not reviewing the MTA's rules in connection with that investigation.

5. Defendants de Blasio and O'Neill are liable for this claim because they demonstrated

deliberate indifference about complaints that I reported to them prior to 7/25/17 partly against Mr. Redmond and other members of the NYPD.

## **Demand for a Jury Trial**

I demand a trial by jury in this action for all of my causes of action.

## **Prayer for Relief**

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1.      Causing arrangements to be made by this Court's personnel to have good-faith and continuous efforts made on my behalf to try to have me appointed pro-bono legal representation for this case.

2.      Authorizing me to be promptly issued a free Pacer account largely to minimize the harm to my First and Fourteenth Amendment rights that is being caused by constant, illegal, and pretextual stalking and harassment of me inside of federal courthouses in New York City during the ongoing pandemic by federal court security officers ("CSOs") at the direction of the U.S. Marshals Service ("USMS") that is in furtherance of an ongoing and longstanding vendetta instead of a valid law-enforcement function that I have previously and repeatedly reported objections about to many federal judges to no avail.

3.      Ordering the USMS pursuant to 28 U.S.C. §566 and 28 U.S.C. §1651 to immediately cause CSOs to stop stalking me inside of federal courthouses when I visit them and conduct myself in a lawful manner partly because that illegally causes me to be illegally, unduly, and oppressively stigmatized in the eyes and minds of people who may be potential jurors, judges, clerks, witnesses in this case as well as attorneys and journalists; stressed; subjected to greater health risks partly due to potential Covid-19 transmission; distracted and delayed in carrying out

the purposes of my visits to such courthouses. My 209-page 11/30/21 submission in *Komatsu v.*

*USA*, No. 21-cv-1838 (RJD)(RLM)(S.D.N.Y.) contains sufficient grounds to be granted this

relief.

4.      Ordering the USMS pursuant to 28 U.S.C. §566 and 28 U.S.C. §1651 to immediately

stop having my face appear on tablet computer screens that it and CSOs use inside of federal

courthouses that I have repeatedly seen on them while those screens have been viewable to any

member of the public who have been near them.

5.      Ordering the USMS pursuant to 28 U.S.C. §566 and 28 U.S.C. §1651 to immediately

destroy all images of me that it has been causing to be displayed on tablet computer screens

inside of federal courthouses and instead show the faces of its personnel and CSOs on those

tablet computer screens continuously for the next 3 years in a public and prominent manner.

6.      Ordering the USMS pursuant to 28 U.S.C. §566 and 28 U.S.C. §1651 to immediately

obtain images of the faces of the defendants in this case and display them continuously, publicly,

and prominently on the tablet computer screens inside of federal courthouses on which my face

has been displayed as a result of arrangements that the USMS has made.

7.      Authorizing me to keep all electronics devices with me whenever I visit federal

courthouses in New York City throughout the entire time that I visit them after I complete the

security screening process to enter them.

8.      Authorizing me to record video recordings, take photographs, and recording audio

recordings with a cell phone of mine of interactions that I may have with CSOs and members of

the USMS inside of federal courthouses in New York City whenever they stalk me and otherwise

harass me inside of such courthouses to preserve evidence of that partly to report that to the

judges who will be assigned to this case to have immediate and decisive corrective action taken.

9.      Limiting this Court's communications with me that would otherwise occur through mailed corresponds to electronic communications instead.

10.     Declaring that no one may wear uniforms, other attire, and adornments that partly consist of NYPD shields, ribbons, and patches that are affiliated with the NYPD during court hearings that are conducted in this case.

11.     Declaring that when this Court conducts court hearings in this case, members of the press will not be able to sit anywhere in the courtrooms in which such hearings are conducted that members of the public cannot have an equal opportunity to sit in instead.

12.      Declaring that no member of the press will be able to bring electronic devices with them to court hearings that are conducted in this case.

13.     Requiring everyone who enters federal courthouses in New York City to undergo the exact same type of security screenings each and every time that they visit them and to use the exact same entrances that the general public must use to enforce full and continuous compliance with my Fourteenth Amendment and First Amendment rights that pertain to equal treatment instead of allowing for discrimination and selective-enforcement to occur that puts people on a pedestal and is indicative of prohibited bias and prejudice.

14.     Ordering the City of New York to provide me a copy of the entirety of the Mayor's 7/18/17 resource fair video within 24 hours unedited and to make a copy of that to be publicly and prominently available within 24 hours on the Internet continuously on the same web site the Mayor's Office used to share video recordings of town hall meetings that were conducted partly by Mr. de Blasio.

15.     Declaring that personnel of the City of New York committed acts of voter suppression, voter fraud, and whistleblower retaliation in flagrant violation of the following:

a.      The Voting Rights Act (52 U.S.C. §10307) that is discussed really well between pages 15 and 17 in the decision that was issued in *Drumwright v. Cole*, No. 20-cv-998 (CCE)(LPA)(M.D.N.C. June 2, 2021) and in *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20-cv-8668 (VM) (S.D.N.Y. Jan. 12, 2021), particularly between pages 11 and 15.

b.      Federal Hatch Act about matters of public concern that were protected speech by having illegally concealed the Mayor's 7/18/17 resource fair video from the public until after the 2017 New York City government elections were decided and then illegally concealed that video recording again after having temporarily made part of it available to me.

16.      Declaring that it is objectively reasonable to infer from the totality of the circumstances that personnel of the City of New York committed the acts of voter suppression, voter fraud, and whistleblower retaliation that were just discussed for Mr. de Blasio's benefit as well as their own while they were likely motivated to do so to protect their access to publicity, protect their job security, and pave a clear path for them and others to possible career advancement opportunities instead of having to compete for that through fair elections.

17.      Voiding the results of the 2017 New York City government elections on the grounds that acts of voter suppression, voter fraud, whistleblower retaliation, and whistleblower news censorship caused that election contest to have been impermissibly rigged in an illegal manner instead of having been fairly conducted that materially prejudiced the ability that voters and prospective voters had to make more informed decision in an independent manner about whether to vote, who to vote for, and whose political campaigns to financially support.

18.      Ordering the City of New York to have all video recordings that have been recorded of all public resource fair meetings that Mr. de Blasio has conducted to be uploaded to the YouTube web page that was used by Bill de Blasio while he was New York City's Mayor in his capacity

as New York City's Mayor within 24 hours and made available to the public in unedited form to befit the public's interest in government accountability and transparency as well as core First Amendment and Fourteenth Amendment values.

19.      Ordering the City of New York to inform me within one week of **a)** the identities of all of its personnel who have been involved in handing the FOIL demand that he submitted to the Mayor's office in order to be provided the Mayor's 7/18/17 resource fair video and **b)** the nature of the tasks that they performed in relation to that FOIL demand that must include information that identifies the person or people who disabled my access to that video recording on the Internet.

20.      Ordering the City of New York to inform me within one week of the names of the members of the press who attended the Mayor's 7/18/17 resource fair to facilitate my ability to lawfully communicate to others the names of people who wrongfully censor whistleblowers, dishonor military veterans, do not support fundamental civil rights, and facilitate voter suppression and voter fraud by their censorship.

21.      Ordering the City of New York to make certain that all members of the NYPD security detail for whoever is New York City's Mayor maintain a distance from me of at least 15 feet at all times while I am conducting myself in a lawful manner.

22.      Prohibiting the City of New York's personnel from conducting events in subway stations and on subway trains in locations and ways that violate the MTA's Rules of Conduct and my legal rights.

23.      Declaring that the video recordings, Twitter postings, and e-mail messages that I have shared with this Court in support of my claims in this complaint sufficiently establish that journalists in New York City certainly are not a surrogate for the public in gathering and

disseminating information about very newsworthy matters and are instead censors in journalists' clothing.

24.     Declaring that the following people who worked in journalism on 7/25/17 and attended Mr. de Blasio's 7/25/17 publicity stunt inside of the City Hall subway station demonstrated by their acts and omissions in regards to me that they **a)** are not a surrogate for the public in gathering and reporting news and **b)** cannot be relied upon by whistleblowers to investigate and report news shared by whistleblowers in response to them having not chosen not to report anything about the fact that Defendant Redmond illegally seized me in their immediate presence and then illegally coerced me to leave the subway station that I was then lawfully in:

> Gloria Pazmino, Michael Gartland, Ben Max, Mara Gay, Jillian Jorgensen, Courtney Gross, J. David Goodman, Erin Durkin, Harry Goldman, Shant Shahrigian, Marc Santia, Audrey Wachs, Madina Toure

25.     Declaring that the following news organizations for which the preceding people worked on 7/25/17 demonstrated by their acts and omissions in regards to me that they **a)** are not a surrogate for the public in gathering and reporting news and **b)** cannot be relied upon by whistleblowers to investigate and report news shared by whistleblowers:

> Spectrum News/ NY1, Politico New York, Observer, New York Post, New York Times, Gotham Gazette, Wall Street Journal, Bloomberg News, New York Daily News, NBC News, ABC News

26.     Declaring that this Court will equitably reciprocate in support of First Amendment values and whistleblowers by refusing to grant any preferential treatment to those who worked in journalism on 7/25/17 and who their employers then were with respect to those who attended Mr. de Blasio's 7/25/17 publicity stunt inside of the City Hall subway station by:

> i.      Denying access to those people and their employers' other personnel to

areas in this Court's courtrooms that ordinary members of the public can't equally access.

      ii.      Making those people and their employers' other personnel wait until after all ordinary members of the public enter this Court's courtrooms before they can enter it.

      iii.      Prohibiting those people and their employers' other personnel from having electronic devices inside of this Court's courtrooms.

27.      Declaring pursuant to New York State Public Officer Law §30(1)(f) and §30(1)(g) that **a)** all of the defendants in this case who are people demonstrated that they were incompetent as a result of their acts and omissions that my claims in this case are about in performing duties that they had with respect to the jobs that they held as public officers and City of New York personnel and **b)** the elections and/or appointments that occurred that caused those defendants to be public officers and personnel of the City of New York for those jobs are void and that they have forfeited those jobs as personnel of the City of New York.

28.      Declaring that defendants Redmond and Taylor violated NYC Charter §1116(b) as a result of their acts and omissions in their capacities as personnel of the City of New York that my claims in this case are about by having knowingly made a deceptive and false reports and statements about me in the course of their duties as members of the NYPD.

29.      Declaring that **a)** all of the defendants in this case who are people violated NYC Charter §1116 as a result of their acts and omissions in their capacities as personnel of the City of New York that my claims in this case are about in performing duties that they had as personnel of the City of New York, **b)** those defendants are guilty of a misdemeanor in response to that and have forfeited their offices and employment as personnel of the City of New York, and **c)** the City of New York is permanently restrained from allowing those defendants to be employed by it and otherwise hold any office under the City of New York.

30.      Declaring that all of the defendants in this case who are people violated the constitutional

oath of office that they were required to take upon working for the City of New York as a result of their acts and omissions in their capacities as personnel of the City of New York that my claims in this case are about.

31. Declaring that all of the defendants in this case who are people are barred from being employed by the State of New York and federal government partly to prevent them from being able to commit illegal acts and omissions as government personnel that may impact me.

32. Declaring that it's patently stupid and disruptive to people who use the subway system in New York City for government personnel to conduct publicity stunts and press events inside of subway stations and subway trains while the general public are present because that illegally interferes with the ability and rights that the public have to use that subway system.

33. Declaring that government personnel are prohibited from conducting publicity stunts and press events inside of subway stations and subway trains in New York City while the general public is present in them.

34. Declaring that the NYPD and those who operate subway trains in New York City and otherwise manage their operations are prohibited from causing subway trains in New York City to be delayed in being able to enter and depart from subway stations in New York City to accommodate government personnel who may wish to board those trains in instances when no objectively valid rationale that pertains to security, safety, and health matters exists to warrant that.

35. Declaring that the MTA's rules that pertain to activities that may and may not occur inside of subway stations and subway trains are to be strictly and continuously enforced.

36. Ordering the City of New York to publicly and prominently display information inside of all subway stations and subway trains in New York City that clearly informs the public how **a)**

video recordings from the video security cameras inside of those subway stations and **b)** detailed log records that correspond to Metrocard use that report the dates, times, and locations at which metrocards have been used may be obtained and the timetable in which such information will be made available upon request.

37.    Granting me a permanent restraining order against the NYPD that will restrain its personnel from attempting to violate my constitutional and other legal rights in any way through the acts and omissions of its personnel.

38.    Restraining the NYPD from interfering with attempts by members of the public to lawfully board subway trains in New York City that are in service.

39.    Restraining the NYPD from initiating physical contact with members of the public without their consent inside of subway stations and subway trains in New York City while such members of the public are conducting themselves in a lawful manner.

40.    Restraining the NYPD from directing members of the public to move elsewhere inside of subway stations and subway trains in New York City while such members of the public have a First and Fourteenth Amendment right to remain exactly where they then are within them.

41.    Ordering the City of New York to immediately, publicly, prominently, and widely make available all information that has been in its possession that **a)** is about the actual rationale for why a downtown subway train was delayed on 7/25/17 from being able to depart from the City Hall subway station after 5:30 pm that Defendants de Blasio and Redmond took to reach Brooklyn, **b)** identifies everyone who has involved in decision that was made to delay that train for that purpose, and **c)** identifies the functions that they performed in causing that to occur.

42.    Ordering the City of New York to immediately, publicly, prominently, and widely make available all information that has been in its possession that is about the decision and

arrangements that were made on 7/25/17 to conduct the publicity stunt by Mr. de Blasio inside of the City Hall subway station in a location and manner that violated the MTA's rules and my constitutional rights that my claims in this case are about.

43.    Prohibiting large cameras from being carried in subway trains in ways that cause a nuisance to passengers in them by obstructing their ability and right to freely view information that is available in such trains about their destinations and advertisements.

44.    Restraining the New York City Transit Adjudication Bureau from conducting any hearing about anything that has occurred inside of a subway station and subway train in New York City in instances in which members of the public who would be directed to participate in such hearings have submitted requests to be provided relevant evidence that is in the possession of the NYPD, MTA, and/or New York City Transit Authority that has not been fully provided to such members of the public for review.

45.    Restraining the New York City Transit Adjudication Bureau from conducting any hearing about anything that has occurred inside of a subway station and subway train in New York City until 3 weeks have passed after members of the public have received such evidence to enable them to properly prepare for such hearings.

46.    Ordering the New York City Transit Adjudication Bureau to make all decisions that it has issued within the last 10 years and continues to issue in response to hearings that it conducts to be publicly available on the Internet within 1 week and searchable by name, violation number, date, and subject matter.

47.    Ordering the New York City Transit Adjudication Bureau to void all violations that have been issued that would otherwise cause it to conduct hearings in the event that the NYPD, MTA, and/or New York City Transit Authority do not fully comply with demands for relevant

discovery material within 3 weeks after they are issued by people who receive summonses inside of subway stations and subway stations in New York City for such hearings to occur.

48.     Declaring that those who work in journalism are not essential workers and are not surrogates for the public in gathering and communicating information largely because of how they inappropriately censor newsworthy information.

49.     Ordering the City of New York to provide me all records that partly include all audio recordings that its personnel recorded of interviews that it conducted of NYPD personnel in response to complaints that I reported to the CCRB in unedited and unredacted form within 48 hours that have been in the possession of the CCRB and its personnel in relation to complaints that I have reported to the CCRB against members of the NYPD.

50.     Declaring that the CCRB demonstrated reprehensible incompetence in regards to my claims in this case partly by not interviewing all of the members of the NYD who were involved in committing illegal acts and omissions against me on 7/25/17 inside of the City Hall subway station.

51.     Ordering the City of New York to provide me all reports within 48 hours in electronic form that its personnel issued that related to my claims in this case that include an ejection report that Defendant Redmond specifically mentioned while he was interviewed on 8/18/17 by the CCRB in response to a complaint that I reported partly against him.

52.     Ordering the City of New York to provide me all video recordings that were recorded on 7/25/17 by video security cameras that it controls, cell phones that people who then worked for it used, and other cameras that its personnel, contractors, and agents used **a)** after 5 pm and inside of the City Hall subway station that are related to my claims in this case, **b)** prior to 5:35 pm and outside of the City Hall subway station of interactions that I had with Defendant Redmond, and

c) prior to 5:35 pm of people who brought signs and other objects and equipment into the City

Hall subway station for use in connection with the illegal publicity stunt that Mr. de Blasio

conduced inside of that subway station on 7/25/17.

53.     Ordering the City of New York to provide me copies of all communications within 1

week in unedited and unredacted form and with no protective order nor confidentiality order in

place for that material that people who were among its personnel between 7/25/17 and 12/31/17

engaged in about me between April of 2017 and December 31, 2017 that relate to my claims in

this case.

54.     Declaring that the CCRB wasn't permitted to provide me audio recordings of interviews

that it conducted of NYPD personnel in response to complaints that I reported to the CCRB

against members of the NYPD until after New York State Civil Rights Law §50(a) was repealed

and the Second Circuit thereafter upheld that repeal on 2/16/21 through the decision that it issued

in *Uniformed Fire Officers Association v. De Blasio*, No. 20-2789-cv (L) (2d Cir. Feb. 16, 2021).

55.     Ordering the CCRB to immediately and continuously do the following in response to

complaints that are reported to it against members of the NYPD:

        a.      Make certain to immediately collect and preserve all relevant video recording,

audio recording, and photographic evidence that includes audio and video recordings from video

security cameras, cell phones, and news cameras as well as photographs that were taken by cell

phones and news cameras.

        b.      Make certain to immediately collect and preserve all relevant communications

that members of the NYPD who the complaints are against engaged in. This partly includes all e-

mail messages, cell phone text messages, encrypted communications, radio communications,

telephone call logs, unusual occurrence reports, stop reports, and memo book records that

members of the NYPD engaged in and otherwise have maintained that are related to the

complaints that were reported against them to the CCRB.

      c.     Make certain to immediately and diligently review all relevant rules, policies,

regulations, and laws that apply to the locations about which members of the public reported

complaints against the NYPD to the CCRB.

      d.     Make certain to immediately collect relevant Global Positioning System ("GPS")

data from devices that members of the NYPD are equipped with that include cell phones and

NYPD body-cameras as well as vehicles that members of the NYPD used and were otherwise in

that is relevant for the complaints that members of the public reported to the CCRB against the

NYPD.

      e.     Interview all members of the NYPD who have direct knowledge of the facts and

circumstances that apply to the complaints that are reported by the public against members of the

NYPD to the CCRB and record all of those interviews on audio.

      f.     Visit the locations about which members of the public reported complaints against

members of the NYPD to the CCRB to gain an understanding of relevant facts.

      g.     Promptly refer instances in which members of the NYPD lie and mislead during

interviews that the CCRB conducts to prosecutors to have criminal prosecutions commenced

against them for perjury and obstruction of justice.

56.     Declaring that the following current and former personnel of the City of New York

violated New York City Charter §1116 as a result of the acts and omissions that they committed

against me as discussed in this complaint:

      Defendants de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Mansharamani,
      Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, Sendroff

57.     Declaring that all personnel who are employees of the City of New York have a legal

duty to try to intervene in a decisive and immediate manner in situations in which the constitutional rights of others are being violated in their presence.

58.    Declaring that Defendant Redmond clearly demonstrated by his behavior on 7/25/17 and 2/19/20 that was recorded on video that he does not support the First Amendment legal right that people have to protest and demonstrate in a lawful manner.

59.    Declaring that I clearly established partly by my discussion of matters pertaining to *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that Defendant Redmond has a major credibility problem that is relevant in this case about interactions that he has with members of the public in public forums.

60.    Declaring that the City of New York is ordered to cause all of the video recordings to be provided to me in unedited and non-redacted form as ".mp4", ".mov", or ".avi" computer files within 5 days for which the following facts apply:

    a.    They were recorded by video security cameras controlled by the New York City Transit Authority inside of the City Hall subway station that is located below Broadway by Warren Street on 7/25/17.

    b.    They were recorded between 4:45 pm and the time that a subway train that Mr. de Blasio boarded with Defendant Redmond fully exited that subway station while they were on it.

    c.    They recorded me and everyone who interacted with me throughout the entire time that he was in that subway station during that period.

    d.    They recorded Mr. de Blasio, people who were then members of his NYPD security detail, members of his staff, people who then worked in journalism, other members of the NYPD, and members of the public who were within 50 feet from where Mr. de Blasio was while he was in that subway station and on a subway train.

e.      They recorded Mr. de Blasio, people who were then members of his NYPD security detail, members of his staff, and people who then worked in journalism while they entered and exited that subway station.

61.    Ordering the City of New York to provide me all of the following additional discovery material within one week with no protective order nor confidentiality order in place for that:

a.      All e-mail messages as a searchable PDF file in unedited and non-redacted form that its current and former personnel sent and received about me since 2/1/16.

b.      All cell phone text messages as a searchable PDF file in unedited and non-redacted form that its current and former personnel sent and received about me since 2/1/16.

c.      All audio and video recordings as well as photographs in unedited and non-redacted form that its current and former personnel have had about me since 2/1/16.

d.      All other written and electronic information that its current and former personnel have had about me since 2/1/16 in unedited and non-redacted form.

e.      Ordering Defendant City of New York to give me a job immediately to enable me to become self-sufficient that will entail independently providing proper oversight of how the NYPD, CCRB, City Council, HRA, and HRA's business partners operate as well as the extent to which newsworthy matters about how the City of New York's government operated are not being reported in the press in return for compensation that equals or exceeds the highest paid employee of the City of New York.

f.      Declaring that the City of New York is prohibited from delaying subways from being able to move and have their doors close without a valid legal justification.

g.      Declaring that that this Court will promptly uphold my First Amendment right of access to the courts to seek redress partly by promptly reviewing the entirety of legal filings that

include order to show cause applications that I may submit in this case and are related to my claims in this case.

      h.      Declaring that that this Court will similarly and further uphold my First Amendment right of access to the courts to seek redress partly by issuing timely decisions and orders in response to my submissions in this case that are related to my claims in it.

      i.      Granting me authorization to promptly move for partial summary judgment for matters for which I have sufficient incontrovertible evidence in support of my claims for such partial summary judgment to not cause further discovery for those claims to be appropriate or necessary.

      j.      Granting me declaratory, injunctive, and equitable relief in accordance with findings expressed in *Capitol Records, Inc. v. Thomas-Rasset* that is discussed in this complaint's "Legal Standards" section by restraining Defendant City of New York's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

      k.      Restraining the City of New York from allowing its personnel to impede my ability to enter and exit subway stations while they are open by closing such entrances and exits with tape and other means without a valid legal justification. This refers to how members of the NYPD illegally closed exits to a subway station that I attempted to lawfully exit less than 2 months ago near City Hall by the Brooklyn Bridge while I was attempting to lawfully observe how a Black Lives Matter protest was being conducted and while I sought to do so mostly as an independent legal observer.

      l.      Restraining the City of New York from allowing its personnel to accost, harass, seize, and/or assault people who peacefully ride subways in New York City while they may

possibly have property that belongs to them on more than one seat on a subway train while other seats on that train are not occupied as such abuse against others that include travelers from airports and Christmas shoppers almost certainly would not occur on subways in New York City while they also have their possessions on more than one seat on a subway train. This request for injunctive relief largely refers to a news article that was written by a journalist named Sydney Pereira and is entitled "Cops Punch Homeless Man on Subway, Then Manhattan DA Charges Him with Assault" that was published on the Internet on 7/15/20 at

https://gothamist.com/news/cops-punch-homeless-man-subway-then-charge-him-assault by a news organization named Gothamist. That article includes a video recording that was recorded by a NYPD officer's body-camera that unequivocally confirms that a Black male NYPD officer criminally assaulted a man as he was peacefully sitting in a seat on a nearly empty subway train in New York City. That video shows that NYPD officer as he repeatedly punched that other person in the face without any legal justification whatsoever. Manhattan District Attorney Cyrus Vance, Jr. has proven to be the equivalent of garbage in my view because he chose to unconscionably file criminal charges against the man who was repeatedly punched in his face by the member of the NYPD that I just discussed simply because that NYPD gangster injured his hand while criminally assaulting that other man without any valid legal justification. This discussion of the Manhattan District Attorney's office is relevant partly because after I was criminally assaulted on a subway train on 2/27/19 in New York City and his assailant was arrested by the NYPD, the Manhattan District Attorney's office gave a plea deal to my assailant instead of properly prosecuting that person to cause that individual to be incarcerated as a result of the physical injuries that I sustained from that assault. A natural question that this raises is about why the member of the NYPD who punched that other person in the face repeatedly

wasn't on the same subway train where I was on 2/24/19 and 2/27/19 as I was criminally assaulted and injured by different people to punch my assailants repeatedly in the face to do his job properly by protecting me.

62.     Empaneling a jury to hear and decide this case strictly on its merits.

63.     Declaring that this Court will adopt practices that were employed by the judge assigned to the case of _USA v. Donziger_, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) in order to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this complaint concerns in response to criminal acts that they committed and/or condoned that were committed against me to remedy the fact that prosecutors have negligently refused to do so.

64.     Ordering that the following defendants are required to immediately and fully reimburse those who were their employers on and after 7/25/17 with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to my efforts to have attended Mr. de Blasio's 7/25/17 illegal publicity stunt inside of the City Hall subway station:

> Bill de Blasio, James O'Neill, Howard Redmond, NYPD Detective Christopher Fowler, NYPD Inspector Ritchie Taylor, Marco Carrion, Mansharamani, NYPD 7/25/17 John Doe3, Jesse Sendroff

65.     Ordering the City of New York to provide me the following within one week in unedited, non-redacted form, and electronic form:

a.      Copies of all records that have been in the possession of Defendant City of New York's personnel that pertain to the deliberations, planning, coordination, execution, and setup that took place in regards to the arrangements that were made to conduct Mr. de Blasio's 7/25/17 illegal publicity stunt inside of the City Hall subway station.

b.      Copies of all records that have been in the possession of Defendant City of New York's personnel that are related to the fact that a subway train that Mr. de Blasio boarded with Defendant Redmond on 7/25/17 at the end of Mr. de Blasio's 7/25/17 illegal publicity stunt inside of the City Hall subway station was illegally and deliberately delayed in that subway station after Mr. de Blasio boarded it while members of the public were on it.

c.      Copies of all records that have been in the possession of Defendant City of New York's personnel that are related to communications that the Mayor, members of his staff, and members of the NYPD had with people who worked in journalism in July of 2017 about me that concerned my presence near Mr. de Blasio's 7/25/17 illegal publicity stunt inside of the City Hall subway station as it was conducted and/or how I was illegally coerced to leave that area then.

66.   Granting me compensatory damages for all legal expenses that I pay for and otherwise incur that are related to my pursuit of this case

67.   Granting me an award of damages against Defendants de Blasio, O'Neill, Redmond, Fowler, Taylor, Carrion, Mansharamani, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant, NYPD 7/25/17 John Doe2, Sendroff, and Briscoe pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have:

a.      Lawfully attended Mr. de Blasio's 7/25/17 illegal publicity stunt inside of the City Hall subway station within the immediate area in which members of the press who attended it sat as it was conducted.

b.      Lawfully exercised my constitutional rights and those pursuant to the MTA's Rules of Conduct without interference by members of the NYPD to mercilessly criticize Mr. de Blasio and others and engage in whistleblowing at his expense and others while standing within 20 feet from him throughout the entire time that he was inside of the City Hall subway station

after 5:20 pm on 7/25/17 in which he conducted his illegal publicity stunt prior to boarding a

train with Defendant Redmond that I would have also otherwise boarded with them and

continued to lawfully and mercilessly criticize them.

68.    Granting me an award of damages against Defendants de Blasio, Redmond, Fowler,

Taylor, Mansharamani, Lemorin, NYPD 7/25/17 John Doe3, NYPD 7/25/17 Kelly Bryant,

NYPD 7/25/17 John Doe2, and Briscoe pursuant to New York State General Business Law §349

for deception in relation to my efforts to have attended Mr. de Blasio's 7/25/17 illegal publicity

stunt inside of the City Hall subway station throughout the entire time that it was conducted,

remarks that Mr. O'Neill made to me on 6/26/17 by telling me that he would need to talk with

Mr. Redmond about what I discussed with Mr. O'Neill then, and how some of those defendants

conducted themselves as criminal accomplices instead of the law-enforcement personnel that

they technically were throughout July of 2017.

69.    Granting me an award of punitive damages for all of my claims set forth in this complaint

to the greatest that is possible.

70.    Granting me further damages in response to violations of my constitutional rights, abuse

of process, nuisance, unjust enrichment, and other claims in this complaint as well as pain,

suffering, mental anguish, and humiliation that I experienced due to the illegal acts and

omissions by the defendants.

71.    Granting me an award of pre-judgment and post-judgment interest.

72.    Declaring that my medical records are strictly off-limits for discovery purposes in this

case because my claims in this case about emotional distress are mainly about being humiliated

by being illegally seized by Defendant Redmond on 7/25/17 inside of the City Hall subway

station and thereafter ejected from it in the presence of other members of the public that is

entirely unrelated to my medical records.

73.    Granting me such other, further, and different relief as the interests of justice and equity

may require.


Dated:         New York, New York
               January 17, 2022


                                              From,

                                              s_/Towaki Komatsu

                                              *Plaintiff, Pro Se*
                                              802 Fairmount Pl., Apt. 4B
                                              Bronx, NY 10460
                                              (347) 316-6180
                                              Towaki_Komatsu@yahoo.com